UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Case |
| | ) | |
| PVP KREWSTOWN, LLC, | ) | Case No. 23-16198-MAM |
| | ) | |
| Debtor. | ) | |
| | ) | |

**MOTION TO DISMISS BANKRUPTCY CASE UNDER 11 U.S.C. § 1112(b)**

COME NOW FI 135 Baltimore, LLC, FI 135 Battle Creek LLC, FI 135 Hines, LLC, FI 135 Philadelphia-Castor, LLC, FI 135 Philadelphia-Krewstown, LLC, FI 135 Troy, LLC, and FI 135 Waynesboro, LLC (collectively, the "FI 135 Parties"), and ICA Acquisition Baltimore, LLC, ICA Acquisition Battle Creek, LLC, ICA Acquisition Castor, LLC, ICA Acquisition Hines, LLC, ICA Acquisition Krewstown, LLC, ICA Acquisition Troy, LLC, and ICA Acquisition Waynesboro, LLC (collectively, the "ICA Acquisition Parties, and together with the FI 135 Parties, the "Movants" or the "FI 135/ICA Acquisition Parties"), by and through undersigned counsel, and file this Motion to Dismiss Bankruptcy Case under 11 U.S.C. § 1112(b) (the "Motion"). In support of this Motion, Movants state as follows:

**Introduction**

This case should be dismissed, with prejudice, on any and all of the following grounds:

- This case should be dismissed because the court lacks jurisdiction over the Debtor.

- This case should be dismissed because this case was filed in bad faith.

  o Debtor has no business operations and there is no valid reorganization purpose;

  o Debtor has never been, was not on the petition date, and is not now in financial distress; and

o This case is a paradigmatic two-party dispute.

- The Debtor has not filed a single substantive operational motion since this case was filed on August 4, 2023-119 days ago. Not one. This is extraordinary and demonstrates that there is no legitimate *bona fide* business for the Debtor to reorganize and no legitimate reorganization purpose for this chapter 11 case.[1]

As of this date, no plan has been filed. But the Debtor's Schedules and Statements have been filed, [ECF No. 28], and they are illuminating. The Schedules and Statements demonstrate that there are only 7 creditors with priority unsecured claims, of which 6 are listed as owed an unknown amount. The Debtor also lists a total of 25 general unsecured claims with 13 of those claims being listed as owed an unknown amount. Out of the 25 scheduled unsecured creditors, 8 are law firms related to the Debtor's litigation campaign against the FI 135/ICA Acquisition Parties, not one of which has ever been paid by the Debtor, 9 of which are insiders of the Debtor,

---

[1] In response to questioning by the representative of the Office of the United States Trustee at the 341 Meeting of Creditors held on September 8, 2023 ("Meeting of Creditors") regarding when the Debtor would be filing its plan of reorganization, Mr. Sabella testified as follows:

Q. Okay. So, what do you view the debtor needs to do as its next step in bankruptcy?
A. I think we need to file a plan so the Court 9   can see, you know, what's really here and how it works.

Transcript of Meeting of Creditors at 28:6-9.

When asked about the timing of the Debtor's filing of its plan, Mr. Sabella testified as follows:

Q. And when do you think the plan could be filed under that scenario?
A. I'm not a bankruptcy lawyer, although I have had some experience in recent times. I would expect some time in the next several weeks, maybe a month. I don't know, I'd have to confer with my counsel, but soon.
Q. Give yourself credit, you talk –
A. I mean, it's --
Q. Give yourself credit –
A. I'm sorry, go ahead.
Q. -- you talk better than most bankruptcy lawyers I know. So, you know, what would you say, you know, you think a month from now, six weeks?
A. I would think -- I think in less than a month we can get a plan –
Q. Okay.
A. -- that we can show others.
Q. Okay. Good.

*Id.* at 29:3-21.

2

and the remaining 8 creditors are the Movants.  [ECF No. 28, Schedule F]. Other than the proofs of claim of the Movants, and those of Rite Aid Corporation and Thrifty Payless, Inc., only 2 of the creditors listed in the Debtor's Schedules have filed Proofs of Claim.

As set forth below, the Debtor has never had a single employee and it has never had a bank account and it has never had any active business operations.  Ever.  This bankruptcy case was filed to frustrate the FI135/ICA Acquisition Parties in their efforts to recover property to which they are entitled in the face of the Debtor's assertion of claims against them that the Debtor has also asserted against other similarly situated parties in many lawsuits throughout the United States in which the Debtor has not prevailed.  Ever.

The Debtor—an entity borne of *ultra vires* and *void* mergers and other novel shell games concocted by an attorney and real estate speculator named Richard Sabella—commenced the above-captioned chapter 11 case not because of a need to reorganize its business, or because of any financial distress, but solely to exert leverage over Movants in litigation pending in other courts.  In those cases, Mr. Sabella seeks to unwind loan transactions which were entered into by the Debtor and its affiliates in 1998.  Indeed, no court has subscribed to Mr. Sabella's claims, and courts in Delaware, Virginia, Michigan, Idaho, and Oregon have entered judgments against the entities that Mr. Sabella controls.

As a threshold matter, this case should be dismissed "for cause" pursuant to 11 U.S.C.  § 1112(b) because the Court lacks jurisdiction over PVP Krewstown, LLC (the "Debtor") or any asset it purports to own.  The Court lacks jurisdiction because the complex corporate machinations through which Mr. Sabella purported to convert and/or merge five (5) other single purpose entities into the Debtor (which is also a single purpose entity) and to file this case without the requisite

3

consent of an independent director, all in violation of the entities' organizational documents, were *ultra vires* and *void* as a matter of Delaware law.

However, even if *arguendo* the Court has jurisdiction, this case should be dismissed "for cause" pursuant to 11 U.S.C. § 1112(b) because it was clearly filed in bad faith. The Debtor has no legitimate purpose in seeking to reorganize its affairs under the Bankruptcy Code. The Debtor has never been and is not now under any financial distress—all of its loans are non-recourse. And other than contrived litigation claims Mr. Sabella has pursued unsuccessfully for several years, the Debtor has no material assets, no meaningful debt, no employees, no bank account, no income, and no actual business operations. Instead of seeking to achieve some legitimate reorganizational purpose, it is facially apparent that the Debtor commenced this bankruptcy case *solely* to advance the self-interested investment and litigation objectives of Mr. Sabella, the Debtor's beneficial owner, in connection with two-party disputes between the Debtor and Movants involving each of the properties listed in footnote 4, below. In sum, the totality of circumstances evidence the Debtor's bad faith filing of this case. Accordingly, the case should be dismissed with prejudice.

## Background[2]

### A. *The 1998 Transaction*

98 RA2 Philadelphia-Krewstown Limited Partnership, along with dozens of affiliated bankruptcy remote single purpose entities,[3] were formed as Delaware limited liability companies

---

[2] Any reference to entities that merged into the Debtor as "Debtor" is, for purposes of this Motion, for ease of reference only and does not constitute an admission or insinuation that such entities were properly and validly merged into PVP Krewstown, LLC or that PVP Krewstown, LLC owns the properties of such entities.

[3] Single purpose entities are designed to insulate an entity from the risks of bankruptcy and also decrease the risk that the entity's assets will be consolidated into the bankruptcy estate of an affiliated entity. A single purpose entity is typically bound by requirements in its organizational documents and/or loan documents which: (i) restrict its purpose and powers; (ii) limit its ability to incur additional indebtedness, other than ordinary course debt related to its ownership and operation of the mortgaged property or other encumbered assets; (iii) impose separateness covenants with respect to its business operation; (iv) restrict merger, consolidation, dissolution and any amendment to the provisions in its organizational documents related to its separateness; (v) require an independent director whose vote is necessary to file bankruptcy; and (vi) impose other restrictions on its ability to file for bankruptcy. *See* David W.

4

or limited partnerships in 1998 to facilitate sale-leaseback transactions involving a portfolio of drugstore properties previously owned and operated by affiliates of Rite Aid.

The bankruptcy remote special purpose entities at issue here that entered into loan transactions in 1998 (collectively, the "Borrowers") are 98 RA2 Philadelphia Krewstown Limited Partners, a Delaware limited partnership ("Krewstown LP"), RA2 Philadelphia-Castor Limited Partnership, a Delaware limited partnership ("Castor LP"), and RA2 Baltimore-Harford L.L.C., RA2 Hines L.L.C., RA2 Troy L.L.C., and RA2 Battle Creek L.L.C., all Delaware limited liability companies (collectively, the "RA2 LLC Entities").

In 1998, the Borrowers each acquired a retail property (each a "Property" and collectively, the "Properties")[4] from Rite Aid by borrowing 100% of the purchase price under a non-recourse loan (each a "Loan" and collectively, the "Loans") from PW Real Estate Investments Inc. (the "Original Lender" and, together with its successors and assigns, the "Lender" or "Lenders"). Each of the Properties was leased back to a Rite Aid entity pursuant to a triple-net bond lease. The Loans matured on September 1, 2020, with a substantial balloon payment due at maturity.

To secure the Loans, each of the Borrowers executed a deed of trust or mortgage (depending on the law of the jurisdiction in which the Properties were located) and an assignment of leases and rents  in favor of the Original Lender.  In addition, Rite Aid executed a Consent Agreement with the Original Lender and each of the Borrowers (each a "Consent Agreement," and collectively, the "Consent Agreements"), which provided that all Rite Aid rents were payable

---

Forti and Allison M. Whip, *"Bankruptcy Remote" Special Purpose Entities in Commercial Mortgage Lending: Characteristics, Enforcement and Limitations*, American Bar Association, RPTE eReport 2020 Fall Issue. https://www.americanbar.org/groups/real_property_trust_estate/publications/ereport/rpte-ereport-fall-2020/bankruptcy-remote/.

[4] These 6 Properties are: (1) 4604 Harford Road, Baltimore, Maryland 21214 (the "Baltimore Property"); (2) 629 North Highway 20, Hines, Oregon 97220 (the "Hines Property"); (3) 7972 Castor Avenue, Philadelphia, Pennsylvania 19152 (the "Castor Property"); (4) 9280 Krewstown Road, Philadelphia, Pennsylvania 19115 (the "Krewstown Property"); (5) 2971 Maple Road, Troy, Michigan 48084 (the "Troy Property"); and (6) 1434 W. Michigan Avenue, Battle Creek, Michigan 49037 (the "Battle Creek Property").

directly to the Lender – not the Borrowers – and that the Borrowers would not provide contrary instruction to Rite Aid.[5]  *Id.*  A sample of a Consent Agreement among the original parties is attached hereto as **Exhibit A**.

As a condition of the Loans, the Original Lender required each Borrower to comply with certain single purpose entity ("SPE") covenants.  Separately, SPE covenants were included in the Borrowers' organizational documents, *i.e.* the certificates of limited partnership, limited partnership agreements, certificates of formation, and limited liability company agreements, as the case may be.  Samples of the Borrowers' 1998 certificate of limited partnership, excerpts containing the applicable sections of the limited liability company agreement and limited partnership agreement, together with an excerpt containing Section 4.02 and 4.11 of each Borrower's loan agreement dated as of August 14, 1998 (as amended, each a "Loan Agreement") are attached hereto as **Composite Exhibit B**.

The Borrowers' organizational documents provide that, without the Lender's consent, (1) the Borrower shall not dissolve, consolidate, merge or sell all or substantially all of its assets, except in accordance with Section 4.11 of the Loan Agreement (*see* Composite Exhibit B, Certificate of Limited Partnership, § 4(s); Limited Liability Company Agreement, § 2.8(s); and Limited Partnership Agreement, § 2.8(s)),[6] (2) the Borrower shall not amend its organizational documents to violate the separateness covenants in Section 4.02 of the Loan Agreements (*id.,* Certificate of Limited Partnership, § 4(t); Limited Liability Company Agreement, § 2.8(t); and

---

[5] Under this structure, which was common for credit-tenant loan transactions at the time, the Borrowers contributed no equity to acquire the Properties at closing.  Furthermore, the Borrowers had no operational obligations after closing, as the tenant was solely responsible under the triple-net bond lease for maintaining and insuring the Properties and for paying all taxes incidental to owning the Properties, and the tenant paid all rents directly to the Lender (or the respective taxing authority) in satisfaction of the Borrowers' obligations under the Loans.  The Borrowers were truly shell entities and never had any employees or even so much as a bank account.  Ownership of the Borrowers, however, carried with it certain tax benefits, including the right to deduct depreciation and loan expenses.

[6] Section 4.11 of the Loan Agreement does not authorize a conversion or merger of the Borrowers.

Limited Partnership Agreement § 2.8(t)); (3) the Borrower will not amend, alter, change or repeal its certificate of limited partnership, its limited partnership agreement, or its limited liability company agreement, as applicable (*id.,* Certificate of Limited Partnership, § 4(u); Limited Liability Company Agreement, § 2.8(u); and Limited Partnership Agreement § 2.8(u)); and (4) the limited partnership Borrower will perform the activities necessary to maintain its status as a limited partnership in good standing (*id.,* Certificate of Limited Partnership, § 4(a)(iv); and Limited Partnership Agreement, § 2.8(a)(iv)).

Each Borrower's organizational documents prohibit the Borrower from filing or consenting to the filing of a bankruptcy or insolvency petition or otherwise instituting insolvency proceedings without the consent of the independent director of the managing member of the managing member of the General Partner (in the case of the limited partnership Borrowers) or the independent director of the managing member of the Managing Member of the Borrower (in the case of the limited liability company Borrowers). *See id.,* Certificate of Limited Partnership, § 4(t); Limited Liability Company Agreement, § 2.8(t); and Limited Partnership Agreement, § 2.8(t).[7]  The managing member described in the Borrower's organizational documents that was required to appoint an independent director was RA2 Holdings Management Corporation, a Delaware corporation ("RA2 Management").

The Certificate of Amendment of the Certificate of Incorporation of RA2 Holdings Management Corporation dated August 26, 1998, provides that RA2 Management "at all times shall have at least one director (an "Independent Director")" and also prohibits certain actions of

---

[7] Single purpose entities in large commercial financings are typically required to engage an unaffiliated independent director or manager from a nationally recognized corporate services provider who must consent to any bankruptcy filing by the entity. The independent director or manager serves as a check on a corporate parent's ability to put a solvent borrower into strategic bankruptcy, which may be more likely, for example, if each of the directors on the board of a borrower also serve on the board of its corporate parent. Footnote 3, *supra.*

RA2 Management and any entity managed or controlled by RA2 Management (including the Borrowers) without the affirmative vote of all of the members of its Board of Directors which must include the affirmative vote of at least one duly appointed Independent Director who must be present to constitute a quorum for such vote.[8]

In 2002, in violation of their respective certificates of limited partnership and limited partnership agreements (which prohibited a change to its status as a limited partnership without the Lender's consent), 98 RA2 Philadelphia-Krewstown Limited Partnership and RA2 Philadelphia-Castor Limited Partnership purportedly converted into limited partnerships known as PVP Krewstown, LLC and PVP Castor LLC. Such conversions were made without the prior consent of the Lender (Transcript of 2004 Examination of Richard Sabella held on November 14, 2023 ("Sabella Tr.") at 163:2-8) or the independent director (Sabella Tr. at 183:23-186:13).

**B.**     *The Residual Value Insurance Policies*

As a condition of the Loans, the Original Lender required the Borrowers to procure residual value insurance ("RVI") in favor of the Lender.

According to the Borrowers, "[r]esidual value insurance ("RVI") is a risk management tool that asset-based lenders sometimes use to manage the risk that their collateral will depreciate faster than projected or will unexpectedly decline in value…" *RA2 Troy LLC v. F1 135 Troy LLC,* No. 362023, 2023 WL 4044493, at *1 (Mich. Ct. App. June 15, 2023).

The Borrowers each obtained RVI from an insurer called Financial Structures Limited ("FSL").

---

[8] These actions include: dissolving or liquidating; instituting proceedings to be adjudicated bankrupt or insolvent; consenting to the institution of bankruptcy or insolvency proceedings; filing a petition seeking or consenting to reorganization or relief under any applicable federal or state law relating to bankruptcy or insolvency; merging or consolidating; selling all or substantially all of its assets; acquiring all or substantially all of the assets or capital stock or ownership interest of any other corporation, company, partnership or entity; incurring or assuming any indebtedness for borrowed money; granting a consensual lien on its property; or amending, altering, repealing or otherwise changing any of the foregoing provisions.

The Borrowers and FSL entered into two agreements in connection with FSL's issuance of RVI: (1) an RVI Policy; and (2) an Insured Covenants Agreement.

The Borrowers acknowledge that obtaining the RVI Policies and entering into the Insured Covenants Agreements with FSL allowed them to "achieve favorable financing terms." *See* Compl. ¶ 25 filed in *RA2 Troy, L.L.C. v. FI 135 Troy, LLC, and ICA Acquisition Troy, LLC*, No. 21-189427-CB, Circuit Court for Oakland County, Michigan, filed contemporaneously herewith under separate notice of filing.

Under each RVI Policy, if a Borrower failed to make the balloon payment at maturity of its Loan, the Lender was entitled to make a claim to FSL under the RVI Policy for an insured amount, and FSL was required to pay the insured amount to the Lender.  A sample of the RVI Policy is attached hereto as **Exhibit C**.

Importantly, if FSL paid a claim to the Lender under an RVI Policy, (i) the RVI Policy required the Lender to assign the loan documents relating to the Loan to FSL or its designee, and (ii) the Insured Covenants Agreement required the Borrower to immediately deed its Property to FSL in consideration of the amount paid by FSL under the RVI Policy.  A sample of the Insured Covenants Agreement is attached hereto as **Exhibit D**.

The Borrowers' Loans were all non-recourse, meaning that the Borrowers had no risk of personal liability for their Loans if they chose not to repay them.  However, the parties expressly agreed and understood that if a Borrower elected not to repay its Loan at maturity, then, upon FSL's payment of the Lender's claim under the RVI Policy, FSL was entitled to ownership of the Property, either by foreclosure of the assigned loan documents or by enforcement of the right to receive a deed under the Insured Covenant Agreement.  *See id.*

The Borrowers agreed in the Insured Covenants Agreements that "[i]n no event will [Borrower] have any ownership interests or rights with respect to the proceeds of this Policy." *See* Exhibit C, RVI Policy, Art. V(a) (emphasis added).

**C.**      ***The Debtor's Default in September 2020***

According to the *Debtor's Chapter 11 Case Management Summary* [ECF No. 15] filed on August 14, 2023 (the "CMS"), "at the very time of maturity of the UBS Portfolio and for many months thereafter, all or nearly all institutional and other lenders for assets like the property suspended loan origination business operations because of the uncertainty in financial markets deriving from the pandemic", and, accordingly, the balloon payments could not timely be refinanced. CMS, pg. 4. This statement is not true. As Mr. Sabella stated under penalty of perjury in a separate case involving the Debtor:

> [I]n 2002, an entity wholly owned by me sold 100% of the membership interests in Holdings and as a consequence of that sale transaction I was divested of all control rights in respect of the [RA2 Entities]. Thereafter, until March 21, 2021, I had no meaningful involvement with or control over them.

*RA2 Bishop L.L.C., et al. v. Michael Katz, et al.*, Case No. 50-2021-CA-008603 (Circuit Court of the 15th Judicial Circuit, Palm Beach County, Florida), *see* Affidavit of Richard J. Sabella in Support of Plaintiffs' Summary Judgment Motion Relating to Counterclaim and Third Party Claim of Defendant 487 Morris Associates LLC, ¶ 13, being filed contemporaneously herewith under separate notice of filing. As pleadings and discovery responses from the Debtor and Mr. Sabella in other cases make clear, the Borrowers' failure to pay the balloon amounts upon maturity in September 2020 had nothing to do with the COVID-19 pandemic.

In all events, it is undisputed that the Borrowers failed to pay the balloon amounts when due upon maturity of the Loans in September 2020. As contemplated by the RVI Policies, the

Lender submitted a claim to FSL for the insured value under each RVI Policy, which FSL paid to the Lender in September 2020.

Contrary to the suggestion by the Debtor in its bankruptcy filing, upon receipt of the RVI claim proceeds, the Lender did **not** treat the Loans as paid in full by returning the notes to the Borrowers and satisfying the mortgages or discharging the deeds of trust via reconveyance of the Properties to the Borrowers.[9] Instead, in accordance with the express requirements of the Additional Named Insured Endorsement to the RVI Policies, in March 2021, the Lender assigned the loan documents relating to the Loans to FSL's designee. A sample of the Additional Named Insured Endorsement is attached here as **Exhibit E**. These loan documents were subsequently assigned by FSL's designee to the FI 135 Parties in June 2021. *See id.*

In June 2021, after FSL had paid the claims under the RVI Policies, FSL assigned its rights under the Insured Covenants Agreements to the ICA Acquisition Parties.

The Debtor's principal, Richard J. Sabella, is a real estate speculator and attorney who has long been an investor in properties leased to Rite Aid. Mr. Sabella routinely pushes the legal boundaries regarding the propriety of various structuring transactions designed to extract tax and other financial benefits from Rite Aid properties. Such aggressive strategies have not gone unnoticed by other courts.[10]

---

[9] Several courts, including the court in the litigation relating to the Battle Creek Property putatively owned by the Debtor in this case, have expressly rejected Mr. Sabella's theory that the RVI claim proceeds somehow satisfied the Loans and discharged the deeds of trust. *See RA2 Troy LLC v. F1 135 Troy LLC*, No. 362023, 2023 WL 4044493, at *1 (Mich. Ct. App. June 15, 2023); *PVP Aston, LLC, et al v Fin Structures Ltd, et al.*, No. N21C-090985 AML CCLD, 2023 WL 2728775 (Del. Sup. Mar. 31, 2023); *RA2 Troy, L.L.C. v. FI 135 Troy, LLC, and ICA Acquisition Troy, LLC*, No. 21-189427-CB, 2022 Mich. Cir. LEXIS 422 (Circuit Court for Oakland County, MI Apr. 28, 2022) and *TJV Associates LLC v. RA2 Boise-Overland L.L.C., et al.,* in the District Court of the Fourth Judicial District of the State of Idaho, in and for the County of Ada (Dist. Ct. , July 7, 2022) No. CV01-21-07907. None of these courts have ruled in favor of the positions that Mr. Sabella has advanced regarding the structure and legal consequences of the loan documents and the ICA agreements. Each of the rulings referenced herein is being filed contemporaneously herewith under separate notice of filing.

[10] Indeed, in one Delaware case in which Mr. Sabella was seeking to reacquire the remainder interest in a Rite Aid property that his transferee had previously donated to a south Florida charity, the court found that Mr. Sabella colluded

D.    *The 2021 Mergers*

On or about May 31, 2021, the RA2 LLC Entities adopted resolutions approving mergers of those Borrowers into separate Texas limited companies organized by Mr. Sabella, in order to eliminate the equity interests of the remainderco third parties invested in those entities.[11]   At the same time, the RA2 LLC Entities adopted amendments to their respective limited liability company agreements unilaterally declaring that, because the Lender had committed tortious acts in respect of their Loan and because the Lender was in default of material obligations under their Loan Documents, the RA2 LLC Entities were excused from its obligations to perform its covenants under the Loan Documents, and that, accordingly, it was amending its Amended and Restated Limited Liability Company Agreement[12] to delete the SPE provisions and the requirement that the Lender consent to any amendment to the limited liability company agreement that affected the SPE provisions.   This purported amendment in May 2021, adopted without the consent of the Lender, was unlawful and ineffective to amend the RA2 LLC Entity's limited liability company agreement.   In his Rule 2004 examination, Mr. Sabella testified that the tortious act of the Lender was that "the loans were paid off, and the lender pretended that they weren't." Sabella Tr. at

---

with an appraiser essentially to defraud the charity, hid evidence from the court, and did not testify credibly.  *Allerand FS Investco, LLC v. RA03 Pittsfield Remainderco, LLC*, No. 2019-0779-JTL (Del. Ch. Feb. 19, 2020) at 4-5 (finding Mr. Sabella not to be a credible witness, noting "I view him as having performed at trial like a lawyer arguing a case and describing matters as he wished them rather than as they actually transpired.  I will say he's a good advocate, but that's different from being a credible fact witness."), and at 47 (finding that "Allerand breached the implied covenant and acted in bad faith" by procuring and purporting to rely upon collusive appraisals when seeking to reacquire a Rite Aid property interest from the United Way of Miami-Dade).  An excerpt of the transcript is being filed contemporaneously herewith under separate notice of filing.

[11] Mr. Sabella testified that "we created this transaction to try to posture these properties so that we could pay off the debt and fight the foreclosure forfeiture that we knew was coming" and "The merger was crucial to unifying the ownership." Sabella Tr. at 167:4-7 and 168:4-5.

[12] Each of the RA2 LLC Entities had purportedly amended and restated its limited liability company agreement in 2002 – again without the consent of the Lender - which amended and restated limited liability company also included the SPE provisions and the requirement that the Lender consent to any amendment to the RA2 LLC Entity's limited liability company agreement that affected the SPE provisions.

148:19-20. Of course this assertion has been flatly rejected by numerous courts, including the Michigan Court of Appeals.

In October 2021, Mr. Sabella caused each of the RA2 LLC Entities purportedly to be merged into separate Texas limited liability companies organized by Mr. Sabella, with the Texas limited liability companies being the surviving entities (each an "AUBSP Texas LLC").[13]   Such actions were taken without the consent of the Lenders (Sabella Tr. at 163:2-8) or the independent director (Sabella Tr. at 183:23-186:13) of RA2 Management, and in violation of the RA2 LLC Entities' and RA2 Management's organizational documents.  At the same time, and (i) without the consent of the lender and in violation of both the original organizational documents of 98 RA2 Philadelphia-Castor Limited Partnership and the limited liability company agreement of PVP Castor, LLC adopted upon its purported conversion in 2002, and in violation of the certificate of incorporation of RA2 Management, Mr.  Sabella purportedly caused PVP Castor, LLC to merge with an existing Texas limited liability company formed by him (AUBSP Ownerco 16, LLC), with PVP Castor, LLC being the surviving entity[14] and (ii) without the consent of the lender or the independent director, and in violation of the original organizational documents of 98 RA2

---

[13] On October 6, 2021, RA2 Baltimore-Harford L.L.C. purportedly merged with and into AUBSP Ownerco 10, LLC; RA2 Hines L.L.C. purportedly merged with and into AUBSP Ownerco 11, LLC; RA2 Troy L.L.C. purportedly merged with and into AUBSP Ownerco 12, LLC; and RA2 Battle Creek L.L.C. purportedly merged with and into AUBSP Ownerco 13, LLC.  The Agreements and Plans of Merger of these entities provide that the certificates of formation of each AUBSP Texas LLC would become the organizational document of the applicable surviving limited liability company and that the business and affairs of each surviving limited liability company would be governed by the applicable AUBSP Texas LLC's limited liability company agreement.  As of the date of the putative mergers, each AUBSP Texas LLC had purportedly adopted a limited liability company agreement and a restated certificate of formation, both of which included provisions stating that the company would not perform any act in contravention of any loan agreement, mortgage or other documents securing or evidencing any financing affecting the property of the company, the documentation of which contains bankruptcy remoteness or single purpose covenants, and further providing that the lender in respect of such financing documents is a third-party beneficiary of the foregoing provision and entitled to enforce it as if it were a party to such organizational documents.

[14] The Agreement and Plan of Merger for PVP Castor, LLC and AUBSP Ownerco 16, LLC provides that the certificate of formation of PVP Castor, LLC would become the organizational document of the surviving limited liability company and that the business and affairs of the surviving limited liability company would be governed by PVP Castor, LLC's limited liability company agreement, which was amended and restated in 2002 and included the SPE provisions.

Philadelphia-Krewstown Limited Partnership and the limited liability company agreement of PVP Krewstown, LLC adopted upon its purported conversion in 2002, and in violation of the certificate of incorporation of RA2 Management, Mr. Sabella caused PVP Krewstown, LLC to merge with AUBSP Ownerco 17, LLC, a Texas limited liability company formed by him, with PVP Krewstown LLC being the surviving entity.[15]   These purported mergers occurred after the Borrowers had defaulted on their respective Loans, FSL had paid the claims under the RVI Policies, and FSL had assigned its rights under the Insured Covenants Agreements to the ICA Acquisition Parties.   The Agreement and Plan of Merger for each of the putatively merged Borrowers with an AUBSP Texas LLC makes no reference to the requirement in the Borrowers' organizational documents that the Lender consent to any merger by the Borrowers.  Moreover, the Plans of Merger — which were intended to squeeze out holders of the remainder interests in the Borrowers in order to obtain refinancing (Sabella Tr.  at 168:5-9) — included various recitals and statements making clear that Mr.  Sabella understood that the Loans remained outstanding and the Borrowers were obligated to deed over the Properties in accordance with the Insured Covenants Agreements. See Plans of Merger, Recital F ("The Property is encumbered by a first mortgage loan facility (the 'Mortgage'). . . . The Mortgage matured on September 1, 2020, on which date a balloon maturity payment became due to the lender from time to time in respect of the Mortgage ('Lender') . . . . RA2 is in default of its obligations to pay the Balloon Payment.").  Copies of the applicable Agreement and Plan of Merger for each RA2 LLC Entity, PVP Castor, LLC, and PVP Krewstown, LLC are attached as **Composite Exhibit F** (the "Plans of Merger").

---

[15] The Agreement and Plan of Merger for PVP LTLKrewstown, LLC and AUBSP Ownerco 17, LLC provides that the certificate of formation of PVP Krewstown, LLC would become the organizational document of the surviving limited liability company and that the business and affairs of the surviving limited liability company would be governed by PVP Krewstown, LLC's limited liability company agreement, which was amended and restated in 2002 and included the SPE provisions.

E.    *The Litigation Relating to the Property*

Beginning in 2021, Mr. Sabella embarked on an extraordinary litigation blitz against virtually every party in the deal structure in hopes of extracting value from the Properties or the parties through pursuit of vexatious claims and oppressive litigation tactics.  This onslaught of litigation commenced by Mr. Sabella (or sometimes initiated by other parties as a result of Mr. Sabella's threats and/or failure to comply with contractual obligations) in connection with the Debtor or their affiliated entities include:

- *RA2 Troy, L.L.C. v. FI 135 Troy, LLC, and ICA Acquisition Troy, LLC*, No. 21-189427-CB (Circuit Court for Oakland County, Michigan) (litigation involving Troy, Michigan Rite Aid property; **summary judgment awarded against Mr. Sabella's entity)**;

- *RA2 Battle Creek, L.L.C. v. FI 135 Battle Creek, LLC, and ICA Acquisition Battle Creek, LLC*, No. 21-2196-CB (Circuit Court for Calhoun, County Michigan) (litigation involving Battle Creek, Michigan Rite Aid property; **summary judgment awarded against Mr. Sabella's entity)**;

- *FI 135 Krewstown Philadelphia, LLC v. 98 RA2 Philadelphia-Krewstown LP* (No. 220202251); *FI 135 Castor Philadelphia, LLC v. 98 RA2 Philadelphia-Castor LP* (No. 220202252); *PVP Krewstown LLC and PVP Castor LLC v. ICA Acquisition Krewstown and ICA Acquisition Castor LLC* (No. 211001566) (First Judicial District of Pennsylvania, Court of Common Pleas of Philadelphia County, Pennsylvania) (consolidated litigation involving two Pennsylvania Rite Aid properties; **summary judgment awarded against Mr. Sabella's entities**);

- *AUBSP Ownerco 14, LLC v. FI 135 Waynesboro, LLC*, No. CL21000254-00 (Circuit Court of Waynesboro, Virginia) (litigation involving Virginia Rite Aid property; **lender authorized to foreclose on Virginia property over Mr. Sabella's objection**);

- *RA2 Troy, LLC v. FI 135 Troy LLC and ICA Acquisition Troy, LLC,* No. 362023, State of Michigan Court of Appeals (No. 2021-189427-CB, Oakland Circuit Court) and *RA2 Battle Creek LLC and AUBSP Ownerco 13, LLC v. FI 135 Battle Creek, LLC and ICA Acquisition Battle Creek, LLC,* No. 362572, State of Michigan Court of Appeals (No. 2021-002196-CB, Calhoun Circuit Court) (**Consolidated Appeals affirming ruling in favor of Movants**);

- *TJV Associates LLC v. RA2 Bishop L.L.C., Bridge Financial Services, LLC; RA2 Bishop, L.L.C. v. TJV Associates, LLC, 487 Morris Associates LLC, Michael R.*

*Katz, WT Capital Lender Services, Thrifty Payless, Inc., and Bridge Financial Services, LLC*, No. SI CV CV2166605 (Superior Court for Inyo County, California) (litigation involving California Rite Aid property; **movants authorized to foreclose on California property over Mr. Sabella's objection**).

- *PVP Aston, LLC, et al v Fin Structures Ltd, et al.*, No. N21C-09-095 AML CCLD, 2023 WL 2728775 (Del. Sup., Mar. 31, 2023) (Superior Court of Delaware; **Sabella's Complaint dismissed with Prejudice**)
- *PVP Aston, LLC, et al v US Bank Nat Assoc, et al*, No. N22-C-03-103 AML CCLD, 2023 WL 525059 (Del. Sup., Jan. 24, 2023) (Superior Court of Delaware; **Sabella's Amended Complaint dismissed with Prejudice**)

In each of these cases, the Borrowers (or other-similarly borrowers controlled by Mr. Sabella) asked courts to declare that the Loan documents and the Insured Covenants Agreements were void and unenforceable.

Despite this extraordinary barrage of litigation, Mr. Sabella and his entities have lost in every case at the trial level and in all appeals that have been decided prior to the commencement of the Debtor's instant bankruptcy case. Courts in Delaware, Idaho, Michigan, Oregon, Virginia, and Pennsylvania, among others, have rejected Mr. Sabella's meritless claims.

Moreover, despite being ordered by courts to convey properties in Idaho, Oregon and Michigan to the Lenders, the Borrowers have either refused to comply with those directives or substantially delayed in doing so.

Therefore, in order to obtain specific performance by the Borrowers and to protect their rights under the loan documents and the Insured Covenants Agreements, the FI 135/ICA Acquisition Parties commenced the following litigation in respect of the Properties:

- *ICA Acquisition Battle Creek, LLC v. RA2 Battle Creek, L.L.C. aka AUBSP Ownerco 13, LLC;* Calhoun County, Michigan Circuit Court, No. 2022-2605-CB (the Battle Creek Property);

- *ICA Acquisition Troy, LLC v. RA2 Troy, L.L.C.;* Oakland County, Michigan Circuit Court, No. 2022-196299-CB (the Troy Property);

- *FI 135 Castor Philadelphia, LLC v. 98 RA2 Philadelphia-Castor Limited Partnership;* Court of Common Pleas of Philadelphia County, Pennsylvania, No. 220202251 (the Castor Property);

- *ICA Acquisition Castor Philadelphia, LLC v. 98 RA2 Philadelphia-Castor Limited Partnership;* First Judicial District of Pennsylvania, Court of Common Pleas of Philadelphia County, Pennsylvania, No. 220902981 (the Castor Property);

- *FI 135 Krewstown Philadelphia, LLC v. 98 RA2 Philadelphia-Krewstown Limited Partnership;* First Judicial District of Pennsylvania, Court of Common Pleas of Philadelphia County, Pennsylvania, No. 220202252 (the Krewstown Property);

- *ICA Acquisition Krewstown Philadelphia, LLC v. 98 RA2 Philadelphia-Krewstown Limited Partnership;* First Judicial District of Pennsylvania, Court of Common Pleas of Philadelphia County, Pennsylvania, No. 220902982 (the Krewstown Property);

- *FI 135 Baltimore, LLC through David F. Fontana and Richard A. Dubose, III, as Substitute Trustees;* Circuit Court for Baltimore City, Maryland, No. 24-O-22-000003 (the Baltimore Property);

- *ICA Acquisition Baltimore, LLC v. RA2 Baltimore-Harford, L.L.C. (now known as AUBSP Ownerco 10, LLC);* Circuit Court for Baltimore City, Maryland, No. 24-C-22-004382 (the Baltimore Property); and

- *ICA Acquisition Hines, LLC v. RA2 Hines, LLC;* Circuit Court of the State of Oregon for the County of Harney, No. 22CV37744 (the Hines Property)

(collectively, the "Litigation").

At the time of the filing of this Bankruptcy Case, the various two-party disputes comprising the Litigation were at different procedural stages in Movants' quest to obtain foreclosure and/or specific performance in connection with the Properties.

The Calhoun County, Michigan and Harney County, Oregon courts ordered the Borrowers in those cases to convey title to the Properties at issue in those cases to ICA Acquisition Battle Creek, LLC and ICA Acquisition Hines, LLC, respectively, but those entities failed to comply, and to this day still have not complied.

F.    *The 2022 Merger of LLC Entities into the Debtor*

In November 2022, Mr. Sabella executed documents that purportedly caused each of the AUBSP Texas LLC's and PVP Castor, LLC to be merged into the Debtor, again without the consent of the Lenders or the independent director and in violation of their respective original organizational documents.[16] Regarding the efficacy of the pre-petition mergers, the Agreement and Plan of Merger entered into in connection with these mergers provide that the existing operating agreement of PVP Krewstown, LLC would be the operating agreement of the Debtor following the putative mergers.  And this operating agreement, last amended in 2002, continues to include the SPE provisions prohibiting the a merger without the consent of the Lender, and prohibiting a bankruptcy filing without the consent of the independent director.

G.    *The Bankruptcy Filing*

On August 4, 2023, the Debtor commenced this Bankruptcy Case (the "<u>Bankruptcy Case</u>").

### <u>Relief Requested and Basis for Relief</u>

Pursuant to Section 1112(b) of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Movants seek dismissal of this Bankruptcy Case for cause.

A.    **The Putative Corporate Conversions of 98 RA2 Philadelphia-Krewstown Limited Partnership and 98 RA2 Philadelphia-Castor Limited Partnership, the Putative Mergers of the Borrowers, and the Filing of this Bankruptcy Case were Void *Ab Initio* for Lack of Authority and Thus the Court Lacks Subject Matter Jurisdiction Over the Bankruptcy Case.**

---

[16] The Agreement and Plan of Merger adopted by the Borrowers on November 15, 2022 states "Each Mortgage matured on September 1, 2020, and was satisfied in full not later than November 15, 2020" and "As a result of the satisfaction of the Mortgages and other circumstances, the Bankruptcy Remoteness Covenants no longer bind the parties named in the preamble to this agreement."  These statements fly in the face of all of the court rulings and findings that the Mortgages were <u>not</u> satisfied, which rulings and findings were made before the Agreement and Plan of Merger was entered into. *See* <u>Composite Exhibit F</u>. Mr. Sabella conceded at his Rule 2004 Examination that "no court has agreed with us as of now." Sabella Tr. at 197:14.

18

Although Mr. Sabella executed and submitted with the Debtor's bankruptcy petition a unanimous written consent on behalf of the Debtor that purports to authorize the Debtor's bankruptcy filing, this consent was ineffective to authorize a bankruptcy filing as a matter of law.

The filing of a bankruptcy petition is "a special act requiring special authorization and not a general duty of an officer." *In re Al–Wyn Food Dist., Inc.*, 8 B.R. 42, 43 (Bankr.M.D.Fla.1980).

A bankruptcy court lacks jurisdiction over a bankruptcy case where, like here, the petition is filed without proper corporate authorization.  *See, e.g.*, *Price v. Gurney*, 324 U.S. 100, 103 (1945) (noting that the power of the bankruptcy court "is strictly limited to those situations where a petition has been approved."); *Hager v. Gibson*, 108 F.3d 35, 39 (4th Cir.  1997) (noting that when a bankruptcy petition is filed the bankruptcy court "does not acquire jurisdiction unless those purporting to act for the corporation have authority under local law" to file the petition); *In re Arista Imaging of N. Miami, LLC*, No. 19-26520, 2020 WL 609613, at *11 (Bankr.  S.D. Fla. Feb. 7, 2020) (Cristol, J.) (dismissing a bankruptcy case based upon lack of subject matter jurisdiction because the case was filed by a manager without the authorization required under the operating agreement); *In re Advanced Vascular Resources of Johnstown, LLC*, 590 B.R. 323, 328 (Bankr. W.D. Pa. 2018) (determining that the filing was *ultra vires* and thus dismissing the case); *In re Reliable Air, Inc*., No. 05-85627, 2007 WL 7136475, at *3 (Bankr.  N.D. Ga. Mar. 9, 2007) (noting that a bankruptcy court lacks jurisdiction over a bankruptcy case unless the petition was filed by those with authority to act).

"'[T]he initiation of the [bankruptcy] proceedings, like the run of the corporate activities, is left to the corporation itself, *i.e.* to those who have the power of management.' The determination of who has the power of management is governed by state law." *In re Stavola/Manson Electric Co.*, 94 B.R. 21, 24 (Bankr.  D. Conn.1988) (quoting *Price, supra*).

The Debtor lacked corporate authority to file the petition commencing this Bankruptcy Case.

For starters, the purported conversions of 98 RA2 Philadelphia-Krewstown Limited Partnership ("Krewstown LP") and 98 RA2 Philadelphia-Castor Limited Partnership ("Castor LP") into limited liability companies and the subsequent merger of those entities with an AUBSP Texas LLC and then into PVP Krewstown, LLC were unlawful and ineffectual.

The limited partnership documents of Krewstown LP and Castor LP are governed by Delaware law.  Composite Exhibit B, Limited Partnership Agreement, § 11.5

The Delaware Revised Uniform Limited Partnership Act ("DRULPA") is intended to support "the fundamental principle of freedom of contract."  *JER Hudson GP XXI LLC v. DLE Investors, LP*, 275 A.3d 755, 781 (Del.  Ch. 2022).  DRULPA is an enabling statute, which "provides default provisions subject to modification by limited partnership agreements" such that, "the limited partnership agreement serves as the primary source of rules governing the 'affairs of a limited partnership and the conduct of its business.'"  *Id.* at 782 (internal citation omitted).

Thus, the rights and responsibilities of the parties to a limited partnership agreement are defined within the agreement, and the provisions of that agreement are given "significant deference" from the courts.  *Id.*; *see Exit Strategy, LLC v. Festival Retail Fund BH, LP*, No. 2017-0017, 2023 WL 4571932, at *7–8 (Del.  Ch. Jul. 17, 2023).  When a partnership agreement provides a restrictive covenant that requires consent of certain parties prior to transferring a partnership interest, an attempt to transfer that interest without the required consent is invalid.  *In re Estate of Conway*, No. 6056, 2012 WL 524190, at *3–4 (Del. Ch. Feb. 15, 2012).

Additionally, DRULPA contains a provision governing approval requirements to convert a limited partnership to a different form of entity.  The provision first states that "the conversion

20

shall be authorized as specified in the partnership agreement." 6 Del. C. § 17-219(b).  Similarly, the DRULPA provision addressing merger or consolidation of a limited partnership states, "[u]nless otherwise provided in the partnership agreement, an agreement of merger or consolidation or a plan of merger shall be approved . . . ." 6 Del. C. § 17-211(b).

Each of Krewstown LP and Castor LP was a Borrower under a Loan Agreement with the Original Lender.  Both the certificate of limited partnership and the limited partnership agreement for each of Krewstown LP and Castor LP included single purpose entity covenants precluding Krewstown LP and Castor LP, without the prior written consent of the Lender, from, among other things, (i) dissolving, liquidating, consolidating, or merging, (ii) amending its organizational documents to violate the separateness covenant in Section 4.2 of its Loan Agreement, (iii) filing or consenting to the filing of a bankruptcy or insolvency petition or otherwise instituting insolvency proceedings without the consent of the General Partner and the independent director of the managing member of the managing member of the General Partner, (iv) amending, altering, changing or repealing its certificate of limited partnership or limited partnership agreement if it would have a material effect on the Lender, (v) failing to perform the activities necessary to maintain its status as a limited partnership, or (vi) engaging in any business or other activity other than the business of holding an interest in and leasing its property identified in its Loan Agreement.

On November 8, 2002, Krewstown LP purportedly converted to a limited liability company, changing its name to PVP Krewstown, LLC. On that same date, Castor LP purportedly converted to a limited liability company, changing its name to PVP Castor, LLC.  The conversions required the limited partnerships to change their organizational documents, which was prohibited without the Lender's consent or the consent of the independent director of RA2 Management. These purported conversions were made in bad faith and in violation of Krewstown LP's and

Castor LP's respective certificate of limited partnership and limited partnership agreement, inasmuch as neither of them had obtained the prior written consent of the Lender or the independent director. Therefore, the purported conversions of Krewstown LP into PVP Krewstown, LLC and of Castor LP into PVP Castor, LLC were *ultra vires* and a nullity. Inasmuch as the Debtor does not exist as a limited liability company, its bankruptcy filing was not and cannot be deemed to have been properly authorized. Accordingly, the Debtor's unauthorized filing should be dismissed for want of jurisdiction.

The Debtor remains bound by Krewstown LP's limited partnership certificate and limited partnership agreement, both of which prohibit it from filing a bankruptcy without the consent of the independent director, which was not obtained. The act of the Debtor in filing the Bankruptcy Case without such consents in violation of the limited partnership certificate and limited partnership agreement is also void *ab initio*.

The mergers of the RA2 LLC Entities into an AUBSP Texas LLC and then into PVP Krewstown, LLC were also unlawful and ineffectual. The limited liability company agreements of each of the RA2 LLC Entities prohibited such entities from amending their limited liability company agreements and from merging without the Lender's consent. Therefore, the purported amendments of the RA2 LLC Entities' limited liability company agreements in 2002 and in 2021 (*see* footnote 12, *supra.*) and their mergers into the AUBSP Texas LLCs in 2021 (*see* footnote 13, *supra.*) without the Lenders' consent violated their respective limited liability company agreements (including the limited liability company agreements of the AUBSP Texas LLCs) and were also void and of no effect. Likewise, the purported mergers of AUBSP Owner 16, LLC with and into PVP Castor, LLC and of AUBSP Ownerco 17, LLC with and into PVP Krewstown, LLC

in 2021 without the Lender's consent violated the organizational documents of PVP Castor, LLC and PVP Krewstown, LLC.

The subsequent purported mergers of PVP Castor LLC and each of the AUBSP Texas LLCs into PVP Krewstown, LLC, the Debtor in this Bankruptcy Case, also violated the original limited liability company agreements or limited partnership agreements, as applicable, of each of the Borrowers and were therefore void and of no effect. Such mergers, purportedly resulting in the Debtor's ownership of all of the real properties of the merged entities, also violated the single purpose entity provisions of the Borrowers' organizational documents (including those of the Debtor) prohibiting each of them from owning property other than that which they owned at the time the Loans were made.

Disputes involving limited liability companies in Delaware are determined by first reviewing the provisions of the limited liability company agreement at issue, then to review the default rules of the Delaware LLC Act, and then to consider the rules of law and equity. *Holifield v. XRI Investment Holdings LLC*, No. 407, 2022, 2023 WL 5761367, at *23 (Del. Sept. 7, 2023). The parties to an LLC agreement "may provide that an act that does not comply with the LLC agreement is incurably void." *Id.* at *28. No specific language is required to demonstrate the parties' intent, instead courts should "apply [the] well-established principles of contract interpretation to determine the meaning in the given context of the instrument." *Id.* at *28–29.

Delaware courts have held that under a limited liability company agreement, void acts are those the entity itself has no implicit or explicit authority to undertake or those acts that are fundamentally contrary to public policy. Stated differently, they are acts that the entity lacks the power or capacity to effectuate. Voidable acts are within the power or capacity of an entity, but were not properly authorized or effectuated by the representatives. *Zohar III Ltd. v. Stila Styles,*

23

*LLC*, No. 2021-0384, 2022 WL 1744003, at *15 (Del. Ch. May 31, 2022) (internal quotation marks and citation omitted)).  Delaware courts have determined that unilateral actions taken without obtaining proper consents are void and invalid as having been done without proper authority.  *See id.*

For the reasons set forth above, (i) the act of Krewstown LP in converting to PVP Krewstown, LLC, the Debtor in this Bankruptcy Case; (ii) the act of Castor LP in converting to PVP Castor, LLC, subsequently merging with AUBSP Ownerco 16, LLC, and thereafter merging with PVP Krewstown, LLC; (iii) the act of each RA2 LLC Entity in amending its limited liability company agreement, merging with an AUBSP Texas LLC and thereafter merging with PVP Krewstown, LLC; (iv) the act of PVP Krewstown, LLC in merging with AUBSP Ownerco 17, LLC and thereafter merging with the AUBSP Texas LLCs and PVP Castor, LLC; and (v) the act of the Debtor in filing this Bankruptcy Case, are all in violation of the organizational documents of each Borrower, done in bad faith[17], and are unauthorized, *ultra vires*, and void.  Accordingly, this Bankruptcy Case should be dismissed for want of jurisdiction.

As set forth above, the petition in this Bankruptcy Case was unauthorized, *ultra vires*, and void.  Thus, the Court lacks jurisdiction over this Bankruptcy Case and this Bankruptcy Case should therefore be dismissed.

## B.    This Case Should be Dismissed for Cause Because it was Filed in Bad Faith

Section 1112(b) of the Bankruptcy Code, titled "Conversion or Dismissal," provides:

Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 ***or dismiss a case under this chapter***, whichever is in the best interests

---

[17] Mr. Sabella admitted at his Rule 2004 Examination that at the time of the mergers in 2022, no court had agreed with his position that the Loans had been satisfied, Sabella Tr. 197:14. Accordingly, his assertions in the merger documents that the Loans were satisfied, thereby relieving the Borrowers from compliance with the SPE provisions in their organizational documents, were totally unsupported and in flagrant disregard of the rulings and orders of the various courts. In fact, the Debtor's bad faith is evidenced by its flagrant disregard of the requirements of its organizational document each time that it took an unauthorized action described above.

of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1) (emphasis added).

The United States Court of Appeals for the Eleventh Circuit has held that "[a] case under Chapter 11 may be dismissed for cause pursuant to Section 1112 of the Bankruptcy Code if the petition was not filed in good faith." *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988) (citing *Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.)*, 749 F.2d 670, 674 (11th Cir. 1984)). A court's inquiry into good faith or lack thereof (*i.e.*, bad faith) focuses on whether a debtor intended "to abuse the judicial process and the purposes of the reorganization provisions" or merely "to frustrate the legitimate efforts of secured creditors to enforce their rights." *See Albany Partners*, 749 F.2d at 674 (defining "bad faith"); *see also In re Piazza*, 451 B.R. 608 (Bankr. S.D. Fla. June 17, 2011) (granting motion to dismiss chapter 7 case as abuse of chapter and for bad faith where debtor did not file in response to any sudden financial disaster, but to avoid liability on large judgment dwarfing debtor's other liabilities, which were not subject to creditors' collection efforts); *In re Boca Vill. Ass'n, Inc.*, 422 B.R. 318 (Bankr. S.D. Fla. 2009) (granting motion of creditors of chapter 7 debtor-nonprofit condominium association to dismiss debtor's Bankruptcy Case for cause noting the "ultimate question is whether the petition was filed with the intent and desire to obtain the relief that is available under a particular chapter of the Bankruptcy Code, through the means that Congress has specified, or whether the debtor is pursuing some other goal") (quoting *In re Kane & Kane, et al.,* 406 B.R. 163 (Bankr. S.D. Fla. 2009)).

### i.      The Case was Filed in Bad Faith Because It Fails to Serve a Legitimate Reorganizational Purpose

This Bankruptcy Case was filed solely for the purpose of accomplishing the self-interested litigation objectives of Mr. Sabella, the ultimate beneficial equity interest holder in the Debtor, and

not for any legitimate purpose envisioned by the Bankruptcy Code. As is set forth below, multiple Courts of Appeal, including the Eleventh Circuit, require a legitimate bankruptcy purpose for a chapter 11 debtor to be entitled to avail itself of the jurisdiction of a bankruptcy court and the extraordinary powers created under the Bankruptcy Code. *See In re Waldron,* 785 F.2d 936, 940 (11th Cir. 1986); *In re Integrated Telecom Express, Inc.,* 384 F.3d 108, 119 (3d Cir. 2004). There is no such legitimate bankruptcy purpose here. This abuse by the Debtor of the Bankruptcy Code's powers and privileges for Mr. Sabella's own personal gain should come as no surprise given there is not even a hint of independence of the Debtor. Mr. Sabella serves as: (i) sole manager of the Debtor; (ii) sole manager of Allerand entities that are allegedly prepetition creditors of the Debtor; (iii) the sole manager of the debtor-in-possession lender; and (iv) sole beneficial manager equity holder of the Debtor. In wearing these multiple hats, Mr. Sabella is openly using the Debtor as one of his many pawns to pursue litigation outcomes for his own personal benefit.

This is not an "honest but unfortunate debtor" that the Bankruptcy Code is intended to protect. *See Local Loan Co. v. Hunt,* 292 U.S. 234, 244 (1934). The Debtor is a shell entity in the truest sense – never having once conducted any business activities and never having any bank account prior to the commencement of this case, no employees, or other function over their entire 20+ year existence prior to commencement of this case. After acquiring the Borrowers, the Debtor could have simply ceded the properties to the FI 135/ICA Acquisition Parties in accordance with the Insured Covenants Agreements and dissolved without incurring any liabilities. Indeed, this is exactly what the Borrowers agreed would happen, as clearly specified in the Insured Covenants Agreements, if the Borrowers elected not to pay off the loans at maturity.

As such, the only reason why the Debtor is involved in multiple ongoing litigations is because Mr. Sabella elected to pursue a highly speculative litigation campaign to prevent the

Debtor from complying with its unambiguous contractual obligations. There is no financial distress given that there was no recourse debt enforceable against the Borrowers, and Mr. Sabella willingly funded the Debtor's prepetition litigation expenses, particularly because he is the sole beneficiary of such claims. *See* p. 32*, infra.* The discovery provided by the Debtor establishes that the law firms assisting Mr. Sabella in his litigation campaigns against the Movants have been paid by Sabella affiliates; *never* by the Debtor. And out of the 8 law firms listed in the Debtors' Schedules, only 1 of those law firms filed a Proof of Claim in this Bankruptcy Case. Mr. Sabella ultimately caused the Debtor to file this unauthorized Bankruptcy Case to further his personal litigation profiteering strategy as equity owner by trying to create yet another cause of action to benefit himself personally. This Bankruptcy Case was not filed to address creditor obligations or to preserve any business going concern. The Court should not endorse Mr. Sabella's attempts to engineer a need for a bankruptcy through alleged failure to pay modest legal bills (which he demonstrably could, but elected not to, pay) to gain a litigation advantage for the benefit of a non-debtor equity holder.

While Mr. Sabella hopes that, through convoluted and expansive (and expensive) litigation, including prosecution of this Bankruptcy Case, he can bully his way to an outcome that is contrary to the comprehensive business deal negotiated amongst sophisticated parties decades earlier, the litigation result in *every single court* to decide these issues, including some of the state courts hearing matters related to the Properties, has been a direct and complete rejection of his effort to rewrite such deals.[18]

---

[18] Mr. Sabella, through a deluge of litigation, which to date has resulted in more than a dozen separate lawsuits in at least ten states and federal courts throughout the country involving the Borrowers and the Debtor, has asserted that the various transaction documents subject of this Bankruptcy Case, including the Insured Covenants Agreements, which were negotiated and executed decades ago among sophisticated parties, should not be enforced in accordance with their unambiguous terms, but instead should be rewritten by the courts to provide Mr. Sabella with a windfall. Unsurprisingly, every court that has rendered a decision on the merits of Mr. Sabella's claims has soundly rejected

In *Waldron*, *supra,* the Eleventh Circuit rejected the efforts by a debtor that was not experiencing financial distress to use the extraordinary protections of bankruptcy solely to enrich itself at the expense of its contract counterparty.  In *Waldron*, the debtor—which had no material creditors—filed a bankruptcy case solely for the purpose of rejecting an option contract that entitled the non-debtor to purchase certain real property from the debtor at a price favorable to the non-debtor party.  785 F. 2d at 938.  The Eleventh Circuit found the debtor's attempt to use the extraordinary powers of the Bankruptcy Code to avoid complying with a valid contractual obligation, where rejection benefitted only the debtor and not any creditors of the debtor, to be "preposterous," "malevolent," "rapacious," "greedy," and an "abuse" of the bankruptcy process (terms that apply equally to Mr. Sabella's profiteering strategy).   While the Eleventh Circuit acknowledged that commencing a bankruptcy case solely for the purpose of rejecting an executory contract may, indeed, be a legitimate use of bankruptcy in certain circumstances, such cases necessarily turned on the fact that rejection of an unfavorable contract preserved value *for the benefit of creditors of the estate*, thus satisfying a legitimate purpose of bankruptcy.  *Id.* at 940 ("In each case, rejection was permitted to serve the intended purpose of Chapter 11—to facilitate the adjustment of debts through reorganization.").  But where, as here, there are no material creditors and no financial distress, and the debtor files bankruptcy solely to use the extraordinary powers of the Bankruptcy Code as a sword for the benefit of the debtor or its equity holders without creating or preserving value for creditors, no legitimate purpose is served.  *See id.* ("The bankruptcy laws were simply not intended to be used as a sword by the rapacious.").

The Third Circuit reached the same conclusion in *Integrated*, *supra,* where it dismissed the case for bad faith where a debtor sought to use the bankruptcy laws as a sword to achieve some

---

them. *See* Michgan and Delaware Court Orders, rejecting the Debtor's defective claims and another direct refutation of Mr. Sabella's claims. *See* Footnotes 9 and 10.

economic benefit for the debtor itself (including equity owners), rather than for the benefit of creditors. Indeed, this same principle—that commencement of bankruptcy must serve the broader interests of the debtor's creditors (and not just equity owners) in the context of financial distress—has been the underlying principle in two recent high-profile bankruptcy case dismissals. *See Integrated, supra*; *In re LTL Management, LLC,* 64 F. 4th 84, 102 (3d Cir. 2023) ("the good-faith gateway asks whether the debtor faces the kinds of problems that justify Chapter 11 relief").

In the *LTL Management* case, the Third Circuit reversed the Bankruptcy Court and remanded with instructions to dismiss LTL's chapter 11 case. As the Third Circuit explained at the beginning of its decision:

> We start, and stay, with good faith. Good intentions—such as to protect the J&J brand or comprehensively resolve litigation—do not suffice alone. What counts to access the Bankruptcy Code's safe harbor is to meet its intended purposes. Only a putative debtor in financial distress can do so. LTL was not. Thus we dismiss its petition.

*LTL Management*, 64 F. 4th at 93.

The crux of the analysis focused on section 1112(b) of the Bankruptcy Code, which establishes the conditions under which a chapter 11 case may be dismissed for "cause." In examining a debtor's good faith under section 1112(b), two inquiries are especially relevant: "(1) whether the petition serves a valid bankruptcy purpose[;] and (2) whether [it] is filed merely to obtain a tactical litigation advantage." *Id.* at 100-01 (citing *In re 15375 Mem'l Corp. v. BEPCO, L.P.,* 589 F.3d 605, 618 (3d Cir. 2009) (internal quotation marks omitted)).

Under the first prong, a valid bankruptcy purpose includes "preserv[ing] a going concern" or "maximiz[ing] the value of the debtor's estate. *BEPCO*, 589 F.3d at 619. Significantly for purposes of *LTL Management*, a valid bankruptcy purpose "assumes a debtor in financial distress." *Integrated Telecom*, 384 F.3d at 128. Under the second prong, courts within the Third Circuit (and in other jurisdictions) have dismissed chapter 11 filings as not being made in good faith where

they are used as a strategic mechanism to "orchestrate pending litigation." *In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999) (internal citations omitted). This is precisely the case here. *See also In re Aearo Technologies LLC,* 2023 WL 3938436, at *14 (Bankr. S.D. Ind. June 9, 2023) ("[I]n lieu of a multifactor test, the Court is inclined to conclude that good faith is better measured by whether the Chapter 11 case serves 'a valid reorganizational purpose,'. . . and that a debtor's 'need' for relief under the Chapter 11 is central to that inquiry."). Where a bankruptcy case is filed solely to benefit equity or affiliates, rather than to provide a material benefit to creditors of the debtor, the case is not filed in good faith.

### ii.    *The Case Was Filed In Bad Faith Because it Presents a Two-Party Dispute*

Moreover, where a debtor "faces no threat from any of its other purported creditors, [its] financial problems are a two-party dispute suitable for resolution" outside the bankruptcy court, which supports a finding of bad faith. *In re Outta Control Sportfishing, Inc.*, 642 B.R. 180, 185 (Bankr. S.D. Fla. 2022) (citing *In re State St. Houses, Inc.*, 305 B.R. 738, 742 (S.D. Fla. 2003), *aff'd*, 356 F.3d 1345 (11th Cir. 2004)).

"Nor may a Chapter 11 filing be employed to obtain an upper hand or leverage in litigation with another party or to provide an alternate forum for such litigation." *In re The Bridge to Life, Inc.*, 330 B.R. 351, 357 (Bankr. E.D.N.Y. 2005), *aff'd sub nom. In re Bridge To Life, Inc.*, Nos. CV-05-5499 (CPS), 05-19154(jf), 2006 WL 1329778 (E.D.N.Y. May 16, 2006) (dismissing chapter 11 for bad faith where debtor filed petition in order to avoid posting supersedeas bond while appealing state court judgment, debtor had ability to pay bond, debtor had no creditors other than judgment creditor pressing debtor for payment). *See In re Moog*, 159 B.R. 357, 361–62 (Bankr. S.D. Fla. 1993) (dismissing solvent, wealthy individual's chapter 11 petition as a bad faith filing where debtor filed petition as litigation tactic to circumvent state court efforts to enforce

divorce decree and debtor "did not need Chapter 11 protection to conduct his business affairs and pay his other creditors").

Here, the Bankruptcy Case is merely another tactic to obtain leverage in the drawn-out, multi-jurisdiction dispute with the FI 135/ICA Acquisition Parties regarding ownership of the Properties.  By filing the Bankruptcy Case, the Debtor is attempting to frustrate and obstruct Movants' enforcement of legitimate rights in each of the Litigations involving the Properties.

Likewise, a passing mention of reorganization in the Case Management Summary cannot change the fact that there is nothing to reorganize as the Debtor has no assets other than improper claims related to the Properties, no meaningful debt, no income, and is not a going concern.  The Debtor's Case Management Summary states that the Debtor "plans to reorganize by confirming a plan through the chapter 11 process, and utilizing specific provisions and protections within the Bankruptcy Code to maximize its value, including but not limited to recovering rents owed to the Debtor but withheld by Rite Aid."  [ECF No. 15 at 5].  The Debtor has no ownership interest in the Properties or the rents[19], and there is no reason to file a Bankruptcy Case to stop current pending litigation through the abuse of the automatic stay provisions of the Bankruptcy Code.

---

[19] Under Pennsylvania law, rents are not property of the bankruptcy estate once demand is made on the tenant.  *Com. Bank v. Mountain View Vill., Inc*., 5 F.3d 34, 38 (3d Cir. 1993) ("The stipulated facts conclusively establish that the banks are the holders of mortgages that contain assignments of rents conditioned upon default, that the debtor did default, and that, after notifying the tenants, the banks collected the rents. Under Pennsylvania law, it is clear that the banks were legally entitled to take the steps they did when the debtor was unable to cure the default. Therefore, the rents are not property of the debtor's estate and are not available for use in a plan of reorganization."); *Sovereign Bank v. Schwab*, 414 F.3d 450, 453 (3d Cir. 2005) (noting that, because rent demand letter were sent out four months prior to a filing the debtor "no longer possessed an interest in the rents"). Similarly, in Oregon, assignment of rents are devices used to establish a security interest in rents, but do not constitute an absolute assignment such that the rents would not be property of the bankruptcy estate. *See Investor Syndicate, et al. v. Smith, et al.,* 105 F.2d 611 (9th Cir. 1939) (construing Oregon law). Also, in Michigan, the rule appears to be that the debtor does not retain rights in rents assigned to the lender pre-petition. *In re Town Ctr. Flats, LLC*, 855 F.3d 721 (6th Cir. 2017).

### iii.        The Case was Filed in Bad Faith Based upon the Totality of Circumstances

Finally, the totality of the circumstances concept is further explained in *Phoenix Piccadilly, supra*, in which the Eleventh Circuit explained that "bad faith" may be imputed to the Debtor by evaluating the following factors:

(i)        debtor has only one asset, consisting of the property at issue.,[20]

(ii)        debtor has few unsecured creditors whose claims are small in relation to the claims of the secured creditors;

(iii)        debtor has few employees;

(iv)        property is the subject of a foreclosure action as a result of arrearages on the debt;

(v)        debtor's financial problems involve a dispute between the debtor and the secured creditors, which can be resolved in the pending state court action; and

(vi)        the timing of debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors' ability to enforce their rights.

*Phoenix Piccadilly,* 849 F.2d at 1394-1395.

The Debtor's case presents compelling grounds for dismissal under the principles of *Phoenix Piccadilly. See also State St. Houses, Inc. v. N.Y. State Urban Dev. Corp.* (*In re State St. Houses, Inc.*), 356 F.3d 1345, 1347 (11th Cir. 2004) (revisions to Bankruptcy Code regarding single asset real estate debtors did not preempt the *Phoenix Piccadilly* factors).

The totality of the circumstances as measured by the *Phoenix Piccadilly* factors compels dismissal of this case. Factors 2 through 6 weigh heavily in favor of dismissal.

The Debtor has "few" unsecured creditors whose claims are not insider claims. Therefore, the Debtor's case must be dismissed for lack of any unsecured creditors. *See Phoenix Piccadilly*, 849 F.2d at 1394 (listing few unsecured creditors with small claims as factor in favor of dismissal).

---

[20] This is the only factor *potentially* weighing in the Debtor's favor however the multiple "assets" was only accomplished through *ultra vires* and *void* acts as described above.

While the petitions are filed under penalty of perjury and are, therefore, *prima facie* valid, the identity of some of the non-governmental unsecured creditors is unknown. The Debtor lists 25 creditors. Nine of the creditors have connections to the Debtor's insiders. At his deposition, Mr. Sabella was unable to specifically refute that the 7 Remaindercos listed on the Schedules were not insiders of the Debtor. Eight creditors are lawyers who work on the pending litigations relating to the Properties at dispute in this Bankruptcy Case, of which only 2 had amounts listed. And the final 8 creditors are the ICA Acquisition Parties who have asserted their rights to the Debtor's Properties, all of which are scheduled as contingent, disputed, and unliquidated.

Application of the third factor favors dismissal. The Debtor has no employees, and in fact has never had any employees or even a bank account since it was formed. The company is merely a shell entity, which was created to own and lease real estate that it no longer owns. Considering the credit-tenant lease structure, where the tenant was responsible for maintaining the Properties and the tenant paid all rents directly to the Lender in satisfaction of Debtor's Loan obligations, the Debtor never had any operations at all. *See State St. Houses, Inc.*, 305 B.R. at 736 ("Based on Debtor's own Schedules and the admissions of its President, Debtor is a corporate shell, is not a going concern, and has no employees . . . . Thus, this *Phoenix Piccadilly* factor also points toward a finding of bad faith.").

The fourth factor undoubtedly weighs in favor of dismissal: "the property is the subject of a foreclosure action as a result of arrearages on the debt." The FI 135/ICA Acquisition Parties were in the process of foreclosing on the Properties when this Bankruptcy Case was filed. Mr. Sabella avers under oath in the Schedules that the Debtor has "bare legal title" to the Battle Creek Property, but this statement is false. The Michigan Court quieted title to the Battle Creek Property in July 2023. The Debtor has no title interest in the Battle Creek Property, whether

33

legal or equitable. Every meaningful asset that this Debtor "owns," is the subject of a pending action to foreclose and/or for repossession. In fact, with respect to the Hines Property, prior to the Debtor filing for bankruptcy, the Court had issued judgment against the Debtor to allow foreclosure of the Hines Property by the ICA Acquisition Parties. This factor overwhelmingly compels dismissal. *See, e.g., In re Quartz Hill Mining, et al.*, Nos. 14-15419-BKC-AJC and 14-15424-BKC-AJC, 2014 WL 8381311, at *4 (Bankr. S.D. Fla. Aug. 4, 2014) (dismissing chapter 11 case where property was subject to an impending sheriff's sale and holding "the filing of Chapter 11 on the eve of a foreclosure sale is itself evidence of bad faith"); *In re Midway Invs., Ltd.*, 187 B.R. 382, 389 (Bankr. S.D. Fla. 1995) (dismissing case where creditor demanded deed to property out of escrow that was more immediate threat than foreclosure).

Mr. Sabella asserts that the Debtor's other assets consist of accounts receivable. [ECF No. 28 (Schedule A/B) at 2]. However, those accounts receivable are the rents held by Rite Aid, which are not assets of the Debtor. Footnote 19, *supra*.

In addition, the fifth *Phoenix Piccadilly* factor weighs in favor of dismissal: "debtor's financial problems involve a dispute between the debtor and the secured creditors, which can be resolved in the pending state court action." Each of the Properties listed in the Debtor's schedules is the subject of an action in another Court. The pendency of these actions reveal that the Debtors' financial difficulties are due entirely to their defaults to the FI 135/ICA Acquisition Parties. Accordingly, the fifth factor weighs in favor of dismissal. *See, e.g., State St. Houses,* 305 B.R. at 742 (affirming dismissal where debtor's problems were suitable for resolution in pending foreclosure action); *Midway*, 187 B.R. at 389 (dismissing case as "two party dispute" where secured creditor and debtor were litigating property dispute in state court).

34

Finally, the sixth *Phoenix Piccadilly* factor militates in favor of dismissal: "the timing of debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors' ability to enforce their rights." Most of the lawsuits relating to the Properties listed on the Debtor's schedules were very close to entering judgments that would have quieted title to the Properties. The timing of this petition by the Debtor, therefore, is dubious and a clear indicia of bad faith. *See, e.g., State St. Houses,* 305 B.R. at 742 (affirming dismissal for bad faith where mortgagee had sent notices of default and would have sought foreclosure but for the chapter 11 filing); *Quartz Hill Mining*, 2014 WL 8381311, at *4 (dismissing case for bad faith where chapter 11 petitions were filed to frustrate imminent foreclosure).

Under the totality of the circumstances as determined by weighing the *Phoenix Piccadilly* factors, the Debtor's case was filed in bad faith. The Debtor filed this case to frustrate the FI 135/ICA Acquisition Parties. Accordingly, this case must be dismissed.

### Conclusion

For all of the reasons set forth above, this Motion should be granted and Bankruptcy Case should be dismissed "for cause" pursuant to Bankruptcy Code § 1112(b).

WHEREFORE, Movants pray for the Court to enter an order:

(a)    granting the Motion;

(b)    dismissing the Bankruptcy Case with prejudice pursuant to Bankruptcy Code § 1112(b); and

(c)    granting such other and further relief as the Court deems just and appropriate.

Dated: December 1, 2023

Respectfully submitted,

BERGER SINGERMAN LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340

By: */s/ Paul Steven Singerman*
      Paul Steven Singerman
      Florida Bar No. 378860
      singerman@bergersingerman.com
      Ilyse M. Homer
      Florida Bar No. 826316
      ihomer@bergersingerman.com

-and-

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
150 West Flagler Street, Ste. 2200
Miami, FL 33130
Telephone: (305) 789-3598

By: */s/ Drew M. Dillworth*
      Drew M. Dillworth
      Florida Bar No. 167835
      ddillworth@stearnsweaver.com

*Counsel to the F135/ICA Acquisition Parties*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served electronically through the Court's CM/ECF system upon all parties registered to receive electronic notice in this case as indicated on the attached Electronic Mail Notice List and via U.S. Regular Mail, postage prepaid, upon all parties on the attached Creditor Matrix, on this 1st day of December, 2023.

*/s/ Paul Steven Singerman*
Paul Steven Singerman

**Electronic Mail Notice List**

The following is the list of **<u>parties</u>** who are currently on the list to receive email notice/service for this case.

- **Joaquin J Alemany**    joaquin.alemany@hklaw.com, HAPI@HKLAW.COM
- **Drew M Dillworth**    ddillworth@stearnsweaver.com, mfernandez@stearnsweaver.com;jless@stearnsweaver.com;dillworthcdp@ecf.epiqsystems.com;fsanchez@stearnsweaver.com
- **Adam Gilbert**    agilbert@underwoodmurray.com, dstrand@underwoodmurray.com;agilbert_835@ecf.courtdrive.com;kmilliken@underwoodmurray.com;kmilliken@ecf.courtdrive.com
- **Ilyse M. Homer**    ihomer@bergersingerman.com, efile@bergersingerman.com;efile@ecf.courtdrive.com
- **Thomas M. Messana**    tmessana@underwoodmurray.com, dstrand@underwoodmurray.com;tmessana@bellsouth.net;tmessana@ecf.courtdrive.com
- **Megan W Murray**    mmurray@underwoodmurray.com, dstrand@underwoodmurray.com;mmurray@ecf.courtdrive.com
- **Martin P Ochs**    martin.p.ochs@usdoj.gov
- **Office of the US Trustee**    USTPRegion21.MM.ECF@usdoj.gov
- **Paul Steven Singerman**    singerman@bergersingerman.com, efile@bergersingerman.com;efile@ecf.courtdrive.com
- **Scott A. Underwood**    sunderwood@underwoodmurray.com, dstrand@underwoodmurray.com;msydow@underwoodmurray.com;sunderwood@ecf.courtdrive.com
- **Tim B Wright**    timwright@wpltrialattorneys.com, smitchell@wpltrialattorneys.com

```
Label Matrix for local noticing        Allerand Capital LLC                    FI 135 Baltimore, LLC
113C-9                                  1002 SE Monterey Commons Blvd. Suit     c/o Berger Singerman et al
Case 23-16198-MAM                       Suite 100                              1450 Brickell Ave #1900
Southern District of Florida            Stuart, FL 34996-3357                  Miami, FL 33131-3453
West Palm Beach
Fri Dec  1 10:28:46 EST 2023

FI 135 Battle Creek, LLC                FI 135 Hines, LLC                      FI 135 Philadelphia-Castor, LLC
c/o Berger Singerman et al              c/o Berger Singerman et al             c/o Berger Singerman et al
1450 Brickell Ave #1900                 1450 Brickell Ave #1900                1450 Brickell Ave #1900
Miami, FL 33131-3453                    Miami, FL 33131-3453                   Miami, FL 33131-3453


FI 135 Philadelphia-Krewstown, LLC      FI 135 Troy, LLC                       FI 135 Waynesboro, LLC
c/o Berger Singerman et al              c/o Berger Singerman et al             c/o Berger Singerman et al
1450 Brickell Ave #1900                 1450 Brickell Ave #1900                1450 Brickell Ave #1900
Miami, FL 33131-3453                    Miami, FL 33131-3453                   Miami, FL 33131-3453


ICA Acquisition Baltimore, LLC          ICA Acquisition Battle Creek, LLC      ICA Acquisition Castor, LLC
c/o Berger Singerman et al              c/o Berger Singerman et al             c/o Berger Singerman et al
1450 Brickell Ave #1900                 1450 Brickell Ave #1900                1450 Brickell Ave #1900
Miami, FL 33131-3453                    Miami, FL 33131-3453                   Miami, FL 33131-3453


ICA Acquisition Hines, LLC              ICA Acquisition Krewstown, LLC         ICA Acquisition Troy, LLC
c/o Berger Singerman et al              c/o Berger Singerman et al             c/o Berger Singerman et al
1450 Brickell Ave #1900                 1450 Brickell Ave #1900                1450 Brickell Ave #1900
Miami, FL 33131-3453                    Miami, FL 33131-3453                   Miami, FL 33131-3453


ICA Acquisition Waynesboro, LLC         PVP Krewstown, LLC                     Rite Aid Corporation
c/o Berger Singerman et al              c/o Allerand Capital LLC               c/o Holland & Knight LLP
1450 Brickell Ave #1900                 675 W. Indiantown Road                 701 Brickell Ave #3300
Miami, FL 33131-3453                    Jupiter, FL 33458-7548                 Miami, FL 33131-2847


Thrifty Payless, Inc.                   98 PHILADELPHIA-CASTOR REMAINDERCO, LLC c/o   98 RA PHILADELPHIA -KREWSTOWN REMAINDERCO, L
c/o Holland & Knight LLP                850 New Burton Road                    850 New Burton Road
701 Brickell Ave #3300                  Suite 201                              Suite 201
Miami, FL 33131-2847                    Dover, DE 19904-5786                   Dover, DE 19904-5786


98 RA Philadelphia-Krewstown Remainderco LLC   98 RA2 Philadelphia-Castor LLC c/o Allerand   98 RA2 Philadelphia-Castor LLC c/o UBS Warbu
850 New Burton Road                     675 West Indiantown Road               1285 Avenue of the Americas
Suite 201                               Suite 103                              11th Floor
Dover, DE 19904-5786                    Jupiter, FL 33458-7555                 New York, NY 10019-6028


98 RA2 Philadelphia-Krewstown Limited PArtne   98 RA2 Philadelphia-Krewstown Limited Partne   AUBSP Ownerco 11, LLC
675 W. Indiantown Road                  1285 Avenue of the Americas            c/o Cross & Simon, LLC, 1105 N. Market S
Suite 103                               11th Floor                             Suite 901
Jupiter, FL 33458-7555                  New York, NY 10019-6028                Wilmington, DE 19899


AUBSP Ownerco 12, LLC                   AUBSP Ownerco 13, LLC                  AUBSP Ownerco 14, LLC
c/o Cross & Simon, LLC, 1105 N. Market S   c/o Cross & Simon, LLC, 1105 N. Market S   c/o Cross & Simon, LLC, 1105 N. Market S
Suite 901                               Suite 901                              Suite 901
Wilmington, DE 19899                    Wilmington, DE 19899                   Wilmington, DE 19899
```

AUBSP Ownerco 15, LLC
c/o Cross & Simon, LLC, 1105 N. Market S
Suite 901
Wilmington, DE 19899

AUBSP Ownerco 2, LLC
c/o Cross & Simon, LLC, 1105 N. Market S
Suite 901
Wilmington, DE 19899

AUBSP Ownerco 3, LLC
c/o Cross & Simon, LLC, 1105 N. Market S
Suite 901
Wilmington, DE 19899

AUBSP Ownerco 4, LLC
c/o Cross & Simon, LLC, 1105 N. Market S
Suite 901
Wilmington, DE 19899

AUBSP Ownerco 5, LLC
c/o Cross & Simon, LLC, 1105 N. Market S
Suite 901
Wilmington, DE 19899

AUBSP Ownerco 6, LLC
c/o Cross & Simon, LLC, 1105 N. Market S
Suite 901
Wilmington, DE 19899

AUBSP Ownerco 7, LLC
c/o Cross & Simon, LLC, 1105 N. Market S
Suite 901
Wilmington, DE 19899

AUBSP Ownerco 8, LLC
c/o Cross & Simon, LLC, 1105 N. Market S
Suite 901
Wilmington, DE 19899

AUBSP Ownerco 9, LLC
c/o Cross & Simon, LLC, 1105 N. Market S
Suite 901
Wilmington, DE 19899

AUBSPO Ownerco 1, LLC
c/o Cross & Simon, LLC, 1105 N. Market S
Suite 901
Wilmington, DE 19899

Allerand Capital, LLC
675 W. Indiantown Road
Suite 103
Jupiter, FL 33458-7555

Allerand Realty Holdings, LLC
675 W. Indiantown Road
Suite 103
Jupiter, FL 33458-7555

Allerand UBSP Holdingco, LLC
675 W Indiantown Road
Jupiter, FL 33458-7548

Allerand USBP Holdingco, LLC
675 W. Indiantown Road
Suite 103
Jupiter, FL 33458-7555

Amherst RA-357 LLC
c/o Financial Structures Limited,
3600 Arco Corporate Drive
Suite 150
Charlotte, NC 28273-8100

Aston RA-357 LLC
Parkowski Guerke & Swayze, P.A.,
1105 North Market St
19th Floor
Wilmington, DE 19801-1216

Aston RA-357 LLC
c/o Financial Structures Limited,
3600 Arco Corporate Drive
Suite 150
Charlotte, NC 28273-8100

Baltimore County Tax Collector
400 Washington Avenue
Room 150
Towson, MD 21204-4605

Baltimore RA-357 LLC
c/o Financial Structures Limited,
3600 Arco Corporate Dr
Suite 150
Charlotte, NC 28273-8100

Battle Creek RA-357 LLC
c/o Financial Structures Limited
3600 Arco Corporate Dr
Suite 150
Charlotte, NC 28273-8100

Berea RA-379 LLC
c/o Financial Structures Limited
3600 Arco Corporate Dr
Suite 150
Charlotte, NC 28273-8100

Berkadia Commercial Mortgage
Potter Anderson Corroon LLP
1313 Market St
PO Box 951
Wilmington, DE 19899-0951

Bishop RA-357 LLC
c/o Financial Structures Limited
3600 Arco Corporate Dr
Suite 150
Charlotte, NC 28273-8100

Blythe RA-320 LLC
c/o Financial Structures Limited
3600 Arco Corporate Dr
Suite 150
Charlotte, NC 28273-8100

Brandon John Wilson
39400 Woodward Ave
Suite 101
Bloomfield Hills, MI 48304-5151

Broadview Heights RA-357 LLC
c/o Financial Structures Limited
3600 Arco Corporate Dr
Suite 150
Charlotte, NC 28273-8100

Brookpark RA-357 LLC
c/o Financial Structures Limited
3600 Arco Corporate Dr
Suite 150
Charlotte, NC 28273-8100

Bureau of Revenue Collections
200 Holiday Street
Baltimore, MD 21202-6294

Calhoun County Treasurer Office
215 W. Green Street
Marshall, MI 49068

Carson R. Bartlett
Potter Anderson Corroon LLP
1313 Market St
PO Box 951
Wilmington, DE 19899-0951

```
Castor Philadelphia RA-357 LLC          Chad Stover                             Christina B. Vavala Polsinelli PC,
c/o Financial Structures Limited        Barnes & Thornburg LLP                  222 Delaware Avenue
3600 Arco Corporate Dr                  1000 North West St                      Suite 1101
Suite 150                               Suite 1500                              Wilmington, DE 19801-1621
Charlotte, NC 28273-8100                Wilmington, DE 19801-1054


(p)CITY OF PHILADELPHIA LAW DEPARTMENT   Claremont RA-320 LLC                   Comptroller of Maryland c/o Compliance Divis
MUNICIPAL SERVICES BUILDING             c/o Financial Structures Limited        301 W Preston
1401 JOHN F KENNEDY BLVD 5TH FLOOR      3600 Arco Corporate Drive               Room 409
PHILADELPHIA PA 19102-1617              Suite 150                               Baltimore, MD 21201-2383
                                        Charlotte, NC 28273-8100


Croessmann & Westberg, P.C., c/o Glenn W.D.   Cross and Simon LLC               Cross and Simon LLC
8000 Towers Crescent Drive              1105 N. Market                          1105 N. Market St
Suite 1575                              Wilmington, DE 19801-1216               Wilmington, DE 19801-1216
Vienna, VA 22182-6240


Daniel P. Daniluk                       David F. Fontana                        FI 135 Baltimore LLC  c/o Michael D. Nord
1129 Niles-Cortland Road SE             One South Street                        One South Street
Warren, OH 44484-2542                   Suite 2200                              Suite 2200
                                        Baltimore, MD 21202-3281                Baltimore, MD 21202-3281


FI 135 Baltimore LLC c/o Larry N Woodard   FI 135 Baltimore, LLC                FI 135 Battle Creek LLC
155 N. Wacker Dr.                       c/o Paul Steven Singerman, Esq.         2701 N. Charles Street
Suite 3100                              Berger Singerman LLP                    Suite 404
Chicago, IL 60606-1734                  1450 Brickell Avenue, Ste. 1900         Baltimore, MD 21218-5061
                                        Miami, FL 33131-5319


FI 135 Battle Creek LLC c/o Bloomfield Capit   FI 135 Battle Creek LLC c/o Brandon John Wil   FI 135 Battle Creek LLC c/o Larry Woodard
700 Forest Ave                          39400 Woodward Ave                      155 N. Wacker Dr.
Birmingham, MI 48009-6444               Suite 101                               Suite 3100
                                        Bloomfield Hills, MI 48304-5151         Chicago, IL 60606-1734


FI 135 Battle Creek, LLC                FI 135 Castor Philadelphia              FI 135 Castor Philadelphia LLC c/o Bloomfiel
c/o Paul Steven Singerman, Esq.         2701 N. Charles Street                  700 Forest Ave
Berger Singerman LLP                    Suite 404                               Birmingham, MI 48009-6444
1450 Brickell Avenue, Ste. 1900         Baltimore, MD 21218-5061
Miami, FL 33131-5319


FI 135 Castor Philadelphia LLC c/o Larry N.   FI 135 Castor Philadelphia, LLC    FI 135 Hines LLC
155 N. Wacker Dr.                       c/o Paul Steven Singerman, Esq.         2701 N. Charles Street
Suite 3100                              Berger Singerman LLP                    Suite 404
Chicago, IL 60606-1734                  1450 Brickell Avenue, Ste. 1900         Baltimore, MD 21218-5061
                                        Miami, FL 33131-5319


FI 135 Hines LLC c/o Bloomfield Capital Asse   FI 135 Hines c/o Dustin Martinsen   FI 135 Hines, LLC
700 Forest Ave                          P.O. Box 430                            c/o Paul Steven Singerman, Esq.
Birmingham, MI 48009-6444               292 Main Street South                   Berger Singerman LLP
                                        Vale, OR 97918-1341                     1450 Brickell Avenue, Ste. 1900
                                                                                Miami, FL 33131-5319


FI 135 Krewstown Philadelphia LLC       FI 135 Krewstown Philadelphia LLC c/o Bloomf   FI 135 Krewstown Philadelphia LLC c/o Larry
2701 N. Charles Street                  700 Forest Ave                          155 N. Wacker Dr.
Suite 404                               Birmingham, MI 48009-6444               Suite 3100
Baltimore, MD 21218-5061                                                        Chicago, IL 60606-1734
```

FI 135 Krewstown Philadelphia, LLC
c/o Paul Steven Singerman, Esq.
Berger Singerman LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL 33131-5319

FI 135 Philadelphia-Castor, LLC
c/o Paul Steven Singerman, Esq.
Berger Singerman LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL 33131-5319

FI 135 Troy LLC
2701 N. Charles Street
Baltimore, MD 21218-4351

FI 135 Troy LLC c/o Bloomfield Capital Asset
700 Forest Ave
Birmingham, MI 48009-6444

FI 135 Troy LLC c/o Larry N. Woodward
155 N. Wacker Dr.
Suite 3100
Chicago, IL 60606-1734

FI 135 Troy, LLC
c/o Paul Steven Singerman, Esq.
Berger Singerman LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL 33131-5319

FI 135 Waynesboro LLC c/o Larry N. Woodard
155 N. Wacker Dr.
Suite 3100
Chicago, IL 60606-1734

Financial Structures Limited
3600 Arco Corporate Drive
Suite 150
Charlotte, NC 28273-8100

Financial Structures Limited
Chevron House, 11 Church Street
Hamilton HM 11
Bermuda,

First American Title of Oregon as Trustee
1700 SW Fourth Avenue
Suite 103
Portland, OR 97201

Flint RA-357 LLC
c/o Financial Structures Limited
3600 Arco Corporate Dr
Suite 150
Charlotte, NC 28273-8100

Flora Petitit PC c/o Nancy R. Schlichting
530 E Main Street
P.O. Box 2057
Charlottesville, VA 22902-2057

Florida Dept of  Revenue Attn: Bankruptcy Un
P.O. Box 6668
Tallahassee, FL 32314-6668

Fredericksburg RA-100 LLC
Parkowski Guerke & Swayze, P.A., 1105 No
19th Floor
Wilmington, DE 19801

Fredericksburg RA-100 LLC
c/o Financial Structures Limited
3600 Arco Corporate Dr
Suite 150
Charlotte, NC 28273-8100

GCC-RA Bardstown, LLC
c/o Cross & Simon, LLC,
1105 N. Market S, PO Box 1380
Suite 901
Wilmington, DE 19899-1380

GCC-RA Berea, LLC
c/o Cross & Simon, LLC,
1105 N. Market S, PO Box 1380
Suite 901
Wilmington, DE 19899-1380

GCC-RA Cane Run, LLC
c/o Cross & Simon, LLC
1105 N. Market S, PO Box 1380
Suite 901
Wilmington, DE 19899-1380

GCC-RA Hodgenville, LLC
c/o Cross & Simon, LLC
1105 N. Market S, PO Box 1380
Suite 901
Wilmington, DE 19899-1380

GCC-RA Orangevale, LLC
c/o Cross & Simon, LLC
1105 N. Market S, PO Box 1380
Suite 901
Wilmington, DE 19899-1380

GCC-RA Paradise, LLC
c/o Cross & Simon, LLC
1105 N. Market S, PO Box 1380
Suite 901
Wilmington, DE 19899-1380

Gouverneur RA-357 LLC
Parkowski Guerke & Swayze, P.A., 1105 No
19th Floor
Wilmington, DE 19801

Gouverneur RA-357 LLC
c/o Financial Structures Limited
3600 Arco Corporate Dr
Suite 150
Charlotte, NC 28273-8100

Harney County Tax Assessor
450 Buena Vista #13
Burns, OR 97720-1565

Hill Wallack
1000 Floral Vale Blvd
Suite 300
Morrisville, PA 19067-5569

Hill Wallack LLP
21 Roszel Road
Princeton, NJ 08540-6866

Hill Wallack c/o Francis J. Sullivan Esq.
1000 Floral Vale Blvd
Suite 300
Morrisville, PA 19067-5569

Hines RA-357 LLC
c/o Financial Structures Limited, 3600 A
Suite 150
Charlotte, NC 28273-8100

Hodgenville RA-379 LLC
c/o Financial Structures Limited, 3600 A
Suite 150
Charlotte, NC 28273-8100

ICA Acquisition Baltimore, LLC
c/o Paul Steven Singerman, Esq.
Berger Singerman LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL 33131-5319

ICA Acquisition Baltimore, LLC c/o Michael D
One South Street
Suite 2200
Baltimore, MD 21202-3281

ICA Acquisition Battle Creek LLC c/o Brandon
39400 Woodward Ave.
Suite 101
Bloomfield Hills, MI 48304-5151

ICA Acquisition Battle Creek, LLC
2701 N. Charles Street
Suite 404
Baltimore, MD 21218-5061

ICA Acquisition Battle Creek, LLC
c/o Paul Steven Singerman, Esq.
Berger Singerman LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL 33131-5319

ICA Acquisition Battle Creek, LLC c/o MCB Re
2701 North Charles Street
Suite 404
Baltimore, MD 21218-5061

ICA Acquisition Castor Philadelphia, LLC
c/o Paul Steven Singerman, Esq.
Berger Singerman LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL 33131-5319

ICA Acquisition Castor, LLC
c/o Paul Steven Singerman, Esq.
Berger Singerman LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL 33131-5319

ICA Acquisition Castor, LLC c/o MCB Real Est
2701 North Charles Street
Suite 404
Baltimore, MD 21218-5061

ICA Acquisition Hines LLC
2701 N. Charles Street
Suite 404
Baltimore, MD 21218-5061

ICA Acquisition Hines LLC c/o MCB Real Estat
2701 North Charles Street
Suite 404
Baltimore, MD 21218-5061

ICA Acquisition Hines, LLC
c/o Paul Steven Singerman, Esq.
Berger Singerman LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL 33131-5319

ICA Acquisition Krewstown Philadelphia LLC
2701 N. Charles Street
Suite 404
Baltimore, MD 21218-5061

ICA Acquisition Krewstown Philadelphia LLC c
2701 North Charles Street
Suite 404
Baltimore, MD 21218-5061

ICA Acquisition Krewstown Philadelphia, LLC
c/o Paul Steven Singerman, Esq.
Berger Singerman LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL 33131-5319

ICA Acquisition Krewstown, LLC
c/o Paul Steven Singerman, Esq.
Berger Singerman LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL 33131-5319

ICA Acquisition LLC c/o Keith Lusby
1 South Street
Suite 2200
Baltimore, MD 21202-3281

ICA Acquisition Troy LLC
2701 N. Charles Street
Baltimore, MD 21218-4351

ICA Acquisition Troy LLC c/o MCB Real Estate
2701 North Charles Street
Suite 404
Baltimore, MD 21218-5061

ICA Acquisition Troy, LLC
c/o Paul Steven Singerman, Esq.
Berger Singerman LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL 33131-5319

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

Ironton RA-320 LLC
Parkowski Guerke & Swayze, P.A.
1105 North Market St
19th Floor
Wilmington, DE 19801-1216

Ironton RA-320 LLC
c/o Financial Structures Limited
3600 Arco Corporate Dr
Suite 150
Charlotte, NC 28273-8100

John Anderson Sensing
1313 Market St
PO Box 951
Wilmington, DE 19899-0951

Keybank National Assoc.
c/o Polsinelli PC
222 Delaware Avenue
Suite 1101
Wilmington, DE 19801-1621

Krewstown Philadelphia RA-357 LLC
c/o Financial Structures Limited, 3600 A
Suite 150
Charlotte, NC 28273-8100

Law Office of Michael D. Moccia, PA
1200 N. Federal Highway
Suite 200
Boca Raton, FL 33432-2813

Lorain RA-357 LLC
Parkowski Guerke & Swayze, P.A.
1105 North Market St
19th Floor
Wilmington, DE 19801-1216

Lorain RA-357 LLC
c/o Financial Structures Limited
3600 Arco Corporate Dr
Suite 150
Charlotte, NC 28273-8100

Louisville-Bardstown RA-379 LLC
c/o Financial Structures Limited
3600 Arco Corporate Dr
Suite 150
Charlotte, NC 28273-8100

Louisville-Cane Run RA-379 LLC
c/o Financial Structures Limited
3600 Arco Corporate Dr
Suite 150
Charlotte, NC 28273-8100

```
Marlinton RA-357 LLC                    Marlinton RA-357-LLC                    Marysville RA-357 LLC
c/o Financial Structures Limited        Parkowski Guerke & Swayze, P.A.         Parkowski Guerke & Swayze, P.A., 1105 No
3600 Arco Corporate Dr                  1105 North Market St                    19th Floor
Suite 150                               19th Floor                             Wilmington, DE 19801
Charlotte, NC 28273-8100                Wilmington, DE 19801-1216

Marysville RA-357 LLC                   McGuire Woods Battle & Boothe LLP       McGuire Woods LLP
c/o Financial Structures Limited        901 East Cary Street                    Gateway Plaza 800 East Canal Street
3600 Arco Corporate Dr                  Attn: T. Craig Harmon                   Attn: T. Craig Harmon
Suite 150                               Richmond, VA 23219-4030                 Richmond, VA 23219-3916
Charlotte, NC 28273-8100

Michael W. Teichman                     Michigan Dept of Treasury               Michigan Dept. of Treasury, Tax Policy Divis
Parkowski Guerke & Swayze, P.A.         Lansing, MI 48922-0001                  2nd Floor Austin Building
1105 North Market St                                                           430 W. Allegan Street
19th Floor                                                                     Lansing, MI 48922-0001
Wilmington, DE 19801-1216

Minerva Realty Consultants c/o Merrie S. Fra   Muskegon RA-357 LLC              Muskegon RA-357 LLC
400 E. 55th Street                      Parkowski Guerke & Swayze, P.A.         c/o Financial Structures Limited
Suite 28C                               1105 N Market St                        3600 Arco Corporate Dr
New York, NY 10022-5133                 19th Floor                             Suite 150
                                        Wilmington, DE 19801-1216               Charlotte, NC 28273-8100

New Castle County, Sheriff              Nicol Jacoby LLP c/o Nicol Jacoby       Oakland County Tax Collector
87 Reads Way                            50 Main Street                          1200 N. Telegraph Road
New Castle, DE 19720-1610               Suite 1000                              Pontiac, MI 48341-1032
                                        White Plains, NY 10606-1900

Office of the US Trustee                Orangevale RA-379 LLC                   Orem RA-357 LLC
51 S.W. 1st Ave.                        c/o Financial Structures Limited        Parkowski Guerke & Swayze, P.A.
Suite 1204                              3600 Arco Corporate Dr                  1105 North Market St
Miami, FL 33130-1614                    Suite 150                              19th Floor
                                        Charlotte, NC 28273-8100                Wilmington, DE 19801-1216

Orem RA-357 LLC                         PVP Aston, LLC                          PVP Castor, LLC
c/o Financial Structures Limited        c/o Cross & Simon, LLC                  c/o Cross & Simon, LLC,
3600 Arco Corporate Dr                  1105 N. Market St, PO Box 1380          1105 N. Market St, PO Box 1380
Suiet 150                               Suite 901                              Suite 901
Charlotte, NC 28273-8100                Wilmington, DE 19899-1380               Wilmington, DE 19899-1380

PVP Krewstown, LLC                      PW Real Estate Investments, Inc.        Paine Weber Real Estate Securities, Inc.
c/o Cross & Simon, LLC                  1285 Avenue of the Americas             1285 Avenue of the Americas
1105 N. Market St, PO Box 1380          New York, NY 10019-6031                 Attn Laura Kelly
Suite 901                                                                       New York, NY 10019-6031
Wilmington, DE 19899-1380

Paradise RA-379 LLC                     Paul Hastings Janofsky & Walker LLP     Paul Hastings Jonanofsky & Walker LLP Attn:
c/o Financial Structures Limited        75 East 55th St                         75 East 55th Street
3600 Arco Corporate Dr                  New York, NY 10022                      New York, NY 10022
Suite 150
Charlotte, NC 28273-8100

Philadelphia City Department of Revenue  Philadelphia Dept. of Revenue          RA BATTLE CREAK REMAINDERCO LLC c/o Cogency
1401 John F. Kennedy Blvd               Department 280946                       850 New Burton Road
Philadelphia, PA 19102-1640             Attn: Bankr. Division                   Suite 201
                                        Harrisburg, PA 17128-0946               Dover, DE 19904-5786
```

```
RA Baltimore-Harford Remainderco, LLC c/o Co      RA Hines Remainderco LLC c/o Cogency Global      RA Philadelphia Krewstown Remainderco, LLC i
850 New Burton Road                               850 New Burton Road                              c/o Cogency Global
Suite 201                                         Suite 201                                        850 New Burton Rd., Ste. 201
Dover, DE 19904-5786                              Dover, DE 19904-5786                             Dover, DE 19904-5786



RA Troy Remainderco LLC c/o Corporation Serv      RA WAYNESBORO REMAINDERCO LLC c/o Cogency Gl     RA2 Baltimore-Harford LLC
251 Little Falls Drive                            850 New Burton Road                              c/o Cogency Global,
Wilmington, DE 19808-1674                         Suite 201                                        850 New Burton Rd., Ste. 201
                                                  Dover, DE 19904-5786                             Dover, DE 19904-5786



RA2 Baltimore-Harford LLC c/o UBS Warburg LL      RA2 Battle Creek LLC c/o UBS Warburg LLC         RA2 Flint L.L.C.
1285 Avenue of the Americas                       1285 Avenue of the Americas                      c/o Cross & Simon, LLC
11th Floor                                        Floor 11                                         1105 N. Market St, PO Box 1380
New York, NY 10019-6028                           New York, NY 10019-6028                          Suite 901
                                                                                                   Wilmington, DE 19899-1380



RA2 Hine LLC /o Allerand Capital LLC              RA2 Marlinton L.L.C.                             RA2 Marysville L.L.C.
675 W. Indiantown Road                            c/o Cross & Simon, LLC                           c/o Cross & Simon, LLC
Suite 103                                         1105 N. Market St, PO Box 1380                   1105 N. Market St, PO Box 1380
Jupiter, FL 33458-7555                            Suite 901                                        Suite 901
                                                  Wilmington, DE 19899-1380                        Wilmington, DE 19899-1380



RA2 Orem L.L.C.                                   RA2 Stuarts Draft L.L.C.                         RA2 Toledo L.L.C.
c/o Cross & Simon, LLC                            c/o Cross & Simon, LLC                           c/o Cross & Simon, LLC
1105 N. Market St, PO Box 1380                    1105 N. Market St, PO Box 1380                   1105 N. Market St, PO Box 1380
Suite 901                                         Suite 901                                        Suite 901
Wilmington, DE 19899-1380                         Wilmington, DE 19899-1380                        Wilmington, DE 19899-1380



RA2 Troy LLC c/o Allerand Capital                 RA2 Troy LLC c/o Merchant Equity Financial G     RA2 Waynesboro LLC c/o Allerand Capital
675 W. Indiantown Road                            101 East 52nd Street                             675 W. Indiantown Road
Suite 103                                         30th Floor (attn: John Mannix)                   Suite 103
Jupiter, FL 33458-7555                            New York, NY 10022                               Jupiter, FL 33458-7555



RA2 Waynesboro LLC c/o UBS Warburg LLC            RX Fredericksburg Investors, LLC                 Richard A. DuBose, III
1285 Avenue of the Americas                       c/o Cross & Simon, LLC                           One South Street
11th Floor (attn: Brian Harris)                   1105 N. Market St, PO Box 1380                   Suite 2200
New York, NY 10019-6031                           Suite 901                                        Baltimore, MD 21202-3281
                                                  Wilmington, DE 19899-1380



Rite Aid Corporation                              Rite Aid of Michigan c/o Lawrence Bluestone      Rite Aid of Pennsylvania LLC c/o Lawrence Bl
c/o Joaquin J. Alemany, Esq.                      1600 Market Street                               1600 Market Street
Holland & Knight LLP                              Suite 1650                                       Suite 1650
701 Brickell Avenue, Ste 3300                     Philadelphia, PA 19103-7238                      Philadelphia, PA 19103-7238
Miami, Florida 33131-2898



Stoel Rives LLP c/o Crystal Chase                 Stuarts Draft RA-357 LLC                         Stuarts Draft RA-357 LLC
760 SW North Ave.                                 Parkowski Guerke & Swayze, P.A.                  c/o Financial Structures Limited
Suite 3000                                        1105 North Market St                             3600 Arco Corporate Dr
Portland, OR 97205                                19th Floor                                       Suite 150
                                                  Wilmington, DE 19801-1216                        Charlotte, NC 28273-8100



Sutherland Commercial Mortgage Trust 2018-SE      Sutherland Grantor Trust                         TROY RA-357 LLC
Polsinelli PC, 222 Delaware Avenue                Polsinelli PC, 222 Delaware Avenue               3600 Arco Corporate Drive
Suite 110                                         Suite 1101                                       Charlotte, NC 28273-8100
Wilmington, DE 19801                              Wilmington, DE 19801
```

Thrift Payless Inc c/o Lawrence Bluestone
1600 Market Street
Suite 1650
Philadelphia, PA 19103-7238

Thrifty PayLess, Inc.
c/o Joaquin J. Alemany, Esq.
Holland & Knight LLP
701 Brickell Avenue, Ste 3300
Miami, Florida 33131-2898

Toledo RA-357 LLC
Parkowski Guerke & Swayze, P.A.
1105 N Market St
19th Floor
Wilmington, DE 19801-1216

Toledo RA-357 LLC
c/o Financial Structures Limited
3600 Arco Corporate Dr
Suite 150
Charlotte, NC 28273-8100

Troy RA-357 LLC
c/o Financial Structures Limited
3600 Arco Corporate Dr
Suite 150
Charlotte, NC 28273-8100

US Bank National Association
800 Nicollet Mall
Minneapolis, MN 55402-2511

US Bank National Association
Potter Anderson Corroon LLP, 1313 Market
Wilmington, DE 19801-6101

Varnum LLP c/o Bradley Defoe
480 Pierce Street
Suite 300
Birmingham, MI 48009-6019

WEC 98D-23 LLC
c/o Cross & Simon, LLC
1105 N. Market S, PO Box 1380
Suite 901
Wilmington, DE 19899-1380

WEC 98D-26 LLC
c/o Cross & Simon, LLC
1105 N. Market S, PO Box 1380
Suite 901
Wilmington, DE 19899-1380

WEC 98D-4 LLC
c/o Cross & Simon, LLC
1105 N. Market S, PO Box 1380
Suite 901
Wilmington, DE 19899-1380

WEC 98D-5 LLC
c/o Cross & Simon, LLC
1105 N. Market S, PO Box 1380
Suite 901
Wilmington, DE 19899-1380

WEC 98D-6 LLC
c/o Cross & Simon, LLC
1105 N. Market S, PO Box 1380
Suite 901
Wilmington, DE 19899-1380

WF RR3-CMFU
Barnes & Thornburg LLP
1000 North West
Suite 1500
Wilmington, DE 19801-1054

Waynesboro RA-357 LLC
c/o Financial Structures Limited
3600 Arco Corporate Dr
Suite 150
Charlotte, NC 28273-8100

Wells Fargo Trust Co.
Potter Anderson Corroon LLP
1313 Market St, PO Box 951
Wilmington, DE 19899-0951

West Fairview Boise RA-357 LLC
c/o Financial Structures Limited
3600 Arco Corporate Dr
Suite 150
Charlotte, NC 28273-8100

West Overland Boise RA-357 LLC
c/o Financial Structures Limited
3600 Arco Corporate Dr
Suite 150
Charlotte, NC 28273-8100

Willard RA-357 LLC
c/o Financial Structures Limited
3600 Arco Corporate Dr
Suite 150
Charlotte, NC 28273-8100

Adam Gilbert
100 N Tampa St Suite 2325
Tampa, FL 33602-5842

Brandon J Wilson
c/o Honigman LLP
2290 First National Building
6600 Woodward Ave
Detroit, MI 48226-3506

Megan W Murray
Underwood Murray, P.A.
100 N. Tampa Street
Suite 2325
Tampa, FL 33602-5842

Scott A. Underwood Esq.
Underwood Murray, P.A.
100 North Tampa St Suite 2325
Tampa, FL 33602-5842

Thomas M. Messana Esq.
401 East Las Olas Blvd., Ste. 1400
Ft. Lauderdale, FL 33301-2218

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).


City of Philadelphia / School District of Ph
attn Megan Harper
City of Philadelphia Law Dept - Tax Unit
1401 JFK Blvd, 5th Floor
Philadelphia, PA 19102

(d)Philadelphia Dept. of Revenue
P.O. Box 8409
Philadelphia, PA 19101-8409

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)West Palm Beach

(d)Daniel P. Daniluk
1129 Niles-Cortland Road SE
Warren, OH 44484-2542

(d)Law Office of Michael D. Moccia, PA
1200 N. Federal Highway
Suite 200
Boca Raton, FL 33432-2813

(d)RA2 Troy LLC c/o Allerand Capital LLC
675 W. Indiantown Road
Suite 103
Jupiter, FL 33458-7555

End of Label Matrix
Mailable recipients    233
Bypassed recipients      4
Total                  237

**<u>EXHIBIT A</u>**

Store No: <u>1474</u>

## CONSENT AGREEMENT

CONSENT AGREEMENT, dated as of August 24, 1998 (this "**Agreement**"), among RITE AID OF MICHIGAN, INC., a Michigan corporation (the "Lessee"), RITE AID CORPORATION, a Delaware corporation (the "**Guarantor**"), RA2 BATTLE CREEK L.L.C., a Delaware limited liability company (the "**Lessor**"), and PW REAL ESTATE INVESTMENTS INC., a Delaware corporation (the "**Lender**").

## ARTICLE 1
### ACKNOWLEDGMENT OF ASSIGNMENT AND LESSEE AND GUARANTOR CONSENT

SECTION 1.01. *Loan Agreement.*  The Lessor and the Lender have entered that certain financing arrangement pursuant to the Loan Agreement dated as of even date herewith (the "**Loan Agreement**").  In order to secure the indebtedness evidenced by the Secured Note delivered by the Lessor to the Lender pursuant to the Loan Agreement (the "Secured Note"), the Lessor has granted the Lender a first priority lien on and security interest in the Leased Premises, as defined in the Lease dated as of August 24, 1998 between the Lessee and the Lessor (the "**Lease**"), and, pursuant to the Lease Assignment and Agreement dated as of August 24, 1998 (the "**Lease Assignment**"), has assigned to the Lender all of the right, title and interest of the Lessor in and to (x) the Lease and the Basic Rent and Additional Rent (both as defined in the Lease) to be paid by the Lessee under the Lease, and (y) the Corporate Guaranty dated as of August 24, 1998 (the "**Guaranty**") by the Guarantor in favor of the Lessor and its successors and assigns.  Capitalized terms used herein without definition have the meanings given to them in the Lease.

SECTION 1.02. *Lessee and Guarantor Consent to Loan Documents.*  Effective as of the date hereof, each of the Lessee and the Guarantor:

(a)    consents to the execution, delivery to the Lender and performance by the Lessor of the Lease Assignment, and agrees to pay all Rent directly to the Lender in accordance with Section 3 of the Lease Assignment, a copy of which is attached to this Agreement as Exhibit A;

(NY) 03387/019/CONSENT/FINAL/cnsnt.michigan.1474.wpd

(b)      agrees that any notice given to the Lessee by the Lender shall have the same force and effect as a notice given by the Lessor and that in the event of inconsistent notices from the Lessor and from the Lender, notices from the Lender shall control;

(c)      agrees, except in the event that the Lender succeeds to the interests of the Lessor under the Lease, that the Lender shall not be subject to any obligation, duty or liability under the Lease accruing prior to Lender's succession;

(d)      agrees that, without the prior written consent of the Lender, which consent shall not be unreasonably withheld, conditioned or delayed, neither the Lease nor the Guaranty shall be changed, amended, altered or modified in any respect that modifies any monetary obligations or other material obligations of the Lessee or the Guarantor or affects the rights and remedies of the Lessor or the Lender;

(e)      agrees that any rejection by the Lessor of a rejectable offer made by the Lessee pursuant to Paragraph 13 of the Lease shall not be valid unless countersigned or otherwise approved in writing by the Lender; and

(f)      agrees that, except as expressly permitted in the Loan Agreement, any consent or waiver provided pursuant to the Lease by the Lessor shall not be valid unless approved in writing by the Lender.

## ARTICLE 2
### Representations and Warranties

SECTION 2.01.  *Representations and Warranties of Lessee.*  (a)  The Lessee is a corporation duly formed, validly existing and in good standing under the laws of the jurisdiction of its formation and, if different, is duly qualified to do business in the jurisdiction in which the Leased Premises is located, and has all requisite power and authority to carry on its business as now conducted and to execute, deliver and perform this Agreement,  the Lease and the other documents to be executed and delivered by the Lessee in connection with the transaction contemplated by the Lease.

(b)   The Lessee has not taken any action or failed to take any action which would cause a Lien to attach to the Leased Premises (other than Permitted Encumbrances).

(c)   There are no suits, actions, writs, decrees, injunctions, orders, judgments, claims or proceedings pending or, to the knowledge of the Lessee,

threatened or contemplated, against. arising out of, or relating to the Leased Premises, other than those arising in the ordinary course of business or that would not, if determined adversely to the Lessee, result in an adverse impact on the Lessee's (or the Guarantor's) financial condition or ability to perform its obligations under the Lease or the Guaranty, as applicable.

(d)   The execution, delivery and performance by the Lessee of this Agreement, the Lease and the other documents to be executed and delivered by the Lessee are within its corporate powers, have been duly authorized by all necessary corporate action, require no governmental action by or in respect of, or filing with, any governmental authority and do not contravene, or constitute a default under, any applicable laws or any provision of its articles of incorporation or by-laws or of any agreement, judgment, injunction, order, decree or other instrument binding upon it or result in the creation or imposition of any lien on any of its assets.

(e)   Each of this Agreement and the Lease constitutes a valid and binding agreement of the Lessee, enforceable against the Lessee in accordance with its terms except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws relating to the enforcement of creditor's rights generally and by general equitable principles.

(f)   Subject to the limitation on the survival of liability for false representations and warranties set forth in the Warranties and Representations Agreement dated as of August 24, 1998 (the "**Representations Agreement**") between Rite Aid Corporation, as seller, and the affiliates of such seller listed on Schedule 1 attached thereto, to and for the benefit of the entities listed on such Schedule 1, as purchaser, the Lessee restates herein as if fully set forth herein for the benefit of the Lender the representations and warranties set forth in Section 1 of the Representations Agreement.

(g)   Effective as of the Commencement Date, the Lessee represents and warrants to the Lender that:

(i)   Securities Act. Neither the Lessee nor any affiliate (as defined in Rule 501(b) of Regulation D under the Securities Act, as used in this paragraph (b), an "Affiliate") of the Lessee has directly, or through any agent, (A) sold, offered for sale, solicited offers to buy or otherwise negotiated in respect of, any security (as defined in the Securities Act) which is or will be integrated with the sale of the Secured Note or the Certificates (as defined in Section 4.06) in a manner that would require the registration under the Securities Act of such Secured Note or the Certificates or (B) engaged in any form of general solicitation or general

advertising in connection with the offering of the Secured Note or the Certificates (as those terms are used in Regulation D under the Securities Act) or in any public offering of the Secured Notes or the Certificates within the meaning of Section 4(2) of the Securities Act.

      (ii)   Rule 144A(d)(3). To the extent the Lessee would be deemed to be the "issuer" of the Secured Note or the Certificates pursuant to Applicable Law, neither the Secured Note nor the Certificates was or will be, when issued, of the same class as securities listed on a national securities exchange registered under Section 6 of the Exchange Act or quoted in a U.S. automated interdealer quotation system; provided that securities that are convertible or exchangeable into securities so listed or quoted at the time of issuance and that had an effective conversion premium of less than 10 percent, shall be treated as securities of the class into which they are convertible or exchangeable; and that warrants that may be exercised for securities so listed or quoted at the time of issuance, for a period of less than three years from the date of issuance, or that had an effective exercise premium of less than ten percent, shall be treated as securities of the class to be issued upon exercise. The Lessee is not an open-end investment company, unit investment trust or face-amount certificate company that is or is required to be registered under Section 8 of the Investment Company Act of 1940.

SECTION 2.02.  *Representations and Warranties of Guarantor.* (a) The Guarantor is a corporation duly formed, validly existing and in good standing under the laws of the State of Delaware, and has all requisite power and authority to carry on its business as now conducted and to execute, deliver and perform this Agreement, the Guaranty and the other documents to be executed and delivered by the Guarantor in connection with the transaction contemplated by the Lease.

(b) The execution, delivery and performance by the Guarantor of this Agreement, the Guaranty and the other documents to be executed and delivered by the Guarantor are within its corporate powers, have been duly authorized by all necessary corporate action, require no governmental action by or in respect of, or filing with, any governmental authority and do not contravene, or constitute a default under, any applicable laws or any provision of its articles of incorporation or by-laws or of any agreement, judgment, injunction, order, decree or other instrument binding upon it or result in the creation or imposition of any lien on any of its assets.

(c) Each of this Agreement and the Guaranty constitutes a valid and binding agreement of the Guarantor, enforceable against the Guarantor in accordance with its terms except as the enforceability thereof may be limited by

(NY) 03387/019/CONSENT/FINAL/cnsnt.michigan.1474.wpd

4

bankruptcy, insolvency or other similar laws relating to the enforcement of creditor's rights generally and by general equitable principles.

## ARTICLE 3

### AGREEMENTS

SECTION 3.01. *Further Assurances.* Each of the Lessee and the Guarantor, at its sole cost and expense, will cause to be promptly and duly taken, executed, acknowledged and delivered, all such further acts, documents and assurances as the Lender reasonably may request from time to time in order to carry out more effectively the intent and purposes of this Agreement and the Lease Assignment.

SECTION 3.02. *Notices.* Each of the Lessee and the Guarantor shall deliver to the Lender, upon it becoming aware of the existence thereof, a notice specifying (i) any event or condition that constitutes an event of default under the Lease, or a casualty, or a condemnation or (ii) any threatened condemnation.

All notices and other communications hereunder shall be in writing and shall be deemed to have been given (a) if mailed by first class registered or certified mail, postage prepaid, three (3) days after being so mailed, (b) if deposited for overnight delivery with a nationally recognized courier service, one (1) day after being so deposited, or (c) if delivered by hand, when received, in each case addressed or directed as follows:

| | |
|---|---|
| Lessee: | Rite Aid of Michigan, Inc., a Michigan corporation<br>30 Hunter Lane<br>Camp Hill, Pennsylvania 17011<br>Attention: Richard J. Varmecky<br>Vice President and Treasurer |
| with a copy to: | Wolf, Block, Schorr and Solis-Cohen LLP<br>12th Floor, Packard Building<br>111 South Fifteenth Street<br>Philadelphia, Pennsylvania 19102-2678<br>Attention: Henry F. Miller, Esq. |
| Lessor: | RA2 Battle Creek L.L.C.<br>c/o Merchant Equity Financial Group L.L.C.<br>101 East 52nd Street, 30th Floor<br>New York, New York 10022<br>Attention: John B. Mannix |

| | |
|---|---|
| and | c/o PaineWebber Real Estate Securities Inc. |
| | 1285 Avenue of the Americas |
| | New York, New York 10019 |
| | Attention: Laura Kelly |
| | |
| with copies to: | Law Offices of Daniel P. Daniluk |
| | 1129 Niles-Cortland Road, SE |
| | Warren, Ohio 44484 |
| | Attention Daniel P. Daniluk, Esq. |
| | |
| and | McGuire, Woods, Battle & Booth L.L.C. |
| | 901 East Cary Street |
| | Richmond, Virginia 23219-4030 |
| | Attention: T. Craig Harmon, Esq. |
| | |
| The Lender: | PW Real Estate Investments Inc. |
| | 1285 Avenue of the Americas |
| | New York, NY 10019 |
| | Attention: David C. Wilburn |
| | |
| with a copy to: | Davis Polk & Wardwell |
| | 450 Lexington Avenue |
| | New York, NY 10017 |
| | Attention: Susan D. Kennedy, Esq. |

or at such other address and any copy address as the Lessee or the Lender shall have furnished to the other party by notice. The parties referenced in this Section 3.02 shall each have the right to specify, from time to time, as its address for purposes of this Agreement, any address and any addressee, and any copy address in the continental United States, upon giving fifteen (15) days' written notice thereof to the other party.

SECTION 3.03. *Financial Statements, Etc.* The Guarantor shall deliver or cause to be delivered to the Lender:

(a)   as soon as practicable and in any event within ninety (90) days after the end of each fiscal year, a copy of its annual report on Form 10-K or equivalent statement of its financial position and the related profit and loss and cash flow statement, prepared in accordance with generally accepted accounting principles and certified by a nationally recognized firm of certified public accountants;

(b)   with reasonable promptness and not later than thirty (30) days after the end of the first three fiscal quarters a copy of its quarterly report on Form 10-

Q or equivalent statement of its financial position and the related profit and loss and cash flow statement, certified by an officer of the Guarantor;

     (c)   such other publicly available financial information relating to it as may be reasonably requested by the Lender.

In addition, during the initial term and, if exercised, the first Renewal Term under the Lease, for so long as any of the Lessor's indebtedness to the Lender remains outstanding and the notes evidencing such indebtedness are "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act, the Guarantor shall, during any period in which it is not subject to Section 13 or 15(d) of the Exchange Act, make available to the Lender or to any prospective purchaser of such indebtedness designated by the Lender (including a trustee in a securitization transaction), upon the request of such Lender or prospective purchaser, any information in its possession required to be provided by Rule 144A(d)(4) under the Securities Act in a format reasonably practicable to the Guarantor.

## ARTICLE 4

### MISCELLANEOUS

SECTION 4.01. *Governing Law.* This Agreement shall be construed in accordance with and governed by the law of the State or Commonwealth in which the Leased Premises are located, and shall inure to the benefit of and be binding upon the successors and assigns of the parties hereto.

SECTION 4.02. *Counterparts.* This Agreement may be executed in any number of counterparts, each of which is an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

SECTION 4.03. *Cooperation by Lessor and Lessee.* The Lessor and Lessee agree, to reasonably cooperate with the Lender in order to facilitate any offering by the Lender of the secured note or any interest therein (including pursuant to a securitization); *provided* that neither the Lessor nor the Lessee shall be required to take any action or execute and deliver any document if such action or document would have an adverse impact on the Lessor or the Lessee (as the case may be).

SECTION 4.04. *Estoppel by Lessee.* The Lessee represents and warrants that (a) the Lease is unmodified and in full force and effect; (b) Basic Rent has been paid through August 31, 1998; (c) no event of default under the Lease has occurred and is continuing and there is no other existing default by the Lessor or the Lessee with respect to which a notice of default has been served; (d) the

expiration date of the basic term of the Lease is September 1, 2020; (e) to the knowledge of the Lessee, there are no proceedings pending or threatened against the Lessee before or by any court or administrative agency which if adversely decided would materially and adversely affect the financial condition and operations of the Lessee; and (f) there are no setoffs, defenses or counterclaims against enforcement of the obligations to be performed by the Lessee under the Lease.

SECTION 4.05. *Agreements of Lessor*. The Lessor authorizes and directs the Lessee and the Guarantor to agree with the Lender as set forth in Section 1.02 hereof and agrees for the benefit of the Lessee that the payment by the Lessee to the Lender pursuant to Section 3 of the Lease Assignment of any Rent shall constitute full satisfaction of the requirement to pay to the Lessor such Rent. In addition, the Lessor agrees that the Lessee may fully rely on any notice by the Lender as if such notice were from the Lessor and in the event of any inconsistency between notices from the Lender and the Lessor, notices from the Lender shall control.

SECTION 4.06. *Offering Memorandum.* (a) The Secured Note will be deposited in either a pass through trust or in another loan securitization vehicle and certificates evidencing interests in such pass through trust or other vehicle (the "Certificates") will be offered and sold by the Lender pursuant to an offering memorandum (the "Offering Memorandum"). The Offering Memorandum will identify the Guarantor on the cover and will state that the Certificates are secured by a first mortgage on and security interest in the Premises and an assignment of the Lessor's interest in the Lease but that the Certificates are not obligations of, or guaranteed by, the Lessee or the Guarantor and are without recourse to the general credit of the Lessor (or any member in the Lessor). The Lessee represents and warrants that (x) the filings by the Lessee with the United States Securities and Exchange Commission ("SEC") pursuant to the Securities Exchange Act of 1934, as amended (the "Exchange Act"), on or after January 1, 1998 (the "Securities Reports"), at the time they were filed with the SEC, complied in all material respects with the requirements of Exchange Act, and the rules and regulations adopted by the SEC thereunder, and did not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading, (y) the Lessee has filed on a timely basis all Securities Reports required to be filed under the Exchange Act, and (z) there has not occurred any material adverse change in the financial condition or results of operations of the Lessee and its subsidiaries, taken as a whole, from that reflected in the Securities Reports. Upon the request of the Lender, the Guarantor will execute and deliver an estoppel certificate confirming, if true, the representations and warranties described in the immediately preceding sentence or describing in reasonable detail the reason that such representations

(NY) 03387/019/CONSENT/FINAL/cnsnt.michigan.1474.wpd

8

and warranties cannot be confirmed, except that the Guarantor need not furnish any information if the Guarantor determines that the furnishing thereof would be inconsistent with applicable law or otherwise not in the best interest of the Guarantor.

(b)  The Lessee shall indemnify and hold harmless the Lessor, the Lender (including any assignee of Lender) and PaineWebber Incorporated from and against any and all losses, claims, damages and liabilities (including, without limitation, any legal or other expenses reasonably incurred by the Lessor, the Lender or PaineWebber Incorporated in connection with defending or investigating any such action or claim) caused by any untrue statement of a material fact relating to the Lessee and contained in or incorporated in the Securities Reports.

(c)  The Lender shall indemnify and hold harmless the Lessor and the Lessee from and against any and all losses, claims, damages and liabilities (including, without limitation, any legal or other expenses reasonably incurred by the Lessor or the Lessee in connection with defending or investigating any such action or claim) caused by any information contained in the Offering Memorandum, other than information for which the Lessee provides to the Lender an indemnity in paragraph (b) of this Section 4.06.

(d)  If the indemnification provided for above is unavailable to an indemnified party, then each indemnifying party shall contribute to the amount of such losses, claims, damages or liabilities in proportion to reflect primarily the relative benefits received by each of the parties from the offering and also to reflect where appropriate the relative fault of the parties, as well as any appropriate equitable considerations.

SECTION 4.07.  *Waiver of Jury Trial.*  Each of the parties hereto hereby intentionally, knowingly, voluntarily, expressly and mutually waive any right to trial by jury of any claim, demand, action or cause of action arising under this Agreement or in any way dealing with or incidental to the dealings of the parties hereto or the transactions contemplated hereby, in each case whether now existing or hereafter arising and whether in contract or tort or otherwise.

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed as of the date hereof.

Rite Aid of Michigan, Inc., a Michigan corporation,
  as Lessee

By:

Name:
Title:

RA2 Battle Creek L.L.C.,
a Delaware limited liability company,
  as Lessor

By: RA2 SPE LLC,
a Delaware limited liability company, its managing member

By: RA2 HOLDINGS MANAGEMENT CORPORATION,
a Delaware corporation, its managing member

By:

    Name:   John B. Mannix
    Title:   President

PW REAL ESTATE INVESTMENTS INC.,
a Delaware corporation,
  as Lender

By:

Name:
Title:

RITE AID CORPORATION,
a Delaware corporation,
  as Guarantor

By:

Name:
Title:

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed as of the date hereof.


Rite Aid of Michigan, Inc., a Michigan corporation,
  as Lessee


By:_____
    Name:
    Title:


RA2 Battle Creek L.L.C.,
a Delaware limited liability company,
  as Lessor

By: RA2 SPE LLC,
a Delaware limited liability company, its
managing member

By: RA2 HOLDINGS MANAGEMENT
CORPORATION,
a Delaware corporation, its managing
member

By:_____
    Name:  John B. Mannix
    Title:  President


PW REAL ESTATE INVESTMENTS INC.,
a Delaware corporation,
  as Lender


By:_____
    Name:
    Title:


RITE AID CORPORATION,
a Delaware corporation,
  as Guarantor


By:_____
    Name:
    Title:

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed as of the date hereof.

Rite Aid of Michigan, Inc., a Michigan corporation,
  as Lessee

By:_____

    Name:
    Title:

RA2 Battle Creek L.L.C.,
a Delaware limited liability company,
  as Lessor

By: RA2 SPE LLC,
a Delaware limited liability company, its managing member

By: RA2 HOLDINGS MANAGEMENT CORPORATION,
a Delaware corporation, its managing member

By:_____

    Name:  John B. Mannix
    Title:  President

PW REAL ESTATE INVESTMENTS INC.,
a Delaware corporation,
  as Lender

By:_____

    Name:
    Title:

RITE AID CORPORATION,
a Delaware corporation,
  as Guarantor

By:_____

    Name:
    Title:

EXHIBIT A TO CONSENT

Excerpt from Lease Assignment

"SECTION 3. *Payment of Assigned Sums.* The Assignor hereby presently, unconditionally and irrevocably directs the Lessee to pay all Rent and all other amounts assigned pursuant to Section 2 by wire transfer of immediately available funds to the Assignee, at Banc One Mortgage Capital Markets ABA #111000614, Account # 1886446853, Reference: BOMCM Collection Account, RA II, Attention: Martin Stadler ((214) 290-3349). Payments made in accordance with this Section 3 shall be applied as provided in Section 4."

## COMPOSITE EXHIBIT B



# Delaware

### The First State

Page 1

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF LIMITED PARTNERSHIP OF "98 RA2
PHILADELPHIA-KREWSTOWN LIMITED PARTNERSHIP", FILED IN THIS
OFFICE ON THE ELEVENTH DAY OF AUGUST, A.D. 1998, AT 9 O`CLOCK
A.M.



Jeffrey W. Bullock, Secretary of State

2932709  8100
SR# 20233367544

Authentication: 204057735
Date: 08-29-23

You may verify this certificate online at corp.delaware.gov/authver.shtml

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 08/11/1998
981315182 - 2932709

# CERTIFICATE OF
# LIMITED PARTNERSHIP
## OF
## 98 RA2 PHILADELPHIA-KREWSTOWN LIMITED PARTNERSHIP

This Certificate of Limited Partnership of 98 RA2 Philadelphia-Krewstown Limited Partnership (the "Partnership") is being executed by the undersigned for the purpose of forming a limited partnership pursuant to the Delaware Revised Uniform Limited Partnership Act.

1.    The name of the Partnership is:

98 RA2 Philadelphia-Krewstown Limited Partnership

2.    The address of the registered office of the Partnership in Delaware is 1013 Centre Road, Wilmington, Delaware 19805.  The Partnership's registered agent at that address is Corporation Service Company.

3.    The name and address of the general partner is:

98 RA2 Philadelphia-Krewstown L.L.C.
101 East 52nd Street, 30th Floor
New York, NY   10022

With a copy to:
c/o Paine Webber Real Estate Securities, inc.
Attn: Grant G. Rogers
1285 Avenue of the Americas, 19th Floor
New York, NY   10019

4.    Notwithstanding any other provision of this Certificate of Limited Partnership or the Limited Partnership Agreement of the Partnership and any provision of law that otherwise so empowers the Partnership, the Partnership shall, so long as the Loan remains outstanding, unless otherwise consented to in writing by the Lender under the Loan Agreement:

(a)    Not engage in any business or other activity other than (i) the business of holding an interest in and leasing the Property and the exercise of rights under and the performance of obligations under any document executed or to be executed by it pursuant to the Operative Documents, (ii) lawful business and activities expressly consented to by the Lender, (iii) the making of Permitted Investments, (iv) activities incidental to any of the foregoing including the performance of activities necessary to maintain the Partnership's status as a limited partnership in good standing

and (v) the paying of expenses otherwise permitted by the above.

(b)  hold itself out as an entity that is legally and in fact separate from any other Person;

(c)  conduct its business in its own name and use its own name for the purposes of obtaining required registrations, licenses and permits (whether governmental, administrative or otherwise) necessary to the conduct of its business;

(d)  correct any known misunderstanding regarding its separate identity;

(e)  maintain its books and records separate from any other Person and, if required by law to file tax returns, file any tax returns separate from any other Person;

(f)  maintain its funds and accounts separate from any other Person;

(g)  not commingle its assets with those of any other Person;

(h)  maintain financial statements separate from the financial statements of any other Person;

(i)  use stationery, invoices and checks separate from those of any other Person;

(j)  pay its liabilities out of its own funds;

(k)  not acquire obligations or securities of its affiliates;

(l)  pay the salaries of its employees, if any, and maintain a sufficient number of employees in light of its contemplated business operations;

(m)  allocate fairly and reasonably any overhead for shared office space;

(n)  maintain adequate capital in light of its contemplated business operations and purposes;

(o)  not guarantee or become obligated for the debts of any other Person or hold out its credit as being available to satisfy the obligations of others;

(p)  except as set forth in the Operative Documents, not pledge its assets for the benefit of any other Person or make any loans or advances to any Person;

(q)  not create, incur, assume, guaranty, agree to purchase or repurchase or provide funds in respect of any indebtedness other than the Loan, and unsecured trade debt incurred in the ordinary course of business;

(r) not purchase or agree to purchase any property or asset (other than the Property);

(s) except as expressly provided in Section 4.11 of the Loan Agreement, not dissolve, liquidate, consolidate, merge or sell all or substantially all of its assets; and

(t) not amend its organizational documents to violate the separateness covenants in Section 4.2 of the Loan Agreement without the prior written consent of the Lender and the Rating Agency; not, except as otherwise provided in Section 4.11 of the Loan Agreement, grant any Lien or consent to such Lien on the Property or any interest therein to, or for the benefit of any Person other than the Lender; not, without the consent of the General Partner as well as the independent director of the managing member of the managing member of the General Partner, file, or consent to the filing of, a bankruptcy or insolvency petition or otherwise institute insolvency proceedings.

(u) not, without the prior written consent of the Lender, amend, alter, change or repeal this Certificate of Limited Partnership or the Limited Partnership Agreement if such amendment, alteration, change or repeal would have a material adverse effect on Lender.

Unless otherwise defined in this Certificate of Limited Partnership, capitalized terms in this paragraph 4 shall have the meaning ascribed thereto in the Limited Partnership Agreement of this Partnership dated as of the date hereof.

IN WITNESS WHEREOF, the undersigned, constituting all of the general partners of the Partnership, have caused this Certificate of Limited Partnership to be duly executed as of the 11th day of August, 1998.

<div style="margin-left: 40%;">

98 RA2 PHILADELPHIA-KREWSTOWN L.L.C.,
General Partner

By:    RA2 SPE.L.L.C., Managing Member

    By:    RA2 Management Holdings
         Corporation, Managing Member

        By: _____
            Daniel P. Daniluk
            Authorized Agent

</div>

# LIMITED PARTNERSHIP AGREEMENT OF

## 98 RA2 PHILADELPHIA-KREWSTOWN LIMITED PARTNERSHIP

### (a Delaware limited partnership)

**Dated as of the 11th day of August, 1998**

E:\Merchant Equity\Rite Aid 1998\Organizational\Property LP\phil-krewstown lp agr 82598.wpd
8/26/98  11:09a

**EXHIBIT B**

LIMITED PARTNERSHIP AGREEMENT OF

98 RA 2 PHILADELPHIA-KREWSTOWN LIMITED PARTNERSHIP
(a Delaware limited partnership)

THIS LIMITED PARTNERSHIP AGREEMENT OF 98 RA2 PHILADELPHIA-KREWSTOWN LIMITED PARTNERSHIP (the "Company") is made and entered into as of the 11th day of August, 1998, between RA2 HOLDINGS L.L.C., a Delaware limited liability company ("HOLDINGS LLC"), as the Limited Partner, and 98 RA2 PHILADELPHIA-KREWSTOWN L.L.C., a Delaware limited liability company ("RA2 LLC"), as the sole General Partner.

## WITNESSETH THAT:

WHEREAS, the Partners desire, by execution of this Agreement, to form a limited partnership pursuant to the Delaware Revised Uniform Limited Partnership Act, as amended from time to time (the "Act"), and to constitute themselves a limited partnership for the purposes set forth in Section 2.6, and on the terms and conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto do hereby agree as follows:

## ARTICLE 1

## DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings set forth below or in the Section of this Agreement referred to below:

1.1 "Act" shall have the meaning set forth in the recitals to this Agreement.

1.2 "Additional Capital Contribution" shall mean any Additional Capital Contribution made in accordance with Section 3.3.

1.3 "Affiliate" means with respect to a specified Person, any Person that directly or indirectly Controls, is Controlled by, or is under common Control with, the specified Person.

        (iv)     sue and be sued, complain and defend, and participate in administrative or other proceedings, in its name;

        (v)     appoint employees and agents of the Company, and define their duties and fix their compensation;

        (vi)     indemnify any person in accordance with the Act and obtain any and all types of insurance;

        (vii)     cease its activities and cancel its certificate of limited partnership;

        (viii)     negotiate, enter into, renegotiate, extend, renew, terminate, modify, amend, waive, execute, acknowledge or take any other action with respect to any lease, contract or security agreement in respect of any assets of the Company;

        (ix)     borrow money and issue evidences of indebtedness, and to secure the same by a mortgage, pledge or other lien on the assets of the Company;

        (x)     execute, deliver and file any certificates, applications and other documents necessary or desirable for the Company to qualify to do business in any jurisdiction in which the Company may wish to conduct its business and where the laws of such jurisdiction require such registration or qualification;

        (xi)     pay, collect, compromise, litigate, arbitrate or otherwise adjust or settle any and all other claims or demands of or against the Company or hold such proceeds against the payment of contingent liabilities; and

        (xii)     make, execute, acknowledge and file any and all documents or instruments necessary, convenient or incidental to the accomplishment of any purpose of the Company.

        2.8  Restrictions on Powers and Authority.  Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Company, the Company shall, so long as the Loan remains outstanding, unless otherwise consented to in writing by the Lender under the Loan Agreement:

        (a)  not engage in any business or other activity other than (i) the business of holding an interest in and leasing the Property and the exercise of rights under and the performance of obligations under documents executed or to be executed by it pursuant to the Operative Documents, (ii) lawful business and activities expressly consented to by the Lender, (iii) the making of Permitted Investments (as defined in the Loan Agreement), (iv) activities incidental to any of the foregoing including the performance of activities necessary to maintain

the Company's status as a limited partnership in good standing and (v) the paying of expenses otherwise permitted by the above.

(b)  hold itself out as an entity that is legally and in fact separate from any other Person;

(c)  conduct its business in its own name and use its own name for the purposes of obtaining required registrations, licenses and permits (whether governmental, administrative or otherwise) necessary to the conduct of its business;

(d)  correct any known misunderstanding regarding its separate identity;

(e)  maintain its books and records separate from any other Person and, if required by law to file tax returns, file any tax returns separate from any other Person;

(f)  maintain its funds and accounts separate from any other Person;

(g)  not commingle its assets with those of any other Person;

(h)  maintain financial statements separate from the financial statements of any other Person;

(i)  use stationery, invoices and checks separate from those of any other Person;

(j)  pay its liabilities out of its own funds;

(k)  not acquire obligations or securities of its Affiliates;

(l)  pay the salaries of its employees, if any, and maintain a sufficient number of employees in light of its contemplated business operations;

(m)  allocate fairly and reasonably any overhead for shared office space;

(n)  maintain adequate capital in light of its contemplated business operations and purpose;

(o)  not guarantee or become obligated for the debts of any other Person or hold out its credit as being available to satisfy the obligations of others;

(p)  except as set forth in the Operative Documents, not pledge its assets for the benefit of any other Person or make any loans or advances to any Person;

(q) not create, incur, assume, guaranty, agree to purchase or repurchase or provide funds in respect of any indebtedness other than the Loan, and unsecured trade debt incurred in the ordinary course of business;

(r) not purchase or agree to purchase any property or asset (other than the Property);

(s) except as expressly provided in Section 4.11 of the Loan Agreement, not dissolve, liquidate, consolidate, merge or sell all or substantially all of its assets; and

(t) not amend its organizational documents to violate the separateness covenants in Section 4.2 of the Loan Agreement without the prior written consent of the Lender and the Rating Agency; not, except as otherwise provided in Section 4.11 of the Loan Agreement, grant any Lien (as defined in the Loan Agreement) or consent to such Lien on the Property or any interest therein to, or for the benefit of any Person other than the Lender; not, without the consent of the General Partner as well as the  independent director of the managing member of the managing member of the General Partner, file, or consent to the filing of, a bankruptcy or insolvency petition or otherwise institute insolvency proceedings.

(u) not, without the prior written consent of the Lender, amend, alter, change or repeal this Agreement.

## ARTICLE 3

## PARTNERS: CAPITAL CONTRIBUTIONS

3.1 Partners.

(a) The names and the mailing addresses of the Partners are as set forth under their respective signatures below.  Any action to be taken by the Partners (as opposed to by the General Partner) under this Agreement shall be evidenced by a written consent signed by all of the Partners.

(b) Except as expressly provided by this Agreement or as required by the Act, no Limited Partner shall (i) have the power to act for or on behalf of, or to bind, the Company, (ii) take part in the day-to-day management or the operation or control of the business and affairs of the Company or (iii) be an agent of the Company or have any right, power or authority to transact any business in the name of the Company.

-10-

# LIMITED LIABILITY COMPANY AGREEMENT OF

## RA2 BATTLE CREEK L.L.C.
### (a Delaware limited liability company)

**Dated as of the 31st day of July, 1998**

pages.wpd  8/26/98  11:36a

EXHIBIT B

LIMITED LIABILITY COMPANY AGREEMENT OF

RA 2 BATTLE CREEK L.L.C.
(a Delaware limited liability company)

THIS LIMITED LIABILITY COMPANY AGREEMENT OF RA2 BATTLE
CREEK L.L.C. (the "Company") is made and entered into as of the 31st day of July, 1998,
between RA2 HOLDINGS L.L.C., a Delaware limited liability company ("HOLDINGS
LLC"), as a Member, and RA2 SPE L.L.C., a Delaware limited liability company ("SPE
LLC"), as Managing Member and a Member.

## WITNESSETH THAT:

WHEREAS, the Members desire, by execution of this Agreement, to form a
limited liability company pursuant to the Delaware Limited Liability Company Act (6 Del. C.
§18-101, et seq.), as amended from time to time (the "Act"), and to constitute themselves a
limited liability company for the purposes set forth in Section 2.6, and on the terms and
conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants herein contained
and other valuable consideration, the receipt and adequacy of which are hereby acknowledged,
the parties hereto do hereby agree as follows:

## ARTICLE 1

## DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings set forth below
or in the Section of this Agreement referred to below:

1.1   "Act" shall have the meaning set forth in the recitals to this Agreement.

1.2   "Additional Capital Contribution" shall mean any Additional Capital
Contribution made in accordance with Section 3.3.

1.3   "Affiliate" means with respect to a specified Person, any Person that
directly or indirectly Controls, is Controlled by, or is under common Control with, the
specified Person.

pages.wpd 8/26/98 11:36a

(v)    appoint employees and agents of the Company, and define their duties and fix their compensation;

(vi)    indemnify any person in accordance with the Act and obtain any and all types of insurance;

(vii)    cease its activities and cancel its certificate of formation;

(viii)    negotiate, enter into, renegotiate, extend, renew, terminate, modify, amend, waive, execute, acknowledge or take any other action with respect to any lease, contract or security agreement in respect of any assets of the Company;

(ix)    borrow money and issue evidences of indebtedness, and to secure the same by a mortgage, pledge or other lien on the assets of the Company;

(x)    execute, deliver and file any certificates, applications and other documents necessary or desirable for the Company to qualify to do business in any jurisdiction in which the Company may wish to conduct its business and where the laws of such jurisdiction require such registration or qualification;

(xi)    pay, collect, compromise, litigate, arbitrate or otherwise adjust or settle any and all other claims or demands of or against the Company or hold such proceeds against the payment of contingent liabilities; and

(xii)    make, execute, acknowledge and file any and all documents or instruments necessary, convenient or incidental to the accomplishment of any purpose of the Company.

2.8  Restrictions on Powers and Authority.  Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Company, the Company shall, so long as the Loan remains outstanding, unless otherwise consented to in writing by the Lender under the Loan Agreement:

(a) not engage in any business or other activity other than (i) the business of holding an interest in and leasing the Property and the exercise of rights under and the performance of obligations under documents executed or to be executed by it pursuant to the Operative Documents, (ii) lawful business and activities expressly consented to by the Lender, (iii) the making of Permitted Investments (as defined in the Loan Agreement), (iv) activities incidental to any of the foregoing including the performance of activities necessary to maintain the Company's status as a limited liability company in good standing and (v) the paying of expenses otherwise permitted by the above.

LOAN AGREEMENT

dated as of August 24, 1998

98 RA2 PHILADELPHIA-KREWSTOWN LIMITED PARTNERSHIP,
a Delaware limited liability company

and

PW REAL ESTATE INVESTMENTS INC.,
a Delaware corporation

Property:

Store No: 554
Philadelphia, Pennsylvania
County of Philadelphia

(NY) 03387/019/LA/FINALLA/la.penn.554.wpd

or its interests in the Premises (other than pursuant to the Mortgage and the Lease Assignment and, with respect to the Premises, the Permitted Liens and other than any purchase and sale agreement disclosed in writing to the Lender before the Closing).

(l)    No Registration.   It is not necessary in connection with the offer, sale and delivery of the Secured Note to the Lender to register the Secured Note under the Securities Act.

(m)    Securities Act.   Neither it nor any affiliate (as defined in Rule 501(b) of Regulation D under the Securities Act, as used in this Section 4.01(m), an "Affiliate") of it has directly or through any agent, (i) sold, offered for sale, solicited offers to buy or otherwise negotiated in respect of, any security (as defined in the Securities Act) which is or will be integrated with the sale of the Secured Note in a manner that would require the registration under the Securities Act of the Secured Note or (ii) engaged in any form of general solicitation or general advertising in connection with the offering of the Secured Note (as those terms are used in Regulation D under the Securities Act) or in any other manner involving a public offering within the meaning of Section 4(2) of the Securities Act.

(n)    Rule 144A(d)(3).   The Secured Note (i) was not, when delivered, of the same class as securities listed on a national securities exchange registered under Section 6 of the Exchange Act or quoted in a U.S. automated interdealer quotation system; provided, that securities that are convertible or exchangeable into securities so listed or quoted at the time of issuance and that had an effective conversion premium of less than 10 percent, shall be treated as securities of the class into which they are convertible or exchangeable; and that warrants that may be exercised for securities so listed or quoted at the time of issuance, for a period of less than three years from the date of issuance, or that had an effective exercise premium of less than ten percent, shall be treated as securities of the class to be issued upon exercise, and (ii) is not a security of an open-end investment company, unit investment trust or face-amount certificate company that is or is required to be registered under Section 8 of the Investment Company Act of 1940.

SECTION 4.02.   *Special Purpose Covenant*.  Each of the Company, the General Partner, the General Partner's Manager and the Corporate Manager shall (a) hold itself out as an entity that is legally and in fact separate from any other Person; (b) conduct its business in its own name and will use its own name for the purposes of obtaining required registrations, licenses and permits (whether governmental, administrative or otherwise) necessary to the conduct of its business; (c) correct any known misunderstanding regarding its separate identity; (d) maintain its books and records separate from any other Person and, if required by law to file tax returns, file any tax return separate from any other Person; (e) maintain its funds and accounts separate from any other Person; (f) not commingle its assets with those of any other Person; (g) maintain financial statements separate from the financial statements of any other Person;

Case ID: 220202252

(h) use stationery, invoices and checks separate from those of any other Person; (i) pay its liabilities out of its own funds; (j) not acquire obligations or securities of its Affiliates; (k) pay the salaries of its employees, if any, and maintain a sufficient number of employees in light of its contemplated business operations; (l) allocate fairly and reasonably any overhead for shared office space; (m) maintain adequate capital in light of its contemplated business operations and purpose; (n) not guarantee or become obligated for the debts of any other Person or hold out its credit as being available to satisfy the obligations of others; (o) except as set forth in the Operative Documents, not pledge its assets for the benefit of any other Person or make any loans or advances to any Person; (p) not create, incur, assume, guaranty, agree to purchase or repurchase or provide funds in respect of any indebtedness (other than, in the case of the Company, the Loan) and unsecured trade debt incurred in the ordinary course of business; (q) in the case of the Company, not engage in any business or activity other than holding an interest in and leasing the Premises and the exercise of rights, and the performance of obligations, under the Operative Documents (including making Permitted Investments), and businesses and activities directly related to the Overall Transaction; (r) not purchase or agree to purchase any property or asset (other than, (1) in the case of the Company, the Premises, (2) in the case of the General Partner, its interest in the Company, (3) in the case of the General Partner's Manager, its interest in the General Partner and in 44 other Single Purpose Entities each party to a loan agreement with the Lender dated as of August 24, 1998 and closing on the same date as the Closing Date and (3) in the case of the Corporate Manager, its interest in the General Partner's Manager); (s) except as expressly provided in Section 4.11, not dissolve, liquidate, consolidate, merge, or sell all or substantially all of its assets; and (t) not amend its organizational documents to violate the separateness covenants or, in the case of the Corporate Manager,  to remove the Independent Director without the prior written consent of the Lender and the Rating Agency, which consent may be withheld in the Lender's and/or the Rating Agency's sole and absolute discretion. The General Partner, the General Partner's Manager and the Corporate Manager shall not engage in any business or activity other than (i) in the case of the General Partner, acting as general partner of the Company, (ii) in the case of the General Partner's Manager, acting as manager of the General Partner and of 44 other Single Purpose Entities each party to a loan agreement with the Lender dated as of August 24, 1998 and closing on the same date as the Closing Date, and (ii) in the case of the Corporate Manager, acting as manager of the General Partner's Manager.  The Company will not, except as otherwise provided in Section 4.11, grant any Lien (or consent to such Lien) on the Mortgaged Property or any interest therein to, or for the benefit of, any Person other than the Lender.

SECTION 4.03.  *Other Covenants*. Unless otherwise specified, the Company covenants and agrees as long as any of the Loan remains unpaid or any other Secured Obligation remains outstanding, as follows:

(NY) 03387/019/LA/FINALLA/la.penn.554.wpd

16

SECTION 4.11. *Transfers.* (a) Subject to compliance with the terms and conditions of this Section 4.11, if an Event of Default shall not have occurred and be continuing, upon twenty (20) days' prior written notice from the Company to the Lender, which notice shall be in the form of an Officer's Certificate setting forth the anticipated effective date of such Transfer, the name and address of the transferee and, in reasonable detail, any other material information relating to such Transfer, (i) the Company may, directly or indirectly, assign, convey or otherwise transfer (a "Transfer") all, but not less than all, of its right, title and interest in or to the Premises; (ii) the Company's Manager may Transfer all, but not less than all of its right, title and interest in or to the Company; and (iii) the Corporate Manager may Transfer all, but not less than all of its right, title and interest in or to the Company's Manager (in such context, any of the Company, the Company's Manager and the Corporate Manager shall be a "Transferor"), in each case, to a Single Purpose Entity; *provided* that such transferee (A) is a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code, and (B) is not, and is not using the assets of, (x) an employee benefit plan (within the meaning of Section 3(3) of ERISA), subject to Title I of ERISA, or (y) a "governmental plan" (within the meaning of Section 3(32) of ERISA) subject to state laws, rules or regulations materially similar to those contained in Section 406 of ERISA or Section 4975 of the Code.

(b) Any Transfer permitted by the provisions of this Section 4.11 shall be subject to the satisfaction of the following conditions on or prior to the effective date of such Transfer:

(i) such Transfer shall not violate any provision of, or create a relationship which would be in violation of, the Lease or any Applicable Laws;

(ii) (A) if the Transferor is the Company, the transferee shall enter into an agreement assuming all of the Transferor's obligations under each of the Operative Documents to which the Transferor is a party, which agreement shall be in form and substance reasonably satisfactory to the Lender; (B) the transferee shall pay all taxes incurred in connection with such Transfer and shall indemnify the Lender in respect of any such taxes; and (C) the charter, operating agreement, partnership agreement, trust agreement or articles of organization, as appropriate, of the transferee (and if the transferee is a partnership, of its general partners or, if the transferee is a limited liability company, at least one of its members or, if the transferee is a business trust, of its trustees) shall contain the special purpose provisions substantially in the form of Exhibit 2 and any other provisions related to the special purpose or bankruptcy remote nature of the transferee which, at the time of such Transfer, are ordinarily included in Secondary Market Transactions similar to those contemplated by this Agreement;

(NY) 03387/019/LA/FINALLA/la.michign.1474.wpd

(iii)   the notice required to be given by the Company pursuant to Section 4.11(a) shall specify, the Transferor, the name and address of the proposed transferee, the date on which such Transfer is proposed to become effective and such information and documentary evidence as shall be reasonably necessary to establish compliance with this Section 4.11 (including evidence of the Lessee's consent or deemed consent to such Transfer to the extent required under the Lease), and shall be accompanied by the proposed form of agreement required by Section 4.11(b)(ii), and the legal opinions and certificate required by Section 4.11(b)(v);

(iv)   the Company shall pay all reasonable out-of-pocket expenses, disbursements and costs (including legal and other professional fees and expenses) incurred by the Lender in connection with such Transfer;

(v)   (A) the Company and the transferee shall each have delivered to the Lender an Officer's Certificate to the effect that the conditions to the proposed transfer prescribed by this Section 4.11 have been satisfied, and (B) the transferee shall have delivered to the Lender (x) if the principal balance of the Loan, together with the principal balance of any other loan secured by a mortgage or deed of trust on property the direct or indirect beneficial interest in which is transferred contemporaneously with Transferor's transfer of a direct or indirect beneficial interest in the Premises, exceeds $10,000,000 and if the Loan and such other loan are part of a securitization transaction, a "non-consolidation opinion", in form and substance reasonably satisfactory to the Lender, and (y) an opinion of counsel, in form and substance reasonably satisfactory to the Lender, as to the due authorization, execution, delivery, legality, validity, binding effect and enforceability of the agreement referred to in Section 4.11(b)(ii);

(vi)   if the Transferor is the Company, the transferee shall provide representations and warranties to the Lender in substantially the form of the Company's representations and warranties to the Lender contained in each of the Operative Documents to which the Company is a party; and

(vii)   the Company shall have delivered to the Lender copies of all documents proposed to be entered into to effect the Transfer and copies of all agreements, legal opinions, certificates and other instruments referred to in this Section 4.11(b) or necessary to evidence compliance with the conditions of this Section  4.11(b).

Upon the request of the Company, the Lender shall promptly confirm in writing whether the conditions set forth in this Section 4.11 have been met and, if not, shall specify in reasonable detail the respects in which they remain unsatisfied.

(NY) 03387/019/LA/FINALLA/la.michign.1474.wpd

21

Any transfer of the Premises, of the Company's Manager's interest in the Company or of the Corporate Manager's interest in the Company's Manager, made otherwise than as permitted by this Section 4.11 shall be void *ab initio* and no rights, legal or equitable, shall pass to the transferee as a result thereof.

(c)  From and after any Transfer effected in accordance with this Section 4.11, the Transferor shall be released, to the extent of such Transfer, from its obligations hereunder and under the other Operative Documents to which it is a party in respect of obligations to be performed on or after the date of such Transfer.  Upon any Transfer by the Transferor, the transferee shall be deemed the "Company", or the "Company's Manager" or the "Corporate Manager" (as the case may be) for all purposes of such Operative Documents and each reference therein to such party thereafter shall be deemed a reference to such transferee for all purposes, except as provided in the preceding sentence.  Notwithstanding any Transfer by the Company pursuant to this Section 4.11, the Lender and the Company shall remain entitled to all benefits accrued and all rights vested prior to such Transfer, including, without limitation, the right to indemnification under any of the Operative Documents.

SECTION 4.12.  *Environmental Matters*.  The Company will comply and take all commercially reasonable efforts to cause its agents, employees, contractors, beneficiaries, trustees, lessees and sublessees to comply with all applicable Environmental Laws with respect to the Premises.  The Company will not cause or permit the release, generation, treatment, storage or disposal of any Hazardous Substances on the Premises in violation of any applicable Environmental Law.

SECTION 4.13.  *No Liens*.  The Company shall not create or permit to be created or to remain, and shall immediately discharge or cause to be discharged, any Lien on the Premises or any interest therein (other than Permitted Liens) in each case (a) whether voluntarily or involuntarily created, (b) whether directly or indirectly a Lien thereon and (c) whether or not subject or subordinate hereto, without the prior written consent of the Lender, which consent shall be at the Lender's sole and complete discretion.  The Company, in its individual capacity, shall remove or cause to be removed any Liens other than Permitted Liens with respect to the Mortgaged Property or any part thereof whether now or hereafter existing, within thirty (30) days after the filing thereof unless within such thirty (30)-day period the Company shall have provided an adequate indemnity bond or title insurance endorsement against such Liens reasonably satisfactory to the Lender.  Other than with respect to Liens created by, through or under the Lessor, compliance by the Lessee with Paragraph 9 of the Lease will be deemed to be compliance by the Company with this Section 4.13.

SECTION 4.14.  *Investment Act*.  The Company shall not at any time become an open-end investment company, unit investment trust or face-amount certificate company

(NY) 03387/019/LA/FINALLA/la.michign.1474.wpd

22

**EXHIBIT C**

Policy Number: [Policy Number]

## RESIDUAL VALUE INSURANCE POLICY

**In consideration of the payment of premium, Financial Structures Limited (the "Company") agrees with the Insured and the Additional Named Insured as follows:**

### I. AGREEMENT OF INSURANCE

In the event of receipt of a Notice of Claim from the Additional Named Insured, and subject to the terms and conditions hereof, the Company shall pay to the Additional Named Insured the amount of the Insured Value, subject to the terms and the conditions, exclusions and limitations of this Policy, determined as of the Termination Date.

### II. DEFINITIONS

The following terms shall have the meanings assigned to them below:

1.  **Additional Named Insured:** the person or entity identified in Item 2 of the Declarations and its successors and assigns.

2.  **Additional Named Insured Endorsement:** that certain Additional Named Insured Endorsement, of even date herewith, between the Company and the Additional Named Insured.

3.  **Affiliate:** of a specified person or entity, means a person or entity that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, the person or entity specified.  The term "Control" (and the correlative terms "Controlling," "Controlled by" and "under common Control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of securities, by contract or otherwise.

4.  **Applicable Laws:** means all existing and future applicable laws, rules, regulations, statutes, treaties, codes, ordinances, permits, certificates, orders and licenses of and interpretations by, any Governmental Entities, and applicable judgments, decrees, injunctions, writs, orders or like actions of any court, arbitrator or other administrative, judicial or quasi judicial tribunal or agency of competent jurisdiction (including those pertaining to health, safety or the environment and those pertaining to the construction, use, subdivision or

occupancy of the Property) and any restrictive covenant or deed restriction or easement of record affecting the Property, and any insurance requirement.

5.  **Appraisal and Inspection Procedure:** means the following procedure for determining Fair Market Value or determining compliance of the Property with the Property Return Conditions:

(a)  the Company and the Insured will meet and attempt in good faith to reach an agreement with respect to the issue in question within ten (10) days following the request of either party;

(b)  if the Company and the Insured are unable to reach agreement within such ten (10) day period, the parties, within ten (10) days following such initial ten (10) day period, will either (i) mutually agree on a single Appraiser or Inspector to resolve the dispute or, if they are unable to so agree, each appoint a separate Appraiser or Inspector to resolve the dispute, in which case the two Appraisers or Inspectors so appointed will mutually agree on a third Appraiser or Inspector within five (5) additional days. If any Appraiser or Inspector is not appointed as specified by the foregoing procedure, such Appraiser or Inspector will be expeditiously appointed by the American Arbitration Association. The one or three Appraisers or Inspectors appointed under the foregoing procedures, as applicable, are hereinafter referred to as the "Arbitrator";

(c)  Within fifteen (15) days following his appointment, the Arbitrator will inspect the Property, meet with both the Company and the Insured to discuss the issue in question, and consult with such other experts and advisors as the Arbitrator deems to be appropriate. The Arbitrator will then render a decision, which decision shall be binding on the parties; and

(d)  If the Arbitrator consists of three Appraisers or Inspectors and such three Appraisers or Inspectors are unable to agree on the matter in question, the determination will be based on the average of the values determined by the three Appraisers or Inspectors, provided that any value which varies from the middle of such values by more than ten percent (10%) shall be disregarded.

6.  **Appraiser:** such person(s) or entity(ies) selected by the Company or the Insured, as applicable, for the purpose of determining the Fair Market Value of the Property or the compliance of the Property with the Property Return Conditions, such person(s) or entity(ies) to be members of a nationally recognized appraisal firm and to have a minimum of fifteen (15) years appraisal experience with properties similar to the Property.

7.  **Arbitrator:** is defined in Article II, paragraph 5(b).

8.  **Business Day:** any day except Saturday, Sunday and any day on which banks are required or authorized to close in Bermuda or New York City, New York.

9.        <u>Claim</u>: a demand for payment under Articles I and V of the Policy and the Additional Named Insured Endorsement, based upon the failure of the Insured to pay the Additional Named Insured all amounts payable in connection with the Loan on or before the Termination Date, in accordance with the terms and conditions of this Policy and the Additional Named Insured Endorsement.

10.       <u>Company</u>: Financial Structures Limited, and its successors and assigns.

11.       <u>Declarations</u>: the declarations attached hereto, signed on behalf of the Company and the Insured.

12.       <u>Determining Party</u>: the Company and the Additional Named Insured, acting jointly or, if such parties cannot agree, the Arbitrator.

13.       <u>Effective Date</u>: the date identified in Item 9(i) of the Declarations.

14.       <u>Exchange Property Endorsement</u>: that certain Exchange Property endorsement, of even date herewith, between the Company and the Lessor.

15.       <u>Fair Market Value</u>: with respect to the Property, the price which would be obtained in an arm's-length sales transaction, free and clear of all mortgages, liens, security interests and encumbrances, between an informed and willing seller under no compulsion to sell and an informed and willing purchaser (other than a user in possession) under no compulsion to purchase.

16.       <u>Governmental Entities</u>: government entities, such entities to include the United States of America , the state or states in which the Property is located, any other state in which a party to the Policy (other than the Company) is incorporated or organized, and any municipality or other political subdivision of any of the foregoing, and any agency, authority, department, court, commission, instrumentality or other legal entity of any of the foregoing or any foreign governmental entity asserting jurisdiction over any of the parties hereto or over the Property or over the operation of any business located at the Property.

17.       <u>Inspector</u>: such person(s) or entity(ies) selected by the Company or the Insured, as applicable, for the purpose of conducting inspections of the Property pursuant to Article IV of this Policy, including without limitation engineers, environmental engineers, surveyors, attorneys, accountants, consultants and other experts, such person(s) or entity(ies) to be members of a nationally recognized firm in their respective fields and to have a minimum of fifteen (15) years experience with properties similar to the Property.

18.       <u>Insured</u>: the person or entity identified in Item 1 of the Declarations.

19.       <u>Insured Covenants Agreement</u>: the Insured Covenants Agreement of even date herewith between the Company and the Insured.

- 3 -

20.     **Insured Value:** with respect to the Property, the amount identified in Item 8 of the Declarations, not to exceed all amounts due and payable on the Loan.

21.     **Lease:** the lease of the Property, as identified in Item 4 of the Declarations, a true, complete and correct copy of which is attached to the Application.

22.     **Lessee:** the person or entity identified in Item 7 of the Declarations.

23.     **Lessor:** the person or entity identified in Item 6 of the Declarations.

24.     **Loan:** the mortgage loan advanced by the Additional Named Insured to the Insured and secured by the Property.

25.     **Mortgage:** that certain Mortgage or Deed of Trust of even date herewith, made by the Insured to the or for the benefit of Additional Named Insured, encumbering the Property as security for the Loan.

26.     **Notice of Claim:** a written notice of a Claim from the Additional Named Insured to the Company, which notice (i) states the policy number of this Policy as set forth on the cover page hereof, (ii) states the amount of the Claim, (iii) identifies the Property in respect of which the Claim is made, (iv) states that the Additional Named Insured has not received payment in full with respect to the Loan and (v) separately identifies the amount of principal, interest and other charges owing by the Insured to the Additional Named Insured with respect to the Loan.

27.     **Policy:** this Residual Value Insurance Policy, the Application and the Declarations, the Additional Named Insured Endorsement and any and all other endorsements hereto or thereto.

28.     **Property:** the Property identified in Item 3 of the Declarations.

29.     **Property Return Conditions:** the condition which the Property must be in pursuant to the terms of the Lease when it is returned to the Insured by the Lessee upon termination of the Lease, assuming that the Property has been maintained in accordance with the maintenance provisions of the Lease.

30.     **Special Provisions Endorsement:** that certain Special Provisions Endorsement, of even date herewith, between the Company and the Lessor.

31.     **Termination Date:** the date identified in Item 9(ii) of the Declarations.

NY01/TAUBL/270677.3

### III. NOTICE OF CLAIM

Any Claim hereunder shall be made by the Additional Named Insured. If the Additional Named Insured wishes to make a Claim under this Policy, the Additional Named Insured must file with the Company a Notice of Claim with regard to the Property. Any Notice of Claim must be received by the Company no earlier than ten (10) days before the Termination Date and no later than 5:00 p.m. Eastern Time (U.S.) on that date which is thirty (30) days after the Termination Date.

### IV. INSPECTION AND APPRAISAL

During the period beginning twelve months and ending five months prior to the Termination Date, the Company will perform an Inspection and an Appraisal of the Property and will promptly notify the Insured and the Additional Named Insured of the results thereof, including without limitation any determination by the Inspector and the Appraiser that the Property is not in compliance with the Property Return Conditions.

### V. PAYMENT OF INSURED VALUE

(a)    The Company will pay to the Additional Named Insured an amount equal to the Insured Value, if:

      (i)    a valid Notice of Claim has been given;

      (ii)    the Additional Named Insured shall not have received payment in full of all amounts owing under the Loan; and

      (iii)    all of the terms and conditions of this Policy have been satisfied.

The Company's obligations hereunder are limited to making payment to the Additional Named Insured in accordance with the terms hereof and the Additional Named Insured Endorsement, or, at the Company's option, in accordance with paragraph (V)(d) below, and the Company shall have no liability to the Insured except to make payment to the Additional Named Insured in accordance with this Policy. In no event will the Insured have any ownership interest or other rights with respect to the proceeds of this Policy.

(b)    Upon payment of the Insured Value under paragraph (a) above or paragraph (d) below, all coverage provided by this Policy shall be terminated.

(c)    The Company shall endeavor to make any payment payable under Article V(a) or V(d) hereof on the same day a valid Notice of Claim is received by the Company. In all events if a Notice of Claim is received by the Company not less than three (3) Business Days prior to the Termination Date, the Company will make payment hereunder on the Termination Date, and if a Notice of Claim is received by the Company less than three (3) Business Days

prior to the Termination Date payment shall be made within three (3) Business Days after receipt of the Notice of Claim.

(d)     In the event that the Company is obligated in accordance with the terms and conditions of this Policy to make payment to the Additional Named Insured, on the Termination Date (and at any time thereafter) the Company shall have the option in its sole discretion, in lieu of complying with Article I and Article V of the Policy, to purchase the Loan from the Additional Named Insured for a purchase price equal to all amounts payable under the Loan, but in no event greater than the Insured Value. The Company may exercise such option by giving written notice to the Insured and the Additional Named Insured and making payment of the purchase price to the Additional Named Insured within the time provided in Article V(c) hereof. If the Company exercises such option, the Additional Named Insured will assign the Loan and all documents evidencing or securing the Loan to the Company, without recourse, in accordance with the provisions of Section 8 of the Additional Named Insured Endorsement. Upon completion of such transfer and payment by the Company as provided herein, any and all liability of the Company under the Policy shall terminate. In any event, if the Loan is not outstanding on the Termination Date, any and all liability of the Company under the Policy shall terminate.

## VI. EXCLUSIONS

No coverage shall be provided under this Policy and the Company shall be relieved from any and all liability hereunder in any of the following circumstances:

(a)     The continuance of an Event of Default (as defined in the Lease) by the Lessee under the Lease as of the Termination Date, or a termination of the Lease prior to the Termination Date;

(b)     Sale or transfer of all or a substantial part of the Property, or an interest in the entity(ies) which own, directly or indirectly, the Property, on or prior to the Termination Date without the prior written consent of the Company (which consent will not be unreasonably withheld, conditioned or delayed);

(c)     The Property not being in compliance with the Property Return Conditions as of the Termination Date, as determined pursuant to the Appraisal and Inspection Procedure.

(d)     Written amendment or written modification of the Lease without the prior written consent of the Company (which consent will not be unreasonably withheld, conditioned or delayed);

(e)     the Additional Named Insured shall have consented to any modifications or additions to the Property where such consent is required under the Loan

without the prior written consent of the Company, which consent of the Company will not be unreasonably withheld, conditioned or delayed;

(f)    the assignment of the interest of the Lessee, or its permitted successors or assigns, in the Lease which was consented to by the Additional Named Insured without the prior written consent of the Company (which consent will not be unreasonably withheld, conditioned or delayed);

(g)    the Mortgage shall not be in full force and effect as a lien on the Property on the Termination Date.

## VII.  POLICY OBLIGATIONS WITH RESPECT TO A CLAIM

If a Claim is payable under this Policy, such payment will be made notwithstanding the fact that the Insured has become the subject of a voluntary or involuntary proceeding under applicable bankruptcy laws.  Such obligation to make payment is unconditional, and the Company waives any right of set-off, counterclaim or deduction with respect thereto.  In the event that all terms and conditions of this Policy have been complied with, the Company will pay the Insured Value to the Additional Named Insured on the Termination Date or as otherwise specified in Article V.

## VIII.  MISCELLANEOUS

(a)    **Assignment.**  This is a personal contract and neither this Policy nor the Insured's or the Additional Named Insured's rights under this Policy may be assigned without the prior written consent of the Company and any such purported assignment shall be null and void *ab initio*, provided, that the Additional Named Insured may assign its rights hereunder to a successor mortgagee under the Mortgage, and in addition this Policy may be assigned by the Additional Named Insured (1) in connection with the inclusion of the Loan is a securitization transaction (whether through one or more assignments) and (2) in connection with any other assignment of the Loan, provided in all events that the transferee is a United States domestic entity which is either (i) a securitization vehicle or (ii) an institutional investor such as a bank, trust company, savings bank, insurance company, pension trust, educational institution or similar entity having a net worth of not less than One Hundred Million and 00/100 Dollars ($100,000,000.00), and further provided, that the Additional Named Insured may not be the Insured or an Affiliate of the Insured.  The Additional Named Insured's assignment rights pursuant to the preceding clauses (1) and (2) are cumulative, and the exercise of its assignment rights under one such clause shall not preclude the subsequent exercise of its rights under one or more of the other such clauses.  Notwithstanding the foregoing, the Insured's rights, if any, under this Policy shall be assigned to any person or entity acquiring title to the Property in accordance with the terms of the Mortgage.  A transfer of beneficial interests in the entity comprising the Insured shall not be deemed an assignment of this policy.  In the event that the Company consents to the assignment of this Policy or the Insured's or the Additional Named Insured's rights under this Policy, such assignee shall be identified as the Permitted Assign in Item 12 of the Declarations attached hereto.  Any out-of-pocket expenses incurred by the Company in

- 7 -

connection with an assignment of this Policy by the Insured or the Additional Named Insured, including reasonable legal fees, will be paid by the transferor or the transferee of the interest being assigned.

      (b)    **Notices.** Any notices given pursuant to this Policy shall be sent, postage prepaid by registered or certified mail or by overnight courier or by confirmed facsimile transmission, such facsimile transmission to be accompanied by the mailing, postage prepaid by registered or certified mail or overnight courier, of a hard copy of any such facsimile transmission to the other parties at the address or facsimile number set forth with respect thereto in the Declarations, or to such other addresses or facsimile numbers as the Insured, the Additional Named Insured or the Company shall from time to time designate in writing in lieu thereof. All notices to the Company shall be made to Financial Structures Limited, notwithstanding anything to the contrary set forth in the definition of "Company" in Article II hereof.

      (c)    **Insured Covenants Agreement. THE COMPANY ACKNOWLEDGES AND AGREES THAT A DEFAULT OR FAILURE TO PERFORM BY THE INSURED AND/OR ANY OTHER PARTY OF ANY OF ITS RESPECTIVE OBLIGATIONS UNDER THE INSURED COVENANTS AGREEMENT OR UNDER THE CONTRACT PROVISIONS EXHIBIT OR THE PROPERTY RETURN CONDITION EXHIBIT ATTACHED THERETO OR A MISREPRESENTATION BY THE INSURED AND/OR ANY OTHER PARTY HEREUNDER OR THEREUNDER WILL NOT EXCUSE, LIMIT OR DELAY THE TIME FOR PERFORMANCE OF THE COMPANY'S OBLIGATIONS UNDER THIS POLICY, INCLUDING, WITHOUT LIMITATION, THE OBLIGATION TO PAY THE INSURED AMOUNT, ALL IN ACCORDANCE WITH THE TERMS AND CONDITIONS HEREOF.**

      (d)    **Premium.** The premium payable with respect to the issuance of this Policy is specified in Item 10 of the Declarations. The premium is fully earned when paid in accordance with the Declarations and is non-refundable. The premium having been paid in full when due, this Policy shall not be cancelable by the Company.

      (e)    **Amendments, Changes, Waivers, Consents or Modifications.** This Policy is issued by the Company based upon its review of the Application and the Declarations. This Policy (including all endorsements hereto) may not be amended, changed or modified after the date hereof, or any provisions thereof waived or discharged, except by a written endorsement issued by the Company and consented to by the Insured and the Additional Named Insured, attached hereto and made a part hereof.

      (f)    **Waivers.** The failure by the Insured, the Additional Named Insured or the Company to insist upon full performance of any provision of this Policy shall not be deemed a waiver of such provision. No waiver by the Insured, the Additional Named Insured or the Company at any time, or with respect to any right, condition or requirement contained in this Policy, shall be deemed a waiver at any other time or with respect to any other right or any other condition or requirement, nor shall such waiver be valid unless made in compliance with Section VIII(b) hereof.

- 8 -

(g)    **Subrogation and Recoveries.**  Upon payment in full by the Company with respect to the Property covered hereunder pursuant to Articles I or V hereof, the Company shall be subrogated to all rights of recovery of the Insured and the Additional Named Insured against third parties (but in all events excluding claims of the Insured against the Additional Named Insured and excluding claims under the Loan Documents until such time as the Loan Documents are assigned to the Company in accordance with the provisions of Article V(d) hereof and Section 8 of the Additional Named Insured Endorsement) with respect to the Property for which such payment was made, up to the full extent of such payment, and the Insured and the Additional Named Insured shall upon request of the Company execute and deliver such instruments as may be necessary to secure such rights for the Company.

(h)    **Governing Law.**  This Policy shall be governed and construed in accordance with the laws of Bermuda .

(i)    **Binding Effect.**  This Policy is binding upon the Company and its successors and assigns.

### [REMAINDER OF PAGE INTENTIONALLY OMITTED]

NY01/TAUBL/270677.3

- 9 -

AUG 27 1998 14:32 FR KDW-LLP          212 808 7897 TO *202281900159121 P.18/74

## RESIDUAL VALUE INSURANCE POLICY

       IN WITNESS WHEREOF, the Company has issued this Policy as of August___, 1998 at Hamilton, Bermuda.

By:_____
Title: Authorized Representative

Attest: _____

NY01/TAUBL/270677.3

**<u>EXHIBIT D</u>**

Policy Number: FSL-98-357/554/800.00

## INSURED COVENANTS AGREEMENT

Insured Covenants Agreement made as of August 28, 1998, by and among FINANCIAL STRUCTURES LIMITED, a company organized under the laws of Bermuda ("FSL") and 98 RA2 Philadelphia-Krewstown Limited Partnership ("Owner").

### RECITALS

1.    Owner has been formed for the purpose of owning and leasing a parcel of land located at 9280 Krewstown Road, Philadelphia, PA, which land is more particularly described in Exhibit A attached hereto and made a part hereof, and the improvements thereon (the "Property").

2.    The Property is leased in its entirety to Rite Aid of Pennsylvania, Inc. ("Lessee") pursuant to a Lease dated as of August 24, 1998 between Owner and Lessee (the "Lease").

3.    Owner is the mortgagor under that certain mortgage or deed of trust (the "Mortgage"), dated August 24, 1998, by Owner to PW Real Estate Investments Inc. (the "Additional Named Insured"), securing payment of that certain Secured Note, dated August 24, 1998, made by Owner to the order of Additional Named Insured in the original principal amount of $2,692,406.67 (the "Note"; the Note, the Mortgage and all other documents evidencing or securing the Loan are sometimes collectively referred to herein as the "Loan Documents").

4.    FSL has issued a Residual Value Insurance Policy, which Policy includes an Additional Named Insured Endorsement (the "Policy") relating to the Property, pursuant to which FSL has agreed, among other things, subject to the conditions and exclusions set forth in the Policy, that it will pay to the Additional Named as the "Additional Named Insured" under the Policy an amount equal to the "Insured Value" (as defined in the Policy), in the event that the Note is not repaid in full by Owner on or before the Termination Date (as defined in the Policy).

5.    As issuer of the Policy, FSL is concerned that the Property be properly maintained and that the obligations of the landlord and the tenant under the Lease be fully performed.

6.    Owner has agreed that if FSL makes payment in full to the Additional Named Insured pursuant to Articles I and V of the Policy and the Additional Named Insured Endorsement to the Policy, the Property will immediately be transferred to FSL for no additional consideration other than such payment to the Additional Named Insured pursuant to the Policy.

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which are acknowledged, the parties agree as follows:

Case ID: 220902982

1.        Defined Terms.

        Capitalized terms used herein without definition have the meanings given to them in the Policy.

2.        Procedures Under the Policy.

        (a)        Not less than five (5) Business Days prior to the Termination Date, Owner will notify FSL that Owner either (1) intends to pay in full on the Termination Date all amounts due under the Note and Mortgage (the "Notice of Payment") or (2) does not intend to pay in full on the Termination Date all amounts due under the Note and the Mortgage.

        (b)        If Owner gives FSL Notice of Payment, then not less than two (2) Business Days prior to the Termination Date, Owner shall provide FSL with evidence acceptable to FSL that either (1) Owner has deposited in escrow with a financial institution or nationally recognized title insurance company mutually acceptable to FSL and Owner an amount sufficient to repay the Note and all other amounts due and payable under the Mortgage in full on the Termination Date ("Evidence of Deposit"), or (2) all amounts due and payable under the Note and the Mortgage will be paid in full on the Termination Date, or otherwise satisfied.

        (c)        If Owner fails to pay in full on the Termination Date all amounts due and payable under the Note and the Mortgage, FSL will make payment in full to Additional Named Insured pursuant to Article I and V the Policy and the Additional Named Insured Endorsement and title to the Property will be delivered to FSL in accordance with Section 4 hereof.

3.        Condition of the Property; Consents Under Lease.

        Owner hereby covenants and agrees for the benefit of FSL that Owner shall cause the tenant under the Lease to fully comply with the requirements of the Lease, including without limitation the maintenance and repair obligations of the tenant thereunder, structural and non-structural, foreseen and unforeseen, and the obligation to comply with Applicable Laws. To the extent necessary to cause the tenant to comply with such requirements, Owner shall, subject to any limitations on the Owner's right to enforce the Lease imposed under the Mortgage, enforce the tenant's obligations under the Lease through commercially reasonable means.

4.        Transfer of Title.

        (a)        In the event that FSL makes payment for a Claim under Articles I and V of the Policy, the Owner shall cause the deed to the Property to be immediately delivered to FSL, without payment of additional consideration by FSL. Owner hereby acknowledges that payment by FSL under the Policy is the equivalent of a purchase of the Property by FSL for an amount equal to the amount paid under the Policy and used in satisfying all or part of Owner's obligations under the Note, and that such payment constitutes full and fair consideration for the transfer of title to the Property to FSL.

Case ID: 220902982

(b)     At the time of such transfer of title to the Property, Owner agrees to comply with all of the terms and conditions of, and to execute all documents referred to in, the Contract Provisions Exhibit, attached hereto as Exhibit B.

5.          Representations, Warranties and Covenants of Owner.

Owner hereby certifies, represents, warrants and covenants to FSL, as of the date hereof and the date of issuance of the Policy, as follows:

(a)     Owner is a limited partnership duly organized, validly existing and in good standing under the laws of the State of Delaware.  Owner has all necessary power and lawful authority to own and operate its assets and properties and to carry on its business (including all business contemplated under the Policy).  The execution and delivery by Owner of the documents listed on Schedule 1 hereto ("Closing Documents"), and the consummation by Owner of the transactions contemplated thereby, have been duly authorized by all necessary action of Owner.  There are no other approvals, authorizations, consents or other actions by or filings with any person which are required to be obtained or completed by Owner in connection with the execution and delivery of this Insured Covenants Agreement or any of the Closing Documents (or any other agreement or instrument required hereunder).

(b)     Neither the execution and delivery of the Closing Documents by Owner nor the consummation of the transactions contemplated hereby will: (i) violate any provision of Owner's organizational documents; (ii) violate, conflict with or result in a breach or termination of, or give any other party the right to terminate, or constitute a default under the terms of any agreement to which Owner is a party or by which it is bound; (iii) result in the creation of any encumbrance other than a Permitted Encumbrance (as defined in the Property Return Condition Exhibit) on the Property; (iv) violate any judgment, order, injunction, award or decree of any Governmental Entity against or binding upon the Property or business of Owner; or (v) constitute a violation by Owner of any applicable law or regulation to which Owner is subject.

(c)     There are no outstanding judgments, orders, writs, injunctions or decrees of any Governmental Entity, no pending legal proceedings or material threats of legal proceedings, and no proceedings to foreclose any mortgage, security instrument, lien or other claim against: (i) the Property; (ii) Owner in connection with the Property; and/or (iii) Owner other than in connection with the Property (to the extent that the same would have a material adverse effect on Owner's performance of its obligations under this Insured Covenants Agreement or the Closing Documents).

(d)     There is not pending, with regard to Owner, any petition or proceeding for the appointment of a receiver or trustee, nor has Owner admitted in writing its inability to pay its debts as they mature.

Case ID: 220902982

(c)    Upon information and belief, true and complete copies of the Lease, the Mortgage and all other Closing Documents relating to the Property, together with any and all amendments, attachments, exhibits, and schedules thereto have been delivered to FSL prior to or concurrently with the execution of this Insured Covenants Agreement. Owner covenants that it will not amend, modify, waive or otherwise change any provision of the Lease, the Mortgage or any guaranty of the Lessee's obligations under the Lease or the Loan Documents if such action could have a material adverse effect on the condition or value of the Property without the prior written consent of FSL, except to the extent such action is expressly required under the Lease or the Loan Documents.

(f)    To the best of Owner's knowledge, there are no events of default under the Lease or any related instrument or any agreement, easement, covenant or condition with respect to the Property, and no events have occurred which would, but for the giving of notice or the passage of time, constitute an Event of Default (as defined in the Lease) under the Lease or any such other document. The Lease is in full force and effect as of the date hereof.

(g)    To the best of Owner's knowledge, all information with respect to the Property provided by or at the request of Owner to the appraiser for the purposes of the appraisal made in connection with the original closing and funding of the Loan was true and correct in all material aspects.

(h)    If Owner or any affiliate of Owner has had residual value loss insurance experience or claims history with respect to real or personal properties, Owner has attached hereto a full written explanation of such residual value insurance loss experience or claims history, and certifies that all information with respect to such residual value insurance loss experience or claims history is true and correct in all material aspects.

(i)    Owner has received the advice of counsel concerning each and all of the terms, conditions, limitations and exclusions of the Policy.

(j)    Owner warrants that no purchase option or similar right exists with respect to the Property which could be exercised for an amount less than the Insured Value thereof.

(k)    Owner acknowledges that coverage under the Policy (and applicable reinsurance agreements) is excess to any coverage provided (or which would but for the existence of the Policy be provided) by any other residual value insurance (or other, similar insurance policy or underwriting facility), or "puts" or guaranties of a similar nature, whether effected prior or subsequent hereto in date, and by whomsoever effected, directly or indirectly covering the Property, and Owner warrants that no other such insurance, "puts" or guaranties with respect to residual value are or will be in effect in respect of the Property.

Case ID: 220902982

(l)  At any time during the Policy period and within six (6) months after the Termination Date under the Policy, FSL, its agents or authorized representatives shall, upon not less than three (3) Business Days' notice, be permitted (to the extent permitted by leases of space at the Property, including, without limitation, the Lease), but not obligated, to examine and make copies of and abstracts from the records and books of account, if any, of, and visit the offices of, Owner and tenants under such leases (including, without limitation, the Lessee under the Lease), with respect to any matter in connection with the Property, the operation thereof and the insurance provided under the Policy. Notwithstanding the foregoing, FSL's right to visit the offices of tenants or the Lessee shall be subject to the express terms of the leases which shall govern.

(m)  Subject to the cure rights granted pursuant to the Loan Agreement made between Owner and the Additional Named Insured (the "Loan Agreement") Owner represents, warrants and covenants for the benefit of FSL that Owner shall comply with the requirements of Article 6 of the Loan Agreement.

6.      No Effect on Policy Obligations

        **FSL ACKNOWLEDGES AND AGREES THAT THE RIGHTS AND OBLIGATIONS OF THE OWNER AND/OR ANY OTHER PARTY UNDER THIS AGREEMENT IN NO WAY LIMIT, MODIFY OR DELAY THE TIME FOR PERFORMANCE OF FSL'S OBLIGATIONS UNDER THE POLICY AND THE ADDITIONAL NAMED INSURED ENDORSEMENT TO THE POLICY, AND THAT A DEFAULT OR FAILURE TO PERFORM BY OWNER AND/OR ANY OTHER PARTY OF ANY OF ITS RESPECTIVE OBLIGATIONS HEREUNDER OR UNDER THE CONTRACT PROVISIONS EXHIBIT OR THE PROPERTY RETURN CONDITION EXHIBIT ATTACHED HERETO OR A MISREPRESENTATION BY OWNER AND/OR ANY OTHER PARTY HEREUNDER OR THEREUNDER WILL NOT EXCUSE, LIMIT OR DELAY THE TIME FOR PERFORMANCE OF FSL'S OBLIGATIONS UNDER THE POLICY AND THE ADDITIONAL NAMED INSURED ENDORSEMENT, INCLUDING, WITHOUT LIMITATION, THE OBLIGATION TO PAY THE INSURED AMOUNT, ALL IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF THE POLICY AND THE ADDITIONAL NAMED INSURED ENDORSEMENT.**

7.      Miscellaneous

        This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Agreement may be executed in two or more counterparts and shall be deemed to have become effective when and only when one or more of such counterparts shall have been signed by or on behalf of each of the parties hereto, although is shall not be necessary that any single counterpart be signed by or on behalf of each of the parties hereto, and all such counterparts shall be deemed to constitute but one and the same

Case ID: 220902982

instrument.  This Agreement shall be governed by the laws of the State where the Property is located.

All notifications, notices, demands or requests herein provided for or made pursuant hereto shall be in writing and shall be delivered (i) by hand, (ii) by registered mail, return receipt requested, (iii) by a nationally recognized overnight delivery service or (iv) by facsimile followed by hard copy thereof mailed by reputable overnight delivery service to the party to be notified, to the addresses set forth below, or at such other address as the party to be notified shall have specified by notice in writing.

If to FSL:

Financial Structures Limited
Chevron House
11 Church Street
Hamilton HM 11, Bermuda

If to Owner:

c/o Merchant Equity Financial Group LLC
101 East 52nd Street, 30th Floor
New York, NY 10022

8.      Limitation of Owner's Liability; Limitation of FSL's Remedies.

Notwithstanding any other provision of this Agreement, the Contract Provisions Exhibit, the Property Return Condition Exhibit, the Policy, the Declarations or the Application (the "Policy Documents") to the contrary:

(a)      Owner shall be excused from the performance of its obligation to perform any covenant under the Policy Documents (other than Owner's obligation to pay the Premium in connection with the initial issuance of the Policy), to the extent performance of such covenant would, directly or indirectly, cause Owner to be in default under the Lease, the Note, the Mortgage or any other document evidencing or securing the Loan or if any consent of the Lessee and/or the Additional Named Insured is required under the Lease or such loan documents and such consent shall not have been obtained.  FSL shall not have the right to exercise any of its rights pursuant to this Agreement or under the Contract Provisions to the extent such exercise would, directly or indirectly, cause Owner to be in default under the Lease, the Note, the Mortgage or any other document evidencing or securing the Loan.

(b)      FSL shall not commence any action or proceeding against Owner and/or any and all of its partners, beneficial owners, trustees, members, managers, officers, directors or shareholders seeking any monetary judgment against Owner and/or any and all of its partners, beneficial owners, trustees, members, managers, officers, directors or shareholders.  Nothing in this Section 8(b) shall be deemed to restrict any action against Owner seeking declaratory or injunctive relief.

                    Case ID: 220902982

(c)      Any claim based on or in respect of any liability of Owner under the Policy Documents (other than Owner's obligation to pay the Premium in connection with the initial issuance of the Policy) shall be enforced only against the Owner's interest in the Property (and only at such time as, and in connection with the foreclosure of the lien of the Mortgage by the Company) and not enforced against Owner and/or any and all of its partners, beneficial owners, trustees, members, managers, officers, directors or shareholders individually or personally.

9.          Inspection and Appraisal Rights.

(a)      Subject to the terms of the Lease and the Mortgage, FSL may at any time during the thirty-six (36) months immediately preceding the Termination Date, at its sole expense, cause an inspection to be made of the Property. Any inspection may include (without limitation) any analyses of the physical condition of the Property (including environmental condition), the title to the Property, the value of the Property, the status of the Lease and the Property's compliance with Applicable Laws.

(b)      In the event that the Owner prepares (or has prepared on its behalf) or receives an appraisal or an inspection of the Property, a copy of such appraisal or inspection will promptly be provided to FSL. In addition, Owner hereby authorizes the Additional Named Insured to provide FSL with copies of any appraisals or inspection reports prepared by or on behalf of the Additional Named Insured.

Craig McGuireWoods
McGuireWoods
Dec 10, 2020 15:2

Case ID: 220902982

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

[The balance of this page is intentionally blank.]

confidential
Craig Harmon
McGuireWoods
Dec 10, 2020 15:28

Case ID: 220902982

## INSURED COVENANTS AGREEMENT

FSL:

FINANCIAL STRUCTURES LIMITED

By _____

Title: Authorized Representative

confidential
Craig Harmon
McGuireWoods
Dec 10, 2020 15:28

Case ID: 220902982

## INSURED COVENANTS AGREEMENT

98 RA2 Philadelphia-Krewstown Limited Partnership

By:     98 RA2 Philadelphia-Krewstown L.L.C.
        Its General Partner

        By:    RA2 SPE L.L.C., Its Managing Member

               By:    RA2 Holdings Management
                      Corporation, Its Managing Member

                      By:
                             JOHN B. MANNIX, President

confidential
Craig Harmon
McGuireWoods
Dec 10, 2020 15:28

Case ID: 220902982

STORE No. 554

## EXHIBIT "A"

### LEGAL DESCRIPTION

ALL THOSE TWO CERTAIN LOTS OR PIECES OF GROUND WITH THE BUILDINGS AND IMPROVEMENTS THEREON ERECTED IN THE 63rd WARD OF THE CITY OF PHILADELPHIA, COMMONWEALTH OF PENNSYLVANIA, AND DESCRIBED AS FOLLOWS, TO WIT:

BEGINNING FOR THE SAME AT A POINT LOCATED AT THE INTERSECTION OF THE NORTHWESTERLY SIDE OF KREWSTOWN ROAD (80 FEET WIDE) WITH THE SOUTHWESTERLY SIDE OF GREGG STREET (60 FEET WIDE), SAID POINT BEING LOCATED 0.06 FEET SOUTHEAST OF A REBAR FOUND, THENCE RUNNING WITH AND BINDING ON SAID NORTHWESTERLY SIDE OF KREWSTOWN ROAD 1) SOUTH 37°42'09" WEST, 222.56 FEET; THENCE THROUGH THE LANDS OF LOT 292 AS SHOWN ON TAX MAP SHEET 149 N 21 IN AND FOR THE CITY OF PHILADELPHIA 2) NORTH 52°17'51" WEST, 230.58 FEET TO INTERSECT THE SOUTHEASTERLY SIDE OF ALTON STREET (46 FEET WIDE), THENCE RUNNING WITH AND BINDING ON SAID SOUTHEASTERLY SIDE OF ALTON STREET 3) NORTH 37°42'09" EAST, 64.93 FEET; THENCE ALONG A PORTION OF THE COMMON DIVISION LINE BETWEEN LOTS 292 AND 278 4) SOUTH 44°11'21" EAST, 107.59 FEET TO A POINT LOCATED 0.05 FEET SOUTHEAST OF A REBAR FOUND, THENCE ALONG A PORTION OF THE COMMON DIVISION LINE BETWEEN LOTS 291 AND 278 5) NORTH 37°42'09" EAST, 190.48 FEET TO A REBAR FOUND ON THE SOUTHWESTERLY SIDE OF THE AFOREMENTIONED GREGG STREET, THENCE RUNNING WITH AND BINDING ON SAID SOUTHWESTERLY SIDE OF GREGG STREET 6) SOUTH 44°11'21" EAST, 125.32 FEET TO THE POINT OF BEGINNING.

DSC:521280.2

Case ID: 220902982

**EXHIBIT B**

**CONTRACT PROVISIONS**

Capitalized terms used without definition shall have the meanings ascribed thereto in the Insured Covenants Agreement and/or in the Policy.

Upon a transfer of the Property to FSL pursuant to Section 4 of the Insured Covenants Agreement, the Owner shall strictly comply with the following (unless waived by FSL, in its sole discretion).

1.  At the closing of the transfer of title (the "Closing"), which Closing shall occur within ten (10) Business Days after the Termination Date (the "Closing Date"), time being of the essence, the Owner shall convey to FSL (or such person or entity as may be designated in writing by FSL) good and marketable fee simple absolute title to the Property, which title shall be in the same condition as existed on the Effective Date, free and clear of all mortgages, liens, leases, tenancies, easements, encroachments, covenants, restrictions, security interests or other encumbrances whatsoever, excepting only such Permitted Encumbrances as are identified in Schedule A of the Return Condition Exhibit ("Permitted Encumbrances").

2.  At the Closing, the Owner shall execute and deliver to FSL the following:

    (i)  the Deed, duly executed and acknowledged by the Owner, conveying the fee simple absolute title of the Property to FSL, subject only to the Permitted Encumbrances;

    (ii)  a bill of sale in form and substance reasonably satisfactory to FSL (the "Bill of Sale"), duly executed and acknowledged by the Owner, conveying to FSL, subject only to the Permitted Encumbrances, all of the following now or hereafter owned by Owner, if any: (a) all machinery, equipment, fixtures, furniture, and other personal property owned by Owner attached to or otherwise relating to any buildings, structures or improvements located on the Property; (b) books and records and any architectural, electrical, mechanical, plumbing and other plans and specifications produced in connection with the construction, repair and maintenance of the Property; and (c) all appraisals, reports and analyses of engineers and other consultants, operating manuals and other documents pertaining to the physical operation of the Property;

    (iii)  an assignment in form and substance reasonably satisfactory to FSL (the "Assignment"), duly executed and acknowledged by the Owner, conveying to FSL, to the extent assignable, the following, now or hereafter owned by Owner, if any, subject only to the Permitted Encumbrances, to the extent (but only to the extent) that FSL elects (at its sole option) to receive the same: (a) any construction or service contracts (including any construction management agreement, architect's agreement, general contract, construction contract, subcontract,

- i -

Case ID: 220902982

purchase orders or any other contract or agreement) relating to the design and construction or renovation of the Property or the performance of tenant work and agreements which have a term expiring after the Closing Date for the furnishing of management, maintenance, repairs, supplies, equipment, or other goods and services to the Property on behalf of the Owner (the "Property Contracts"); (b) all building and other permits, certificates, licenses, franchises, authorizations and approvals granted by any Governmental Entity necessary or useful in connection with the Property, to the extent assignable; and (c) any unexpired warranties and guaranties and payment or performance bonds in connection with the construction, renovation or operation of the Property;

(iv) an affidavit executed by the Owner to the effect that the Owner is not a foreign person for purposes of 26 U.S.C. § 1445(b)(2) or any amendment or successor thereto;

(v) such affidavits as the national title insurance company, or companies, selected and approved by FSL (the "Title Company") customarily and reasonably require to insure title to real estate;

(vi) a general release by Owner of FSL from any and all liabilities or obligations of FSL to Owner with regard to the Property and the Policy;

(vii) evidence, in form, scope and substance reasonably satisfactory to FSL and its counsel, the authorization of (i) the actions to be taken by the Owner under this Exhibit, and (ii) the execution and delivery of the Closing Documents and all other documents required to be executed and delivered by the Owner pursuant to this Exhibit, the Policy, or any amendments, attachments or endorsements thereto;

(viii) original certificates or other evidence of existence and good standing for the Owner, dated not more than thirty (30) days prior to the Closing Date, from the jurisdiction in which such party is formed and, with respect to the Owner, from the State in which the Property is located;

(ix) to the extent available to the Owner, originals or true copies of the licenses and permits, the plans, the warranties and guaranties, and the Property Contracts; and

(x) to the extent available to the Owner, all logs, manuals, data, correspondence, files and other records pertaining to the Property.

3.      At the Closing FSL shall execute and deliver to Owner, a general release by FSL of Owner from any and all liabilities or obligations of Owner to FSL with regard to the Property, the Insured Covenants Agreement and the Policy.

4.      As of the date of FSL's election to purchase the Property, the Owner shall not withdraw, settle, or otherwise compromise any protest or reduction proceeding affecting real estate taxes assessed against the Property for any fiscal period in

Case ID: 220902982

which the Closing Date is to occur or any subsequent fiscal period without the prior written consent of FSL (which shall not be unreasonably withheld or delayed if the proposed withdrawal, settlement, or other compromise will not have a material adverse effect on fiscal periods after the Closing Date). Subject to the provisions of any lease of the Property, real estate tax refunds and credits received after the Closing which are attributable to the fiscal tax year during which the Closing Date occurs shall be apportioned between the Owner and FSL, after deducting the fees and costs of collection thereof, pursuant to this Contract Provision Exhibit.

5.      At the Closing, unless FSL has advised the Owner to the contrary prior to the Closing, the Owner shall assign to FSL all deposits or escrows held for the Owner's account at or by any public utility company in connection with utility services furnished to the Property. Prior to the Closing Date, the Owner shall notify all such public utilities in writing (with copies to FSL) of the applicable transfer of service if same is in the name of Owner.

6.      Closing shall be effected on the Closing Date in accordance with the terms, conditions and requirements of the Policy, this Contract Provision Exhibit and all endorsements, attachments or amendments to these or any other documents relating to the Property under the Policy.

confidential
Craig Harwood
McGuireWoods
Dec 10, 2020 15:28

Case ID: 220902982

## EXHIBIT C

## PROPERTY RETURN CONDITION EXHIBIT

THE PROPERTY WILL AT ALL TIMES BE MAINTAINED IN STRICT CONFORMANCE WITH ALL OF THE FOLLOWING MINIMUM PHYSICAL RETURN CONDITIONS:

1.      the Property shall have been maintained in accordance with the requirements of the Lease;

2.      Owner has not removed from the Property any of the mechanical systems, fixtures or personal property thereof or thereon as they exist on the Effective Date except to the extent any removal is in connection with substitution of an item with a replacement item of equal or greater value, utility and useful life or is necessary for the preservation or upgrading of the Property in order to maintain its quality, class and grade in the marketplace and further excepting such trade fixtures owned and removed by any Lessee pursuant to the terms of the Lease;

3.      title to the Property shall be good and marketable fee simple absolute, in the same condition as it exists as of the date of execution of the Policy, free of all encumbrances other than Permitted Encumbrances (as set forth in Schedule A hereto) and other matters consented to by FSL in writing, and except as set forth on Schedule A or consented to by FSL as of the Termination Date, there shall be no deed of trust, mortgage or mechanic's lien on any part of the Property. Without the prior consent of FSL, Owner shall not have entered into any restrictive covenants or easements with regard to the Property, except to the extent Owner is obligated to do so under the Lease or the Loan Documents; and

4.      Owner shall not have consented to any zoning changes, or sold, transferred, assigned, disposed of, or consented to the utilization of, any development rights, or modified or amended or consented to any modification or amendment of the Certificate of Occupancy for the Property without the prior consent of FSL, except to the extent Owner is obligated to do so under the Lease or the Loan Documents.

Case ID: 220902982

## SCHEDULE A TO PROPERTY RETURN CONDITION EXHIBIT

### Permitted Encumbrances

1.    Lien of real estate taxes and assessments.

2.    The Mortgage and other Loan Documents.

3.    The Lease and liens permitted under the Lease and/or under the Mortgage and other Loan Documents, and/or liens which the Lessee is obligated to remove pursuant to the Lease.

4.    The matters identified on Schedule B to the Owner's Title Insurance Policy obtained by the Additional Named Insured, or its predecessor in interest, in connection with the initial closing and funding of the Loan.

5.    Any other matters to which FSL has consented to in writing.

confidential
Craig Harmon
McGuireWoods
Dec 10, 2020 15:28

Case ID: 220902982

## SCHEDULE 1 TO INSURED COVENANTS AGREEMENT

## CLOSING DOCUMENTS

1. Residual Value Insurance Application;
2. Residual Value Insurance Declarations;
3. Residual Value Insurance Policy;
4. Insured Covenants Agreement;
5. Special Provisions Endorsement
6. Exchange Property Endorsement
7. Lease;
8. Note;
9. Loan Agreement;
10. Mortgage;
11. Lease Assignment and Agreement;
12. Consent Agreement;
13. Subordination, Non-Disturbance and Attornment Agreement.

confidential
Craig Harmon
McGuireWoods
Dec 10, 2020 15:28

NY01/TA1JBT/308489.1

Case ID: 220902982

**<u>EXHIBIT E</u>**

Policy Number: FSL-98-357/4938/800.00

## ADDITIONAL NAMED INSURED ENDORSEMENT

Additional Named Insured Endorsement made as of August 28, 1998, issued by FINANCIAL STRUCTURES LIMITED, a company organized under the laws of Bermuda ("Company") to PW REAL ESTATE INVESTMENT INC., a Delaware corporation (the "Additional Named Insured").

A.    The Additional Named Insured has made a loan (the "Loan") to 98 RA2 Philadelphia- Castor Limited Partnership, a Delaware limited partnership, (the "Owner") in the original principal amount of $2,276,266.46; and .

B.    The Loan is evidenced by that certain Secured Note (the "Note"), dated August 24, 1998, made by the Owner to the order of the Additional Named Insured in the aggregate original principal amount of $2,276,266.46; and

C.    The Property is leased to Rite Aid of Pennsylvania, Inc. (the "Lessee"), pursuant to that certain Lease, dated as of August 24, 1998, by and between Owner, as lessor, and the Lessee, as lessee; and

D. ·   The Loan is secured, among other things, by that certain mortgage or deed of trust (the "Mortgage"), and that certain Lease Assignment and Agreement, each made of even date dated as of August 24, 1998 by the Owner to or for the benefit of the Additional Named Insured, encumbering the fee simple estate of the Owner in and to those certain parcels of land more particularly described in Schedule A attached hereto and made a part hereof, and the improvements thereon (the "Property"); and

E.      The Company has issued a Residual Value Insurance Policy (the "Policy") relating to the Property, pursuant to which the Company has agreed, among other things, that pursuant to Articles I and V of the Policy the Company will pay to the Additional Named Insured under the Policy an amount equal to the "Insured Value", in the event that the Note is not repaid in full by the Owner on or before the Termination Date (as defined in the Policy); and

F.      The Company and the Additional Named Insured desire to enter into this Additional Named Insured Endorsement to enter into certain understandings and agreements between Company and the Additional Named Insured as more fully set forth herein.

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which are acknowledged, the parties agree as follows:

1.      Definitions.  Capitalized terms used but not defined in this Additional Named Insured Endorsement shall have the meanings ascribed thereto in the Policy (except references to the Policy herein do not include the endorsements to the Policy).

2.      Payment of Insured Value to Additional Named Insured.  On the Termination Date, subject only to the terms and conditions of this Additional Named Insured Endorsement, the Company will pay the Insured Value to the Additional Named Insured, in immediately available funds by wire transfer to an account designated by the Additional Named Insured.

Any Claim hereunder shall be made by the Additional Named Insured.  If the Additional Named Insured wishes to make a Claim under this Additional Named Insured Endorsement, the Additional Named Insured must file with the Company a Notice of Claim with regard to the Property.  Any Notice of Claim must be received by the Company no earlier than

-2-

ten (10) days before the Termination Date and no later than 5:00 p.m. Eastern Time (U.S.) on that date which is thirty (30) days after the Termination Date.

      3.    Adjustments to Insured Value. The Insured Value payable to the Additional Named Insured under Section 2 will be reduced by (a) all payments made by the Owner to the Additional Named Insured which reduce the principal balance of the Note to an amount less than the Insured Value (including without limitation any repayments of the Note on or about the Termination Date) and (b) without duplication, all payments of insurance proceeds, condemnation awards or other payments of any nature (but excluding payments under the Policy) which reduce the principal balance of the Note to an amount which is less than the Insured Value. As a result of the payment of the Insured Amount, in no event will the Additional Named Insured be entitled to payments under the Note and this Additional Named Insured Endorsement which exceed in the aggregate the amounts payable under the Note.

      4.    Conflicts with Policy. If there are any conflicts between the terms of this Additional Named Insured Endorsement and the terms of the Policy, the Application and Declarations relating to the Policy, and the Insured Covenants Agreement of even date herewith by and between the Company and Owner (collectively, the "Policy Documents") this Additional Named Insured Endorsement will govern.

      5.    No Termination of Coverage. Notwithstanding anything to the contrary in the Policy Documents, except as specifically provided in Section 7 of this Additional Named Insured Endorsement, unless the Insured Value has been paid to the Additional Named Insured in full, no act or failure to act of the Insured or any other person or entity and no provision of the Policy Documents will result in the termination of coverage hereunder for the benefit of the Additional Named Insured. This Additional Named Insured Endorsement will remain in full

- 3 -

force and effect notwithstanding any breach by the Additional Named Insured or the Owner of any of its obligations under the Policy Documents and/or this Additional Named Insured Endorsement. No breach of a covenant by the Additional Named Insured under this Additional Named Insured Endorsement shall give rise to a cause of action by the Company against the Additional Named Insured or constitute an exclusion from coverage (except as set forth in paragraph 7 hereof).

      6.     Claims under the Policy. Additional Named Insured shall have the sole and exclusive right to provide a Notice of Claim pursuant to Section 2 hereof.

      7.     Exclusion from Coverage. Notwithstanding any provisions of the Policy or this Additional Named Insured Endorsement to the contrary, no payment will be required by the Company hereunder or under the Policy, and the Policy and this Additional Named Insured Endorsement will be of no further force or effect, in the event that (a) the Additional Named Insured has received payment of all amounts due and owing under the Note, (b) the Additional Named Insured has consented to any modification, amendment, waiver, termination or discharge of the Note without the prior written consent of the Company (which consent shall not be unreasonably withheld or delayed) or the Mortgage is not in full force and effect on the Termination Date, (c) title to the Property (or the beneficial interests therein) is acquired by any person or entity other than the Additional Named Insured or its Affiliate pursuant to a foreclosure, exercise of a power of sale, acceptance of a deed in lieu of foreclosure or in lieu of the exercise of a power of sale, or any other action or proceeding similar to the foregoing (collectively, a "Foreclosure Event") without the prior written consent of the Company (it being understood that if the Additional Named Insured or its Affiliate becomes the owner of the Property, the rights of the Additional Named Insured will be governed by the Additional Named

- 4 -

Insured Endorsement and will not be adversely affected by any provision of the other Policy Documents), (d) if title to the Property (or the beneficial interests therein) is acquired by the Additional Named Insured or its Affiliate pursuant to a Foreclosure Event or otherwise, the subsequent transfer of such title (or beneficial interests) to any person or entity other than the Additional Named Insured or its Affiliates") without the prior written consent of the Company, (e) (I) the Lessee has become the subject of a bankruptcy or insolvency proceeding and the Lessee has rejected (or is deemed to have rejected) its obligations under the Lease and/or (II) the Lease is not in full force and effect immediately prior to the Termination Date (unless the Lease shall have expired by its terms within the thirty (30) day period immediately preceding the Termination Date), but only if in either event the Property is not in the physical condition required pursuant to the terms of the Lease on the Termination Date (assuming for this purpose that the Lease were in full force and effect on the Termination Date) or (f) the Additional Named Insured has discharged or released the Mortgage in connection with the exercise of a defeasance pursuant to the Note. In the event of the occurrence of any of the foregoing, all liability of the Company under the Policy and this Additional Named Insured Endorsement shall terminate, and the Company shall have no liability to the Additional Named Insured or any other person or entity in connection with the Policy and this Additional Named Insured Endorsement.

8.    Assignment of Loan Documents in Accordance With Requirements of Policy. Upon the payment by the Company of the Insured Value pursuant hereto, the Additional Named Insured agrees to promptly assign to the Company (or its designee), without recourse, the Note, the Mortgage and all other documents relating to the Loan ("Loan Documents", including without limitation the rights of the Additional Named Insured under any mortgagee title insurance policies, to the extent assignable) or, in the event the Additional Named Insured (or its

- 5 -

Affiliate) has acquired title to the Property prior to the Termination Date, the Additional Named Insured, at the option of the Company, shall also transfer good and marketable title to the Property to the Company, subject to no mortgages, deeds of trust, liens, easements, covenants, conditions, restrictions, leases or other encumbrances other than the permitted title matters identified on Schedule B attached hereto and made a part hereof or which do not have a material, adverse effect on the value of the Property as of the Termination Date. Notwithstanding the foregoing, the Additional Named Insured shall not be required to assign any claim it has to rent payable during the term of the Lease.

        9.     Copies of Notices under Loan Documents and Written Reports Prepared on behalf of the Additional Named Insured.

        The Additional Named Insured shall provide the Company with copies of all notices sent by the Additional Named Insured to the Owner within a reasonable period of time after the sending of each such notice to Owner. The Company will provide the Additional Named Insured with copies of all notices sent by the Company to the Owner within a reasonable period of time after sending of each such notice to Owner. In addition, in the event the Additional Named Insured prepares (or has prepared on its behalf) an appraisal of the Property or a written report of the inspection of the Property, the Additional Named Insured will provide the Company with copies thereof within a reasonable period after receipt of the same by the Additional Named Insured. Notwithstanding the foregoing, the failure of the Company or the Additional Named Insured to provide any such notice shall not void the Policy or this Additional Named Insured Endorsement.

        10.    Default by Owner Under Insured Covenants Agreement. The Company acknowledges and agrees that a default by the Owner in the performance of its obligations under the Policy and/or the Insured Covenants Agreement and/or any other Policy Document and/or

<div align="center">- 6 -</div>

this Additional Named Insured Endorsement shall not release the Company from, and shall not constitute a defense to any of the Company's obligations under the Policy or this Additional Named Insured Endorsement.

      11.    Statement of Amount Payable under Loan Documents. At the written request of the Company made at least ten (10) Business Days prior to the Termination Date, the Additional Named Insured shall, at least seven (7) Business Days prior to the Termination Date, specify in writing to the Company the amount of principal, interest and other charges owing by Owner as of the Termination Date to the Additional Named Insured with respect to the Loan (the "Outstanding Loan Amount"); provided, however, that the failure to so specify such Outstanding Loan Amount shall not constitute an exclusion from the Policy.

      12.    Assignment.

      A.    Except as otherwise expressly permitted pursuant to Section 12C below, the rights of the Additional Named Insured under the Policy and this Additional Named Insured Endorsement are personal and may not be assigned without the prior written consent of the Company and any such purported assignment shall be void *ab initio*. In the event of a permitted assignment, the Company shall amend or supplement the Declarations to identify the name and address of the assignee as the "Additional Named Insured" under the Policy.

      B.    Subject to the provisions of Section 12A hereof, this Additional Named Insured Endorsement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.

      C.    This Additional Named Insured Endorsement is a personal contract and may not be assigned without the prior written consent of the Company and any such purported assignment shall be null and void *ab initio*, provided, that this Additional Named

NY01/TAUBL/308455.1

Insured Endorsement may be assigned by the Additional Named Insured (1) in connection with the inclusion of the Loan in a securitization transaction (whether through one or more assignments) and (2) in connection with any other assignment of the Loan, provided in all events that the transferee is a United States domestic entity which is either (I) a securitization vehicle or (ii) an institutional investor such as a bank, trust company, savings bank, insurance company, pension trust, educational institution or similar entity with a net worth of not less than One Hundred Million and 00/100 Dollars ($100,000,000.00), and further provided, that the Additional Named Insured may not be the Insured or an Affiliate of the Insured except as otherwise provided in the Special Provisions Endorsement. The Additional Named Insured's assignment rights pursuant to the preceding clauses (1) and (2) are cumulative, and the exercise of its assignment rights under one such clause shall not preclude the subsequent exercise of such rights. Any out-of-pocket expenses incurred by the Company in connection with any transfer, including reasonable legal fees, will be paid by the transferor or the transferee.

13.    Release. Upon payment of the Insured Amount to the Additional Named Insured in accordance with the terms of this Additional Named Insured Endorsement, the Additional Named Insured will provide the Company with a general release from all liabilities arising out of or relating to the Policy and this Additional Named Insured Endorsement, and the Company will be discharged from all liabilities hereunder and thereunder.

14.    Subrogation and Recoveries. The Additional Named Insured will take all reasonable measures available to it to preserve its rights of recovery with respect to the value of the Property and the indebtedness evidenced by the Note, and will not materially impair any of such rights without the Company's consent. Upon any payment to the Additional Named Insured pursuant to this Additional Named Insured Endorsement, the Company will be

- 8 -

subrogated to the Additional Named Insured's rights against the Insured and other persons, up to the full amount of such payment, and upon the Company's request, the Additional Named Insured will execute and deliver such instruments as may be necessary to secure such rights for the Company.

15.    Supplements and Amendments. This Additional Named Insured Endorsement may be amended only by a written instrument signed by the parties hereto.

16.    Notices. Any notices given pursuant to this Additional Named Insured Endorsement shall be in writing and shall be sent in the manner provided in Article VIII(b) of the Policy.

17.    Governing Law. This Additional Named Insured Endorsement shall in all respects be governed by, and construed in accordance with, the laws of Bermuda (excluding conflict of law rules), including all matters of construction, validity and performance.

18.    Consent to Jurisdiction. The Company hereby irrevocably consents to the jurisdiction and venue of the courts of the United States of America or the State of New York, siting in the State of New York, in connection with any action or proceeding arising out of or relating to the Policy and this Additional Named Insured Endorsement. Personal jurisdiction over the Company may be obtained by the mailing of a summons and other process to the Company at the address set forth in Article VIII(b) of the Policy and the simultaneous mailing, by certified mail, return receipt requested, to the Company, c/o John A. Garraty, Esq., Kelley Drye & Warren LLP, 101 Park Avenue, New York, New York 10178.

19.    Counterparts. This Additional Named Insured Endorsement may be executed in two or more counterparts and shall be deemed to become effective when and only when one or more of such counterparts shall have been signed by or on behalf of each of the

parties hereto, although it shall not be necessary that any single counterpart be signed by or on behalf of each of the parties hereto, and all such counterparts shall be deemed to constitute but one and the same instrument.

        20.    Further Assurances. The Company and the Additional Named Insured agree to reasonably cooperate with each other in taking actions to effect the intent of this Additional Named Insured Endorsement. Without limiting the foregoing, in the event that the Owner becomes the subject of a bankruptcy case, the Additional Named Insured and the Company will reasonably cooperate to take actions in such case to protect the rights of the Additional Named Insured and the Company with respect to the Mortgage and the Property, provided, that no such action shall adversely affect the rights or interest of the Additional Named Insured, and no action or failure to act by the Company or the Additional Named Insured under this Section 20 shall affect coverage under the Policy or this  Additional Named Insured Endorsement.

        21.    Amendments to Loan Documents and Lease Documents. The Additional Named Insured hereby agrees not to amend, modify, change, waive, discharge or terminate the provisions of the Note, the Mortgage or any other document evidencing or securing the Loan in any manner that adversely affects the value of the property without the prior written consent of the Company, which consent shall not be unreasonably withheld or delayed. The Additional Named Insured hereby further agrees, to the extent the Additional Named Insured has the right to consent or to withhold its consent to any such action, not to grant its consent to any amendment, modification, change, waiver, assignment or termination of the Lease or any Lease related document including, without limitation, any guaranty of the Lessee's obligations under the Lease in any manner that adversely affects the value of the property, without the prior written consent

- 10 -

of the Company, which consent shall not be unreasonably withheld or delayed. The provisions of the immediately preceding sentence shall not apply to any amendment, modification, change, waiver, assignment or termination of the Lease or any such Lease related document if all amounts payable to the Additional Named Insured under the Note shall be paid in full in connection with such amendment, modification, change, waiver, assignment or termination. The Additional Named Insured agrees to include a reference to this Section 21 in the provision of the Mortgage which requires that any modification of the Loan documents be in writing.

22.     Quota Share Reinsurance Agreement. The Additional Named Insured shall have all of the rights specified in that certain Quota Share Reinsurance Agreement, of even date herewith, between the Company and The Hartford Fire Insurance Company (the "Reinsurer"), including the right to recover directly from the Reinsurer upon the terms and conditions of such Quota Share Reinsurance Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Additional Named Insured Endorsement to be executed by their respective officers hereunto duly authorized, as of the date and year first above written.

[the remainder of this page is intentionally blank]

NY01/TAUBL/308455.1

## ADDITIONAL NAMED INSURED ENDORSEMENT

COMPANY:
FINANCIAL STRUCTURES LIMITED

By: _____
Name:        David Ezekiel
Title:    Authorized Representative
                357/4938

NY01/TAUBL/308455.1

## ADDITIONAL NAMED INSURED ENDORSEMENT

Accepted and Agreed:

**Additional Named Insured:**

**PW REAL ESTATE INVESTMENTS INC.,**
**a Delaware corporation**

By _Margaret Imperial_
   Name:
   Title:


**PAINE WEBBER REAL ESTATE SECURITIES INC.,**
**a Delaware corporation**

By _Margaret Imperiale_
   Name:
   Title:

- 13 -

## SCHEDULE A

### Legal Description

Store No. 4938

**EXHIBIT A**

LEGAL DESCRIPTION

ALL THAT CERTAIN lot or piece of ground situate in the Fifty-sixth Ward of the City of Philadelphia,

Beginning at the intersection of the Northwesterly side of Castor Avenue (one hundred feet wide) and the Southwesterly side of Rhawn Street (seventy feet wide). Thence extending al the Northwesterly side of Castor Avenue South thirty-seven degrees thirty-eight minutes fi four seconds West two hundred fourteen and eight hundredths feet to a point on the Northeasterly side of Ripley Street (sixty four feet wide), thence along the same North fif degrees thirty-nine minutes West one hundred eleven and five tenths feet to a point, then extending North thirty-seven degrees forty minutes fifty-three seconds East two hundred seventeen feet and thirty-three hundredths to a point on the Southwesterly side of Rhaw    reet; thence along the same South forty-eight degrees fifty-nine minutes four seconds East or    nning. hundred eleven and fifty-two hundredths feet to the first mentioned point and place of i

BEING No. 7972 Castor Avenue

STREET CODE/House No. 21880-07972

CITY REGISTRY: 138N7-218

DSC:520455.1

## SCHEDULE B

### Permitted Title Matters

1.  Lien of real estate taxes and assessments;

2.  The Lease or liens permitted under the Lease or the Mortgage and other Loan Documents and/or liens for which the Lessee is obligated to remove pursuant to the Lease;

3.  Any replacement lease(s) made by the Additional Named Insured which either (i) could not have a material adverse effect on the value of the Property or (ii) were made with the prior written consent of the Company, which consent shall not be unreasonably withheld;

4.  The matters identified on Schedule B to the Mortgagee's Title Insurance Policy obtained by the Additional Named Insured, or its predecessor in interest, in connection with the initial closing and funding of the Loan; and

5.  Any other matters consented to in writing by the Company.

**COMPOSITE EXHIBIT F**

<u>AGREEMENT AND PLAN OF MERGER (BATTLE CREEK)</u>

AGREEMENT AND PLAN OF MERGER (BATTLE CREEK), dated as of September 30, 2021, made by and between RA2 BATTLE CREEK L.L.C. ("RA2"), a Delaware limited liability company having an address at c/o Allerand Capital, LLC, 675 Indiantown Road; Suite 103, Jupiter, FL 33458; and AUBSP OWNERCO 13, LLC ("AUBSP"), a Texas limited liability company having an address at c/o Allerand Capital, LLC, 675 Indiantown Road; Suite 103, Jupiter, FL 33458.

R E C I T A L S :

A.    RA2 was formed as a limited liability company under the provisions of Delaware law relating to the formation and operation of limited liability companies (collectively, the "DE LLC Law") pursuant to Articles of Organization (the "RA2 Articles") filed in the office of the Delaware Secretary of State on July 23, 1998.

B.    AUBSP was formed as a limited liability company under the provisions of Texas law relating to the formation and operation of limited liability companies (collectively, the "TX LLC Law") pursuant to a Certificate of Formation (the "AUBSP Certificate") filed in the office of the Texas Secretary of State on April 28, 2021.

C.    As of July 31, 1998, RA2's then members adopted a written operating agreement governing the operations of RA2, which operating agreement, as amended, remains in effect as of the date hereof (as amended to date, the "RA2 OA").

D.    As of April 28, 2021, the sole member of AUBSP adopted a written company agreement governing the operations of AUBSP, which company agreement remains in effect as of the date hereof (the "AUBSP Agreement").

E.    RA2 is a single asset, single purpose company that owns certain improved real property (the "Property") in Battle Creek, MI. The Property was leased to Rite Aid Corporation or a subsidiary thereof (either, "RAD") pursuant to a certain lease agreement (the "RAD Lease"), dated as of August 24, 1998, originally for use as a retail drug store premises.

F.    The Property is encumbered by a first mortgage loan facility (the "Mortgage") that was originally funded on or about August 24, 1998, in the amount of $3,108,703.  The Mortgage matured on September 1, 2020, on which date a balloon maturity payment became due to the lender from time to time in respect of the Mortgage ("Lender") in the scheduled amount of $957,418 (as increased or decreased to the date hereof, the "Balloon Payment"). RA2 is in default of its obligations to pay the Balloon Payment. It is anticipated that the Balloon Payment will be refinanced by RA2 with funds, services and credit support provided by AUBSP and affiliates of AUBSP and contributed to, or provided for the benefit of, RA2 pursuant to the provisions of a certain Investment Agreement (Battle Creek) dated as of May 31, 2021 (the "Investment Agreement").

G.    Each of the RAD Lease and the Mortgage were structured such that, throughout the term of the Mortgage and the RAD Lease, 100% of all RAD payments under the RAD Lease and

any other income that might be generated by the Property, such as insurance proceeds or condemnation awards, must be paid directly to the Lender, thus leaving RA2 with no cash flow of any amount whatsoever for the entire 22-year term of the RAD Lease and the Mortgage.

H.    The Mortgage also contains prohibitions (the "Bankruptcy Remoteness Covenants") against (i) the ownership by RA2 of any material assets other than the Property; (ii) RA2 engaging in any business or activity other than the leasing of the Property to RAD; (iii) the incurrence by RA2 of any second mortgage loan or other junior financing of any kind; and (iv) RA2 engaging in certain other investments or activities that could generate income for RA2 in addition to the rents payable under the RAD Lease.

I.    As a result of the strictures of the Bankruptcy Remoteness Covenants, and the obligation that 100% of all cash flow generated by RA2's sole asset be applied to the payment of required debt service due under the Mortgage for entire 22-year term of the Mortgage and beyond, until the consummation of certain of the transactions contemplated in the Investment Agreement, RA2 had no reserves, no unfulfilled equity subscriptions, no cash in banks, no bank account, no credit facility of any kind and no investments or assets with which to pay the Balloon Payment or defend against any litigation to which it might become subject.

J.    Also because of the conditions identified above, among others and including, without limitation, the matters described in Section 2 of this agreement, the manager of RA2 (the "Manager") has determined that efforts now to refinance the Balloon Payment with a new loan facility provided by a commercial bank or insurance company or similar institutional lender will be futile and that, in the absence of the transactions contemplated in the Investment Agreement and this agreement, or similar transactions that result in the substantial dilution of the interest of the existing member of RA2 and the Remainderco (as defined below) and the elimination of the unusual equity ownership structure of RA2, RA2 will imminently lose its interest in the Property, and all stakeholders therein other than Lender will likely lose all or nearly all their investments.

K.    For the reasons set forth above, among others, RA2 has determined to accept the Subscription Consideration (as defined in the Investment Agreement), to issue the Interest (as defined in the Investment Agreement) and to enter into the transactions contemplated in the Investment Agreement with certain affiliates of the Manager, which include the merger transaction contemplated in this agreement (the "Merger"; together with the other transactions contemplated in the Investment Agreement and in this agreement, the "Restructuring").

A G R E E M E N T :

NOW, THEREFORE, in consideration of the premises and mutual representations, warranties and covenants contained herein, the parties hereto agree as follows:

1.    The Merger. On the Effective Date (as defined below), RA2 shall be merged with and into AUBSP upon the terms and subject to the conditions hereinafter set forth, all as permitted by and in accordance with the provisions of the Texas Business Organizations Code, the TX LLC Law and the DE LLC Law.  AUBSP shall be the surviving entity upon consummation of the Merger (AUBSP, following such consummation, the "Surviving Company").

2.    <u>Conversion, Cancellation and Exchange of Interests</u>. (a) On the Effective Date, after giving effect to the consummation of all transactions contemplated in the Investment Agreement, the entirety of the membership and other interests in RA2 shall be cancelled, converted or exchanged as follows:  (i)  the 51% voting membership interest acquired pursuant to the Investment Agreement and currently held by AUBSP in RA2 shall be converted into a 100% member interest in the Surviving Company to be issued to the members of AUBSP, each in proportion to such member's interest in AUBSP; (ii) the term of years estate held by RA2 Holdings L.L.C. ("Holdings") in respect of 49% of the total membership interest in RA2 shall be cancelled; and (iii) the remainder interest held by the assignee of Holdings (such assignee, the "Remainderco") in respect of 49% of the total membership interest in RA2 shall be exchanged for the right to receive a payment obligation certificate (the "POC") to be issued by the Surviving Company in the amount of $100,000 and substantially in the form of <u>Exhibit A</u> annexed to this agreement or to initiate the contractual appraisal procedure set forth in Section 7 of this agreement (such procedure, the "Appraisal Procedure") .

(b)    The manner and basis of the foregoing conversions, cancellations and exchanges are as follows:  (A) the conversion referenced in clause (i) of subsection 2(a) above was based on agreement among all affected voting and admitted members of RA2 in respect of the interest identified in such clause; (B) the cancellation referenced in clause (ii) of subsection 2(a) above was based on agreement among all affected voting and admitted members of RA2 in respect of the interest identified in such clause; and (C) the value of the POC to be exchanged for the interest referenced in clause (iii) of subsection 2(a) above is believed in good faith by the parties to this agreement to exceed the value in respect of such interest as of the Valuation Date (as defined below), taking into consideration all of the matters set forth in the Recitals to this agreement and such other facts or matters such parties believe to be relevant.

(c)    Without limiting the provisions of subsection (b) above, AUBSP and the Manager have considered the following in structuring and determining to effect the Restructuring on the terms set forth herein and in the Investment Agreement: (i) the Mortgage has matured and is in default, and judicial or private foreclosure proceedings have been commenced or threatened and are believed to be imminent; (ii) that certain Insured Covenants Agreement made by RA2, dated as of August 28, 1998, by its terms appears to require RA2 to deliver a deed to the Property to Lender upon demand and for no consideration and without the pursuit of foreclosure remedies and litigation has been commenced to enforce such agreement against RA2 or is believed to be imminent; (iii) RA2 has no funds or credit to refinance the Mortgage or pay the Balloon Payment; (iii) RA2 has no funds or credit to refinance the Mortgage or pay the Balloon Payment; (iv) the Remainderco's interest in RA2 is a non-controlling, minority equity interest in a limited liability company, not a recorded realty interest in the Property; (v) the Remainderco's interest in RA2 does not include voting and other rights of membership in RA2; (vi) the governing agreements of RA2 contemplate the issuance of new equity interests and dilution of the existing members' interests in RA2 as a way of raising capital to enable RA2 to satisfy its obligations to creditors; (vii) the Remainderco's interest in RA2 is subject to a continuing purchase option; (viii) the governing document in respect of the Remainderco's interest in RA2 permits RA2 to incur indebtedness on fair market terms in replacement for the Mortgage, which indebtedness may remain in place beyond the vesting date of the Remainderco's interest; (ix) the existence of the Remainderco's

interest in RA2 and the relatively short remaining term of the RAD Lease each strongly inhibits lenders from providing financing to RA2; (x) the Manager has a duty to take reasonable actions to preserve the existence and assets of RA2 so as to enable it to perform its loan and other obligations, and believes that causing the Restructuring to occur is consistent with such duty; and (xii) neither AUBSP nor any other person or entity is obligated to invest money in RA2 or provide guarantees to enhance RA2's creditworthiness, and AUBSP and the Manager believe that, given the risks and benefits and high transaction costs associated with the Restructuring, and the complexity of the matters associated therewith, the terms of the Restructuring are fair and reasonable when compared to those that would be demanded by capital providers unrelated to AUBSP.

3.    Effective Date. The Merger shall be consummated and the transactions contemplated by this agreement shall take place on the day (the "Effective Date") that there shall have been filed with each of the Secretary of State of Texas and the Secretary of State of Delaware a certificate of merger relating to the Merger and this agreement and all conditions to the effectiveness of the Merger, if any, set forth in both such certificates shall have been satisfied or waived.

4.    Name of Surviving Entity. The name of the Surviving Company upon consummation of the Merger shall be "AUBSP Ownerco 13, LLC" until changed in accordance with applicable law.

5.    Effect of Merger. On the Effective Date, (i) the separate existence of RA2 and AUBSP shall cease; (ii) the RA2 Articles and the RA2 OA shall cease to be of any force or effect; (iii) the business and affairs of the Surviving Company shall be governed by the AUBSP Agreement; and (iv) the AUBSP Certificate shall be or become the organizational document of the Surviving Company. The Surviving Company shall have all the rights, liabilities and obligations to third parties of both RA2 and AUBSP and shall continue in existence as the successor by merger to RA2 and AUBSP. From and after the Effective Date, the membership interests set forth in the AUBSP Agreement shall constitute the entirety of the equity interests in the Surviving Company.

6.    POC Issuance. Unless the Remainderco shall have timely invoked an Appraisal Procedure in accordance with all requirements to do so as set forth in Section 7 below, the Surviving Company shall, not later than 30 days after the Effective Date, cause a POC to be issued and delivered to the Remainderco.

7.    Appraisal Procedure. (a)    The Surviving Company hereby grants to the Remainderco the rights comprising the Appraisal Procedure, as set forth below in this Section 7 and in the Appraisal Election Form (as defined below).

(b)    To be effective, any election by the Remainderco to invoke the Appraisal Procedure must be substantially in the form annexed to this agreement as Exhibit B (an "Appraisal Election Form") that is (i) properly completed and signed by the Remainderco or its authorized representative; (ii) accompanied by reasonable documentary evidence that the person or entity delivering such Appraisal Election Form is the lawful owner of the remainder interest referred to in this agreement; and (iii) actually received by the Surviving Company not later than 20 days after notice of the occurrence of the Effective Date is given by the Surviving Company to the

Remainderco to its then current registered agent in Delaware or, if no such current agent is reflected in the public records of the Delaware Secretary of State, to its last known registered agent in the State of Delaware. FAILURE BY THE REMAINDERCO TO TIMELY DELIVER A PROPERLY COMPLETED AND EXECUTED APPRAISAL ELECTION FORM AND APPROPRIATE ACCOMPANYING DOCUMENTATION TO THE SURVIVING COMPANY SHALL BE DEEMED AN IRREVOCABLE WAIVER BY THE REMAINDERCO OF THE RIGHT TO INVOKE THE APPRAISAL PROCEDURE. Notwithstanding the foregoing, should the Remainderco request more time to make such election, it will be granted a reasonable extension of the 20-day period above set forth, provided that a written request for such extension is timely made before the original 20-day period expires and such request sets forth in reasonable detail the facts and circumstances upon which such extension request is based.

(c)    As soon as is reasonably practicable after receipt of a properly completed and executed Appraisal Election Form with appropriate accompanying documentation, the Surviving Company shall negotiate in good faith with the Remainderco for a period not greater than 15 days (such period, the "Negotiation Period") to attempt to agree on a consensual settlement of all the claims of the Remainderco relating in any way to RA2 or any and all transactions or circumstances relating to RA2 or its interest therein (a "Settlement"). If no Settlement is reached within the Negotiation Period, each of the Remainderco and the Surviving Company shall, not later than 10 days after expiration of the Negotiation Period, designate, and give written notice to the other of its designation of, a Qualified Appraiser (as defined below) that is Independent (as defined below) of the designating party and that has been engaged to determine the value, as of the date (the "Valuation Date") that is the business day immediately preceding the Closing Date (as defined in the Investment Agreement), of the interest in RA2 that was owned by the Remainderco on the Valuation Date. In the event the Remainderco timely elects to invoke the Appraisal Process and requests more time to meet any deadline contemplated therein, it will be granted a reasonable extension of such deadline, provided that a written request for such extension is timely made before the original deadline expires and such request sets forth in reasonable detail the facts and circumstances upon which such extension request is based.

(d)    Each of the Qualified Appraisers so designated and engaged shall be instructed to determine a value, as of the Valuation Date, of the interest in RA2 that was then owned by the Remainderco assuming that the Restructuring was not imminent or reasonably possible as of such time, such value to be set forth in a written report that complies with the provisions below in this Section 7 and a copy of which shall be delivered to the Remainderco and the Surviving Company not later than 45 days following the engagement of such Qualified Appraiser. If the difference between the respective values determined by the two Qualified Appraisers so appointed and engaged is less than or equal to 10% of the higher of the two values so determined, the amount to be paid to the Remainderco pursuant to the Appraisal Procedure (the "Final Payment Amount") shall be the average of the values so determined by such Qualified Appraisers. If such difference is greater than 10% of the higher of the two values so determined by the Qualified Appraisers, such Qualified Appraisers shall, within 10 days after receipt by the Remainderco and the Surviving Company of the reports of both such Qualified Appraisers, jointly select a third Qualified Appraiser that is Independent of both the Remainderco and the Surviving Company to determine a value, as of the Valuation Date, of the interest in RA2 that was then owned by the Remainderco assuming that the Restructuring was not imminent or reasonably possible as of such time, such

value to be set forth in a written report that complies with the provisions below in this Section 7 and a copy of which shall be delivered to the Remainderco and the Surviving Company not later than 45 days following the date of the engagement of such third Qualified Appraiser.  In the event that a third Qualified Appraiser is so engaged, the Final Payment Amount shall be the average of the value determined by the third Qualified Appraiser and the value determined by that other one of the three engaged Qualified Appraisers whose value determination is closest in amount to the value determined by such third Qualified Appraiser. If there occurs any dispute or delay concerning the appointment of the third Qualified Appraiser, either participant in the Appraisal Procedure may make application to a Texas court of competent jurisdiction for the determination of such dispute or the designation of such third Qualified Appraiser.

(e)     In addition to any and all facts and circumstances deemed relevant by each Qualified Appraiser, due consideration shall be given by such Qualified Appraiser to each of the individual matters considered relevant to the value of the interest of the Remainderco in RA2 by the Manager and AUBSP and that are referred to in Section 2 of this agreement. The written report of such Qualified Appraiser shall set forth in reasonable detail such Qualified Appraiser's assessment of the relevance and implications of each of such matters and its impact, if any, on such Qualified Appraiser's assessment of the value of the interest of the Remainderco in RA2 as of the Valuation Date.  If any one or more of such matters is concluded to be irrelevant by a Qualified Appraiser, a reasonably detailed explanation for each such conclusion shall be set forth in such report.

(f)     "Qualified Appraiser" means any natural person having at least 10 years of professional experience in the valuation of businesses or the valuation of intangible assets issued or derived from business entities, which person (i) is a member of the American Institute of CPAs ("AICPA"); and (ii) holds the AICPA Credentials "Accredited in Business Valuation (ABV)" or "Certified in Entity and Intangible Valuations (CEIV)".

(g)     A Qualified Appraiser is "Independent" of any party  that engages it (the "Engaging Party") if (i) such Qualified Appraiser and each Covered Person (as defined below) with respect to such Qualified Appraiser, at any time of engagement thereof, has not at any time in the past five years funded to such Engaging Party or any Covered Person with respect to such Engaging Party any amount of money in the nature of a loan, capital contribution, gift or donation, or provided to such Engaging Party or any Covered Person with respect to such Engaging Party any free or discounted professional services or other things of value for no or less than fair consideration; and (ii) there does not exist and has not existed at any time in the past five years any other financial or familial relationship between such Qualified Appraiser or any Covered Person with respect to such Qualified Appraiser and such Engaging Party or any Covered Person with respect to such Engaging Party that a reasonable person would regard as possible to cause such Qualified Appraiser to exhibit a bias in favor of such Engaging Party.

(h)     "Covered Person" means, with respect to any person or entity, any other person or entity that (i) is the employer of such person or entity; (ii) is a partnership or other business organization of which such person or entity is a member, partner, shareholder or investor; (iii) is controlled by, controls or is under common control with such person or entity; (iv) serves as a director, chairman, partner or member of such person or entity or of any entity described in clause

(iii) above; (v) is one of the 5 most highly compensated employees or 5 most senior managers or officers of such person or entity; or (vi) at any time within the five years preceding the Effective Date would have been included within the provisions of clauses (i), (ii), (iii) or (iv) above.

(i)    The Remainderco and the Surviving Company shall each pay the fees and costs of its appointed Qualified Appraiser, and each shall pay half of the fees and costs of the third Qualified Appraiser, if one is appointed.  If a Final Payment Amount shall be determined pursuant to the foregoing provisions of this Section 7, the same shall be paid to the Remainderco by the Surviving Company within 30 days after the date of such determination.

8.    <u>Franchise Tax Payments</u>. The Surviving Company shall be obligated for the payment of any and all required franchise taxes in respect of RA2 or AUBSP.

9.    <u>Further Action</u>.  If, at any time after the Effective Date, the Surviving Company shall deem it advisable or be advised that any deeds, bills of sale, assignments or assurances or any other acts or things are necessary, desirable or proper (i) to vest, perfect or confirm, of record or otherwise, in the Surviving Company its right, title or interest in, to or under any of the rights, properties or assets of RA2 or AUBSP, or (ii) to otherwise to carry out the purposes of this agreement, the Surviving Company shall be authorized to execute and deliver, in the name and on behalf of RA2 or AUBSP, all such deeds, bills of sale, assignments and assurances and do, in the name and on behalf of the Surviving Company, all other acts and things necessary, desirable or proper to carry out the purposes of this agreement.

10.    <u>Consent of RA2 Holdings L.L.C</u>.  By its signature below, Holdings consents to the Merger.

11.    <u>Entire Agreement</u>.  This agreement constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof and no party shall be liable or bound to the other in any manner by any warranties, representations, covenants or agreements except as specifically set forth herein or expressly required to be made or delivered pursuant hereto.

12.    <u>Modifications, Binding Effect and Benefits</u>. Any amendment, change or modification of this agreement shall be void unless in writing and signed by all parties hereto. This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, assigns, transferees and legal representatives.

13.    <u>Headings; Counterparts</u>. The headings in this agreement are for purposes of reference only and shall not limit or otherwise affect the meanings hereof. This agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

14.    <u>Governing Law</u>. This agreement shall be governed by, and construed in accordance with, the laws and decisions of the State of Texas without regard to conflicts of law rules applied in such State.

15.    <u>Consent to Jurisdiction</u>.  All actions and proceedings arising out of, or relating to, this agreement shall be heard and determined in any state or federal court sitting in Texas.  The undersigned, by execution and delivery of this agreement, expressly and irrevocably (i) consent and submit to the personal jurisdiction of any of such courts in any such action or proceeding; (ii) consent to the service of any complaint, summons, notice or other process relating to any such action or proceeding by delivery thereof to such party by hand or by certified mail; and (iii) waive any claim or defense in any such action or proceeding based on any alleged lack of personal jurisdiction, improper venue, *forum non conveniens* or any similar basis.  **EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT.**

16.    <u>Notices</u>.    All notices, demands, consents, approvals, requests or other communications that a party desires or may be required to give hereunder (collectively, "Notices") shall be in writing and shall be given by personal delivery or a nationally recognized overnight courier service, fees prepaid, addressed to the other party at the address or addresses set forth in the preamble to this agreement. Either party may designate another addressee (or change its address) for Notices hereunder by a sending the other party, at its then effective address hereunder, Notice given pursuant to this Section.  A Notice sent in compliance with the provisions of this Section shall be deemed given on the date of receipt, except if delivery is refused, in which event such Notice shall be deemed given on the date delivery is first attempted.

17.    <u>Waiver</u>.  Any breach of any term or provision of this agreement shall be waived only by means of a writing signed by the non-breaching party or parties which sets forth with particularity the breach being waived and the scope of the waiver.  Any waiver of any term or condition of this agreement shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or provision, of this agreement.  No waiver shall be implied from any conduct or action of the non-breaching party or parties.

18.    <u>Time of the Essence</u>.  Except as otherwise provided in Section 7 of this agreement, time shall be of the essence with respect to any deadlines or time periods specified in this agreement or any exhibit hereto.

19.    <u>Binding Effect</u>.  This agreement shall be binding upon and shall inure to the benefit of the respective successors and assigns of the parties hereto.

20.    <u>Approval of Plan</u>.  By their respective signatures below, each of RA2 and AUBSP authorizes and approves this agreement, the Merger and all terms of each thereof and all matters incident to any of the matters contemplated in this agreement.

IN WITNESS WHEREOF, each of the parties hereto has duly executed this agreement as of the date above first written.

RA2 BATTLE CREEK L.L.C

By: RA2 SPE L.L.C., Manager

By: _____

Richard J. Sabella, President


AUBSP OWNERCO 13, LLC

By: _____

Richard J. Sabella, Manager

EXHIBIT A

PAYMENT OBLIGATION CERTIFICATE


Face Amount: $100,000

-Issued By--

AUBSP OWNERCO 13, LLC, Issuer

-To-

_____, Holder

\*    \*    \*

Subject to the conditions and on the terms set forth below, the undersigned Issuer shall pay to the above-named holder ("Holder") on the Payment Date (as defined below) the Face Amount (as defined below) of this Certificate.

1.     Definitions.  As used in this Certificate, each of the following capitalized terms has the meaning given thereto below:

"Face Amount" means the amount of US Dollars so designated above in this Certificate.

"Payment Date" means the 30th day following the date that this Certificate has been delivered to Holder by hand delivery, certified mail or a nationally recognized overnight delivery or courier service, or the first business day thereafter, if such 30th day is not a business day.

"Restructuring" means (i) the investment in Issuer's predecessor by merger made on or about May 31, 2021 by an affiliate of Issuer; (ii) the issuance by such predecessor of an equity interest therein in consideration of such investment; and (iii) the merger transaction following such investment, pursuant to which this Certificate was issued.

2.     Payment.  On the Payment Date, Issuer shall pay to Holder the Face Amount of this Certificate by check or wire transfer of immediately available funds.

3.     Release. Negotiation of any instrument issued to Holder in satisfaction of Holder's payment obligations under this Certificate or acceptance of any other form of payment thereof by Holder shall constitute an unconditional waiver by Holder, on behalf of itself and all its affiliates and related persons, of any and all claims that Holder is entitled to any relief against Issuer or any other person or entity whatsoever in respect of any matter or thing relating in any way to the interest in the predecessor to the Issuer that was held by Holder prior to the Restructuring or this Certificate or the Restructuring.

4.    <u>Miscellaneous</u>. This Certificate shall be governed by, and construed in accordance with, the laws of the State of Texas without regard to conflicts of law rules applied in such State. Wherever provision is made in this Certificate for the giving of any notice or other communication, such notice or other communication shall be in writing and shall be given or made by delivery in person, by reputable overnight courier service or by certified mail (postage prepaid, return receipt requested).  In the case of any notice to Issuer, the same shall be addressed to Issuer at c/o Allerand Capital, LLC, 675 Indiantown Road, Suite 103, Jupiter, FL 33458. Time shall be of the essence with respect to any deadlines or time periods specified in this Certificate. Any breach of any provision of this Certificate shall be waived only by means of a writing signed by the party sought to be charged with such waiver.

IN WITNESS WHEREOF, the above-named Issuer has duly executed this Certificate as of October__, 2021.

AUBSP OWNERCO 13, LLC

By:_____
        Manager

EXHIBIT B

APPRAISAL ELECTION FORM

Relating to Merger of

RA2 BATTLE CREEK L.L.C.

--into and with--

AUBSP OWNERCO 13, LLC

\*    \*    \*

Reference is made to that certain Agreement and Plan of Merger of RA2 Battle Creek L.L.C. and AUBSP Ownerco 13, LLC, dated as of September 30, 2021 (the "Merger Agreement"). Capitalized terms used in this form that are not defined herein have the meanings set forth in respect thereof in the Merger Agreement.

1.    Documentation.    Attached hereto or submitted herewith are copies of the documents required to be provided by the undersigned pursuant to the provisions of clause (ii) of subsection 7(b) of the Merger Agreement.  The undersigned represents and warrants that all such documents are genuine, true and correct and collectively reflect that the undersigned or its controlled affiliate is the lawful owner of the remainder interest (the "Interest") referred to in the Merger Agreement and has all lawful authority and power to execute this form and engage, or cause its controlled affiliate to engage, in the Appraisal Procedure.

2.    Certain Agreements and Release. The undersigned (i) agrees to comply in all material respects with the all the provisions of the Merger Agreement relating to or constituting part of the Appraisal Procedure and to cause all Remainderco Parties (as defined below) involved therein so to comply; (ii) agrees that the Appraisal Procedure is the exclusive means to determine the value of the Interest and that, except for Excluded Claims (as defined below), neither the undersigned nor any other Remainderco Party will commence any action or proceeding in any court in respect of the Interest, the Merger or the Restructuring; and (iii) on behalf of itself and all its affiliates and related parties of any kind (the "Remainderco Parties"), unconditionally waives any and all claims (collectively, "Claims") that it or any of them is entitled to any relief against AUBSP Ownerco 13, LLC or any of its affiliates or related parties of any kind (the "AUBSP Parties") in respect of any matter or thing relating in any way to the Interest, the Merger or the Restructuring, other than a claim (an "Excluded Claim") (A) to receive timely payment from AUBSP Ownerco 13, LLC of any amount or performance in respect of any Settlement or a Final Payment Amount; or (B) alleging in substance that the AUBSP Parties have failed to comply in all material respects with their obligations relating to or constituting part of the Appraisal Procedure. Should there exist any Claim held by any Remainderco Party, other than an Excluded Claim, that

is not released pursuant to the provisions of the immediately preceding sentence, such Claim is hereby assigned to AUBSP Ownerco 13, LLC, without recourse.

      3.    <u>Election</u>.  The undersigned hereby elects to invoke the Appraisal Procedure.

      IN WITNESS WHEREOF, the undersigned has duly executed this Form as of October __, 2021.

_____

By:   _____
      Name:
      Title:

<u>AGREEMENT AND PLAN OF MERGER (KREWSTOWN)</u>

      AGREEMENT AND PLAN OF MERGER (KREWSTOWN), dated as of September 30, 2021, made by and between PVP KREWSTOWN, LLC ("PVP"), a Delaware limited liability company having an address at c/o Allerand Capital, LLC, 675 Indiantown Road; Suite 103, Jupiter, FL 33458; and AUBSP OWNERCO 17, LLC ("AUBSP"), a Texas limited liability company having an address at c/o Allerand Capital, LLC, 675 Indiantown Road; Suite 103, Jupiter, FL 33458.

<p align="center"><u>R E C I T A L S</u> :</p>

A.      PVP was originally formed as a limited partnership known as 98 RA2 Philadelphia-Krewstown, Limited Partnership under the provisions of Delaware law and pursuant to a certificate filed in the office of the Delaware Secretary of State on August 11, 1998.

B.      PVP was converted to limited liability company governed by the laws of Delaware relating to the formation and operation of limited liability companies (collectively, the "DE LLC Law") pursuant to a certificate of conversion filed in the office of the Delaware Secretary of State on November 7, 2002 (the "Certificate of Conversion").

C.      Pursuant to the Certificate of Conversion and the DE LLC Law, PVP adopted a certificate of formation (the "PVP Certificate") and filed the same in the office of the Delaware Secretary of State on November 7, 2002.

D.      AUBSP was formed as a limited liability company under the provisions of Texas law relating to the formation and operation of limited liability companies (collectively, the "TX LLC Law") pursuant to a Certificate of Formation (the "AUBSP Certificate") filed in the office of the Texas Secretary of State on September 28, 2021.

E.      As of August 11, 1998, PVP's then members adopted a written operating agreement governing the operations of PVP, which operating agreement, as amended, remains in effect as of the date hereof (as amended to date, the "PVP OA").

F.      As of September 28, 2021, the sole member of AUBSP adopted a written company agreement governing the operations of AUBSP, which company agreement remains in effect as of the date hereof (the "AUBSP Agreement").

G.      PVP is a single asset, single purpose company that owns certain improved real property (the "Property") in Philadelphia, PA. The Property was leased to Rite Aid Corporation or a subsidiary thereof (either, "RAD") pursuant to a certain lease agreement (the "RAD Lease"), dated as of August 24, 1998, originally for use as a retail drug store premises.

H.      The Property is encumbered by a first mortgage loan facility (the "Mortgage") that was originally funded on or about August 24, 1998, in the amount of $2,692,406.67. The Mortgage matured on September 1, 2020, on which date a balloon maturity payment became due to the lender from time to time in respect of the Mortgage ("Lender") in the scheduled amount of $998,384.41 (as increased or decreased to the date hereof, the "Balloon Payment"). PVP is in default of its obligations to pay the Balloon Payment. It is anticipated that the Balloon Payment will be

refinanced by PVP with funds, services and credit support provided by AUBSP and affiliates of AUBSP and contributed to, or provided for the benefit of, PVP.

I.      Each of the RAD Lease and the Mortgage were structured such that, throughout the term of the Mortgage and the RAD Lease, 100% of all RAD payments under the RAD Lease and any other income that might be generated by the Property, such as insurance proceeds or condemnation awards, must be paid directly to the Lender, thus leaving PVP with no cash flow of any amount whatsoever for the entire 22-year term of the RAD Lease and the Mortgage.

J.      The Mortgage also contains prohibitions (the "Bankruptcy Remoteness Covenants") against (i) the ownership by PVP of any material assets other than the Property; (ii) PVP engaging in any business or activity other than the leasing of the Property to RAD; (iii) the incurrence by PVP of any second mortgage loan or other junior financing of any kind; and (iv) PVP engaging in certain other investments or activities that could generate income for PVP in addition to the rents payable under the RAD Lease.

K.      As a result of the strictures of the Bankruptcy Remoteness Covenants, and the obligation that 100% of all cash flow generated by PVP's sole asset be applied to the payment of required debt service due under the Mortgage for the entire 22-year term of the Mortgage and beyond, PVP has no reserves, no unfulfilled equity subscriptions, no cash in banks, no bank account, no credit facility of any kind and no investments or assets with which to pay the Balloon Payment or defend against any litigation to which it might become subject.

L.      Also because of the conditions identified above, among others and including, without limitation, the matters described in Section 2 of this agreement, the manager of PVP (the "Manager") has determined that efforts now to refinance the Balloon Payment with a new loan facility provided by a commercial bank or insurance company or similar institutional lender will be futile and that, in the absence of the transactions contemplated in this agreement, or similar transactions that result in the elimination of the unusual equity ownership structure of PVP, PVP will imminently lose its interest in the Property, and all stakeholders therein other than Lender will likely lose all or nearly all their investments.

M.      For the reasons set forth above, among others, PVP has determined to enter into the merger transaction contemplated in this agreement (the "Merger"; together with the other transactions contemplated in this agreement, the "Restructuring").

A  G  R  E  E  M  E  N  T :

NOW, THEREFORE, in consideration of the premises and mutual representations, warranties and covenants contained herein, the parties hereto agree as follows:

1.      The Restructuring.  (a) On the Effective Date (as defined below), AUBSP shall be merged with and into PVP upon the terms and subject to the conditions hereinafter set forth, all as permitted by and in accordance with the provisions of the Texas Business Organizations Code, the TX LLC Law and the DE LLC Law.  PVP shall be the surviving entity upon consummation of the Merger (PVP, following such consummation, the "Surviving Company").

(b)     In connection with the Merger and as additional consideration to be provided by AUBSP relating thereto, AUBSP has caused and shall cause its affiliates hereafter to (i) provide a cash infusion into PVP or for its benefit of not less than $50,000; (ii) procure a commitment from a qualified private capital provider (the "New Lender") to make a new loan (the "New Loan") to refinance the Balloon Payment as soon as reasonably practicable; (iii) supervise all professionals, including attorneys, title companies, accountants, surveyors, property inspectors, environmental consultants and others that are required to satisfy all requirements of the New Lender in connection with the making of the New Loan; (iv) provide a creditworthy person or group, satisfactory to the New Lender, to provide any guarantees that are conditions of the funding of the New Loan; (v) negotiate on behalf of PVP the terms and forms of the documents in respect of the New Loan, in coordination with the Manager; (vi) coordinate all participants, including the Lender and the New Lender and their respective attorneys, in connection with the actions necessary to refinance the Mortgage with the New Loan; and (vii) provide such other services and analysis and other efforts to conclude on reasonable terms all the processes and transactions contemplated above, which may include or have included the purchase of the Mortgage by a nominee or other related investor, as a temporary measure to forestall foreclosure or other remedial exercises by the Lender that could result in the loss or forfeiture of PVP's sole asset, to be held by such party until a New Loan transaction can be arranged with a New Lender.

2.      Conversion, Cancellation and Exchange of Interests. (a) On the Effective Date, the entirety of the membership and other interests in PVP and AUBSP shall be cancelled, converted or exchanged as follows:  (i)  the 100% voting membership interest of AUBSP shall be converted into a subordinated debt security in the principal amount of $100,000 to be issued by  the Surviving Company to the members of PVP, each in proportion to such member's interest in AUBSP, which security shall be in the form annexed to this agreement as Exhibit B; (ii) the term of years estate held by RA2 Holdings L.L.C. ("Holdings") in respect of the membership interest in PVP shall be converted to the full fee simple absolute interest in and to the sole the membership interest in PVP; and (iii) the remainder interest held by the assignee of Holdings (such assignee, the "Remainderco") in respect of the sole membership interest in PVP shall be cancelled and exchanged for the right to receive a payment obligation certificate (the "POC") to be issued by the Surviving Company in the amount of $100,000 and substantially in the form of Exhibit A annexed to this agreement or to initiate the contractual appraisal procedure set forth in Section 7 of this agreement (such procedure, the "Appraisal Procedure") .

(b)     The manner and basis of the foregoing conversions, cancellations and exchanges are as follows:  (A) the conversions referenced in clause (i)  and clause (ii) of subsection 2(a) above were based on agreement among all affected voting and admitted members of PVP and AUBSP; and (B) the value of the POC to be exchanged for the interest referenced in clause (iii) of subsection 2(a) above is believed in good faith by the parties to this agreement to exceed the value in respect of such interest as of the Valuation Date (as defined below), taking into consideration all of the matters set forth in the Recitals to this agreement and such other facts or matters such parties believe to be relevant.

(c)      Without limiting the provisions of subsection (b) above, AUBSP and PVP have considered the following in structuring and determining to effect the Restructuring on the terms

set forth herein: (i) the Mortgage has matured and is in default, and judicial or private foreclosure proceedings have been commenced or threatened and are believed to be imminent ; (ii) that certain Insured Covenants Agreement made by PVP, dated as of August 28, 1998, by its terms appears to require PVP to deliver a deed to the Property to Lender upon demand and for no consideration and without the pursuit of foreclosure remedies and litigation has been commenced or is believed to be imminent to enforce such agreement against PVP; (iii) PVP has no funds or credit to refinance the Mortgage or pay the Balloon Payment; (iv) the Remainderco's interest in PVP is a non-controlling, minority equity interest in a limited liability company, not a recorded realty interest in the Property; (v) the Remainderco's interest in PVP does not include voting and other rights of membership in PVP; (vi) the Remainderco's interest in PVP is subject to a continuing purchase option; (vii) the governing document in respect of the Remainderco's interest in PVP permits PVP to incur indebtedness on fair market terms in replacement for the Mortgage, which indebtedness may remain in place beyond the vesting date of the Remainderco's interest; (viii) the existence of the Remainderco's interest in PVP and the relatively short remaining term of the RAD Lease each strongly inhibits lenders from providing financing to PVP; (x) PVP has a duty to take reasonable actions to preserve its existence and assets so as to enable it to perform its loan and other obligations, and believes that causing the Restructuring to occur is consistent with such duty; and (xi) neither AUBSP nor any other person or entity is obligated to invest money in PVP or provide guarantees to enhance PVP's creditworthiness, and AUBSP and PVP believe that, given the risks and benefits and high transaction costs associated with the Restructuring, and the complexity of the matters associated therewith, the terms of the Restructuring are fair and reasonable when compared to those that would be demanded by capital providers unrelated to PVP.

3. <u>Effective Date</u>. The Merger shall be consummated and the transactions contemplated by this agreement shall take place on the day (the "Effective Date") that there shall have been filed with each of the Secretary of State of Texas and the Secretary of State of Delaware a certificate of merger relating to the Merger and this agreement and all conditions to the effectiveness of the Merger, if any, set forth in both such certificates shall have been satisfied or waived.

4. <u>Name of Surviving Entity</u>. The name of the Surviving Company upon consummation of the Merger shall be "PVP Krewstown, LLC" until changed in accordance with applicable law.

5. <u>Effect of Merger</u>. On the Effective Date, (i) the separate existence of PVP and AUBSP shall cease; (ii) the AUBSP Articles and the AUBSP Agreement shall cease to be of any force or effect; (iii) the business and affairs of the Surviving Company shall be governed by the PVP OA; and (iv) the PVP Certificate shall be or become the organizational document of the Surviving Company. The Surviving Company shall have all the rights, liabilities and obligations to third parties of both PVP and AUBSP and shall continue in existence as the successor by merger to PVP and AUBSP. From and after the Effective Date, the membership interest set forth in the PVP OA shall constitute the entirety of the sole equity interest in the Surviving Company.

6. <u>POC Issuance</u>. Unless the Remainderco shall have timely invoked an Appraisal Procedure in accordance with all requirements to do so as set forth in Section 7 below, the

Surviving Company shall, not later than 30 days after the Effective Date, cause a POC to be issued and delivered to the Remainderco.

7.    Appraisal Procedure. (a)    The Surviving Company hereby grants to the Remainderco the rights comprising the Appraisal Procedure, as set forth below in this Section 7 and in the Appraisal Election Form (as defined below).

(b)    To be effective, any election by the Remainderco to invoke the Appraisal Procedure must be substantially in the form annexed to this agreement as Exhibit C (an "Appraisal Election Form") that is (i) properly completed and signed by the Remainderco or its authorized representative; (ii) accompanied by reasonable documentary evidence that the person or entity delivering such Appraisal Election Form is the lawful owner of the remainder interest referred to in this agreement; and (iii) actually received by the Surviving Company not later than 20 days after notice of the occurrence of the Effective Date is given by the Surviving Company to the Remainderco to its then current registered agent in Delaware or, if no such current agent is reflected in the public records of the Delaware Secretary of State, to its last known registered agent in the State of Delaware. FAILURE BY THE REMAINDERCO TO TIMELY DELIVER A PROPERLY COMPLETED AND EXECUTED APPRAISAL ELECTION FORM AND APPROPRIATE ACCOMPANYING DOCUMENTATION TO THE SURVIVING COMPANY SHALL BE DEEMED AN IRREVOCABLE WAIVER BY THE REMAINDERCO OF THE RIGHT TO INVOKE THE APPRAISAL PROCEDURE. Notwithstanding the foregoing, should the Remainderco request more time to make such election, it will be granted a reasonable extension of the 20-day period above set forth, provided that a written request for such extension is timely made before the original 20-day period expires and such request sets forth in reasonable detail the facts and circumstances upon which such extension request is based.

(c)    As soon as is reasonably practicable after receipt of a properly completed and executed Appraisal Election Form with appropriate accompanying documentation, the Surviving Company shall negotiate in good faith with the Remainderco for a period not greater than 15 days (such period, the "Negotiation Period") to attempt to agree on a consensual settlement of all the claims of the Remainderco relating in any way to PVP or any and all transactions or circumstances relating to PVP or its interest therein (a "Settlement"). If no Settlement is reached within the Negotiation Period, each of the Remainderco and the Surviving Company shall, not later than 10 days after expiration of the Negotiation Period, designate, and give written notice to the other of its designation of, a Qualified Appraiser (as defined below) that is Independent (as defined below) of the designating party and that has been engaged to determine the value, as of the date (the "Valuation Date") that is the business day immediately preceding the Effective Date, of the interest in PVP that was owned by the Remainderco on the Effective Date. In the event the Remainderco timely elects to invoke the Appraisal Process and requests more time to meet any deadline contemplated therein, it will be granted a reasonable extension of such deadline, provided that a written request for such extension is timely made before the original deadline expires and such request sets forth in reasonable detail the facts and circumstances upon which such extension request is based.

(d)    Each of the Qualified Appraisers so designated and engaged shall be instructed to determine a value, as of the Valuation Date, of the interest in PVP that was then owned by the

Remainderco assuming that the Restructuring was not imminent or reasonably possible as of such time, such value to be set forth in a written report that complies with the provisions below in this Section 7 and a copy of which shall be delivered to the Remainderco and the Surviving Company not later than 45 days following the engagement of such Qualified Appraiser. If the difference between the respective values determined by the two Qualified Appraisers so appointed and engaged is less than or equal to 10% of the higher of the two values so determined, the amount to be paid to the Remainderco pursuant to the Appraisal Procedure (the "Final Payment Amount") shall be the average of the values so determined by such Qualified Appraisers. If such difference is greater than 10% of the higher of the two values so determined by the Qualified Appraisers, such Qualified Appraisers shall, within 10 days after receipt by the Remainderco and the Surviving Company of the reports of both such Qualified Appraisers, jointly select a third Qualified Appraiser that is Independent of both the Remainderco and the Surviving Company to determine a value, as of the Valuation Date, of the interest in PVP that was then owned by the Remainderco assuming that the Restructuring was not imminent or reasonably possible as of such time, such value to be set forth in a written report that complies with the provisions below in this Section 7 and a copy of which shall be delivered to the Remainderco and the Surviving Company not later than 45 days following the date of the engagement of such third Qualified Appraiser. In the event that a third Qualified Appraiser is so engaged, the Final Payment Amount shall be the average of the value determined by the third Qualified Appraiser and the value determined by that other one of the three engaged Qualified Appraisers whose value determination is closest in amount to the value determined by such third Qualified Appraiser. If there occurs any dispute or delay concerning the appointment of the third Qualified Appraiser, either participant in the Appraisal Procedure may make application to a Texas court of competent jurisdiction for the determination of such dispute or the designation of such third Qualified Appraiser.

(e)     In addition to any and all facts and circumstances deemed relevant by each Qualified Appraiser, due consideration shall be given by such Qualified Appraiser to each of the individual matters considered relevant to the value of the interest of the Remainderco in PVP by PVP and AUBSP and that are referred to in Section 2 of this agreement. The written report of such Qualified Appraiser shall set forth in reasonable detail such Qualified Appraiser's assessment of the relevance and implications of each of such matters and its impact, if any, on such Qualified Appraiser's assessment of the value of the interest of the Remainderco in PVP as of the Valuation Date. If any one or more of such matters is concluded to be irrelevant by a Qualified Appraiser, a reasonably detailed explanation for each such conclusion shall be set forth in such report.

(f)     "Qualified Appraiser" means any natural person having at least 10 years of professional experience in the valuation of businesses or the valuation of intangible assets issued or derived from business entities, which person (i) is a member of the American Institute of CPAs ("AICPA"); and (ii) holds the AICPA Credentials "Accredited in Business Valuation (ABV)" or "Certified in Entity and Intangible Valuations (CEIV)".

(g)     A Qualified Appraiser is "Independent" of any party that engages it (the "Engaging Party") if (i) such Qualified Appraiser and each Covered Person (as defined below) with respect to such Qualified Appraiser, at any time of engagement thereof, has not at any time in the past five years funded to such Engaging Party or any Covered Person with respect to such Engaging Party any amount of money in the nature of a loan, capital contribution, gift or donation, or provided to

such Engaging Party or any Covered Person with respect to such Engaging Party any free or discounted professional services or other things of value for no or less than fair consideration; and (ii) there does not exist and has not existed at any time in the past five years any other financial or familial relationship between such Qualified Appraiser or any Covered Person with respect to such Qualified Appraiser and such Engaging Party or any Covered Person with respect to such Engaging Party that a reasonable person would regard as possible to cause such Qualified Appraiser to exhibit a bias in favor of such Engaging Party.

(h)    "Covered Person" means, with respect to any person or entity, any other person or entity that (i) is the employer of such person or entity; (ii) is a partnership or other business organization of which such person or entity is a member, partner, shareholder or investor; (iii) is controlled by, controls or is under common control with such person or entity; (iv) serves as a director, chairman, partner or member of such person or entity or of any entity described in clause (iii) above; (v) is one of the 5 most highly compensated employees or 5 most senior managers or officers of such person or entity; or (vi) at any time within the five years preceding the Effective Date would have been included within the provisions of clauses (i), (ii), (iii) or (iv) above.

(i)    The Remainderco and the Surviving Company shall each pay the fees and costs of its appointed Qualified Appraiser, and each shall pay half of the fees and costs of the third Qualified Appraiser, if one is appointed.  If a Final Payment Amount shall be determined pursuant to the foregoing provisions of this Section 7, the same shall be paid to the Remainderco by the Surviving Company within 30 days after the date of such determination.

8.    <u>Franchise Tax Payments</u>. The Surviving Company shall be obligated for the payment of any and all required franchise taxes in respect of PVP or AUBSP.

9.    <u>Further Action</u>.  If, at any time after the Effective Date, the Surviving Company shall deem it advisable or be advised that any deeds, bills of sale, assignments or assurances or any other acts or things are necessary, desirable or proper (i) to vest, perfect or confirm, of record or otherwise, in the Surviving Company its right, title or interest in, to or under any of the rights, properties or assets of PVP or AUBSP, or (ii) to otherwise to carry out the purposes of this agreement, the Surviving Company shall be authorized to execute and deliver, in the name and on behalf of PVP or AUBSP, all such deeds, bills of sale, assignments and assurances and do, in the name and on behalf of the Surviving Company, all other acts and things necessary, desirable or proper to carry out the purposes of this agreement.

10.    <u>Consent of RA2 Holdings L.L.C</u>.  By its signature below, Holdings consents to the Restructuring.

11.    <u>Entire Agreement</u>.  This agreement constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof and no party shall be liable or bound to the other in any manner by any warranties, representations, covenants or agreements except as specifically set forth herein or expressly required to be made or delivered pursuant hereto.

12.    <u>Modifications, Binding Effect and Benefits</u>. Any amendment, change or modification of this agreement shall be void unless in writing and signed by all parties hereto. This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, assigns, transferees and legal representatives.

13.    <u>Headings; Counterparts</u>. The headings in this agreement are for purposes of reference only and shall not limit or otherwise affect the meanings hereof. This agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

14.    <u>Governing Law</u>.  This agreement shall be governed by, and construed in accordance with, the laws and decisions of the State of Texas without regard to conflicts of law rules applied in such State.

15.    <u>Consent to Jurisdiction</u>.  All actions and proceedings arising out of, or relating to, this agreement shall be heard and determined in any state or federal court sitting in Texas.  The undersigned, by execution and delivery of this agreement, expressly and irrevocably (i) consent and submit to the personal jurisdiction of any of such courts in any such action or proceeding; (ii) consent to the service of any complaint, summons, notice or other process relating to any such action or proceeding by delivery thereof to such party by hand or by certified mail; and (iii) waive any claim or defense in any such action or proceeding based on any alleged lack of personal jurisdiction, improper venue, *forum non conveniens* or any similar basis. **EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT.**

16.    <u>Notices</u>.    All notices, demands, consents, approvals, requests or other communications that a party desires or may be required to give hereunder (collectively, "Notices") shall be in writing and shall be given by personal delivery or a nationally recognized overnight courier service, fees prepaid, addressed to the other party at the address or addresses set forth in the preamble to this agreement. Either party may designate another addressee (or change its address) for Notices hereunder by a sending the other party, at its then effective address hereunder, Notice given pursuant to this Section.  A Notice sent in compliance with the provisions of this Section shall be deemed given on the date of receipt, except if delivery is refused, in which event such Notice shall be deemed given on the date delivery is first attempted.

17.    <u>Waiver</u>.  Any breach of any term or provision of this agreement shall be waived only by means of a writing signed by the non-breaching party or parties which sets forth with particularity the breach being waived and the scope of the waiver.  Any waiver of any term or condition of this agreement shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or provision, of this agreement.  No waiver shall be implied from any conduct or action of the non-breaching party or parties.

18.    <u>Time of the Essence</u>.  Except as otherwise provided in Section 7 of this agreement, time shall be of the essence with respect to any deadlines or time periods specified in this agreement or any exhibit hereto.

19.    <u>Binding Effect</u>.  This agreement shall be binding upon and shall inure to the benefit of the respective successors and assigns of the parties hereto.

20.    <u>Approval of Plan</u>.  By their respective signatures below, each of PVP and AUBSP authorizes and approves this agreement, the Merger and all terms of each thereof and all matters incident to any of the matters contemplated in this agreement.

IN WITNESS WHEREOF, each of the parties hereto has duly executed this agreement as of the date above first written.

PVP KREWSTOWN, LLC

By: 98 RA2 Philadelphia-Krewstown L.L.C., Manager

By: RA2 SPE L.L.C.

By: RA2 Management Corp.

By: _____
    Richard J. Sabella, President


AUBSP OWNERCO 17, LLC

By: _____
    Richard J. Sabella, Manager

EXHIBIT A

PAYMENT OBLIGATION CERTIFICATE


Face Amount: $100,000

-Issued By--

AUBSP OWNERCO 17, LLC, Issuer

-To-

_____, Holder

*    *    *

Subject to the conditions and on the terms set forth below, the undersigned Issuer shall pay to the above-named holder ("Holder") on the Payment Date (as defined below) the Face Amount (as defined below) of this Certificate.

1.    Definitions.  As used in this Certificate, each of the following capitalized terms has the meaning given thereto below:

"Face Amount" means the amount of US Dollars so designated above in this Certificate.

"Payment Date" means the 30th day following the date that this Certificate has been delivered to Holder by hand delivery, certified mail or a nationally recognized overnight delivery or courier service, or the first business day thereafter, if such 30th day is not a business day.

"Restructuring" means the merger and other transaction transactions pursuant to which this Certificate was issued.

2.    Payment.  On the Payment Date, Issuer shall pay to Holder the Face Amount of this Certificate by check or wire transfer of immediately available funds.

3.    Release. Negotiation of any instrument issued to Holder in satisfaction of Holder's payment obligations under this Certificate or acceptance of any other form of payment thereof by Holder shall constitute an unconditional waiver by Holder, on behalf of itself and all its affiliates and related persons, of any and all claims that Holder is entitled to any relief against Issuer or any other person or entity whatsoever in respect of any matter or thing relating in any way to the interest in the predecessor to the Issuer that was held by Holder prior to the Restructuring or this Certificate or the Restructuring.

4.    Miscellaneous. This Certificate shall be governed by, and construed in accordance with, the laws of the State of Texas without regard to conflicts of law rules applied in such State.

Wherever provision is made in this Certificate for the giving of any notice or other communication, such notice or other communication shall be in writing and shall be given or made by delivery in person, by reputable overnight courier service or by certified mail (postage prepaid, return receipt requested).  In the case of any notice to Issuer, the same shall be addressed to Issuer at c/o Allerand Capital, LLC, 675 Indiantown Road, Suite 103, Jupiter, FL 33458. Time shall be of the essence with respect to any deadlines or time periods specified in this Certificate. Any breach of any provision of this Certificate shall be waived only by means of a writing signed by the party sought to be charged with such waiver.

       IN WITNESS WHEREOF, the above-named Issuer has duly executed this Certificate as of October__, 2021.

PVP KREWSTOWN, LLC

By:_____
          Manager

<u>EXHIBIT B</u>

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE. INTERESTS IN THIS NOTE MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR EXEMPTION THEREFROM.

<u>SUBORDINATED PROMISSORY NOTE</u>

As of _____, 2021                                                                    $_____


        FOR VALUE RECEIVED, PVP KREWSTOWN, LLC ("Borrower") HEREBY PROMISES TO PAY TO _____ (together with its successors and assigns, "Lender") at Lender's address at 675 West Indiantown Road, Jupiter, FL 33458, or at such other place as the holder hereof may from tins to time designate in writing, in immediately available federal funds, the principal amount set forth above (or so much thereof as nay be outstanding from time to time), together with accrued and unpaid interest thereon computed and compounded quarterly, before default, at the interest rate of 12.0% per annum.


        This Note shall mature and all amounts evidenced hereby shall be due and payable without demand or notice, if not sooner paid, on the second anniversary of the date of this Note. Notwithstanding the foregoing, any and all amounts evidenced hereby shall bear interest at the default interest rate of 18.0% per annum at any time following the maturity date.

        All payments received by Lender hereunder shall be applied first to any fees, reimbursements or other amounts owing to Lender (other than interest or principal), then to accrued interest and finally to the principal evidenced by this Note.
Borrower waives demand, presentment for payment, notice of dishonor, protest and notice of protest of this Note.

        Time is of the essence as to all dates set forth herein; <u>provided</u>, <u>however</u>, that whenever any payment to be made under this Note shall be stated to be due on a day that is not a business day, such payment may be made on the next succeeding business day, and such extension of time shall in such case be included in the computations of payment of interest.
No right under this Note may be waived or discharged, and no provision of this Note may be changed, supplemented or modified orally, but only by an agreement in writing signed by the party against whom enforcement of any such waiver, change, modification, supplementation, termination or discharge is sought.

        BORROWER, AND BY ITS ACCEPTANCE HEREOF, LENDER, EACH HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY

JURY, AND WAIVE ANY RIGHT To TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS NOTE, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.

This instrument and the rights and obligations of the parties hereunder shall in all respects be governed by, and construed and enforced in accordance with, the laws of the State of Texas (without giving effect to principles of conflicts of law).

NOTWITHSTANDING ANY CONTRARY PROVISION HEREIN OR IN ANY OTHER AGREEMENT OR INSTRUMENT TO WHICH LENDER IS A PARTY WITH BORROWER, ALL AMOUNTS EVIDENCED BY THIS NOTE ARE SUBORDINATED IN RIGHT OF PAYMENT TO ALL SENIOR UNSECURED AND ALL SECURED INDEBTEDNESS OF BORROWER AND NO AMOUNT MAY BE PAID BY BORROWER IN RESPECT OF THE INDEBTEDNESS EVIDENCED HEREBY UNLESS AND UNTIL ALL SUCH SENIOR AND SECURED NDEBTEDNESS OF THE BORROWER HAS BEEN PAID IN FULL.

IN WITNESS WHEREOF, Borrower has executed and delivered this Note on and as of the date first set forth above,

BORROWER:

PVP KREWSTOWN, LLC

By:_____
               Authorized Signatory

<u>EXHIBIT C</u>

<u>APPRAISAL ELECTION FORM</u>

Relating to Merger of

PVP KREWSTOWN, LLC

--into and with--

AUBSP OWNERCO 17, LLC

\*    \*    \*

Reference is made to that certain Agreement and Plan of Merger of PVP Krewstown, LLC and AUBSP Ownerco 17, LLC, dated as of September 30, 2021 (the "Merger Agreement"). Capitalized terms used in this form that are not defined herein have the meanings set forth in respect thereof in the Merger Agreement.

1.    <u>Documentation</u>.    Attached hereto or submitted herewith are copies of the documents required to be provided by the undersigned pursuant to the provisions of clause (ii) of subsection 7(b) of the Merger Agreement.  The undersigned represents and warrants that all such documents are genuine, true and correct and collectively reflect that the undersigned or its controlled affiliate is the lawful owner of the remainder interest (the "Interest") referred to in the Merger Agreement and has all lawful authority and power to execute this form and engage, or cause its controlled affiliate to engage, in the Appraisal Procedure.

2.    <u>Certain Agreements and Release</u>. The undersigned (i) agrees to comply in all material respects with the all the provisions of the Merger Agreement relating to or constituting part of the Appraisal Procedure and to cause all Remainderco Parties (as defined below) involved therein so to comply; (ii) agrees that the Appraisal Procedure is the exclusive means to determine the value of the Interest and that, except for Excluded Claims (as defined below), neither the undersigned nor any other Remainderco Party will commence any action or proceeding in any court in respect of the Interest, the Merger or the Restructuring; and (iii) on behalf of itself and all its affiliates and related parties of any kind (the "Remainderco Parties"), unconditionally waives any and all claims (collectively, "Claims") that it or any of them is entitled to any relief against AUBSP Ownerco 17, LLC or any of its affiliates or related parties of any kind (the "AUBSP Parties") in respect of any matter or thing relating in any way to the Interest, the Merger or the Restructuring, other than a claim (an "Excluded Claim") (A) to receive timely payment from AUBSP Ownerco 17, LLC of any amount or performance in respect of any Settlement or a Final Payment Amount; or (B) alleging in substance that the AUBSP Parties have failed to comply in all material respects with their obligations relating to or constituting part of the Appraisal Procedure.

Should there exist any Claim held by any Remainderco Party, other than an Excluded Claim, that is not released pursuant to the provisions of the immediately preceding sentence, such Claim is hereby assigned to AUBSP Ownerco 17, LLC, without recourse.

   3. <u>Election</u>. The undersigned hereby elects to invoke the Appraisal Procedure.

   IN WITNESS WHEREOF, the undersigned has duly executed this Form as of October ___, 2021.

             _____

        By: _____

           Name:

           Title:

## AGREEMENT AND PLAN OF MERGER (AUBSP-PHILA)

AGREEMENT AND PLAN OF MERGER (AUBSP-PHILA), dated as of November 15, 2022, made by and between PVP KREWSTOWN, LLC ("PVPK"), and PVP CASTOR, LLC ("PVPC"), each a Delaware limited liability company having an address at c/o Allerand Capital, LLC, 675 Indiantown Road; Suite 103, Jupiter, FL 33458; and AUBSP OWNERCO 10, LLC, AUBSP OWNERCO 11, LLC, AUBSP OWNERCO 12, LLC, AUBSP OWNERCO 13, LLC, and AUBSP OWNERCO 14, LLC, each a Texas limited liability company having an address at c/o Allerand Capital, LLC, 675 Indiantown Road; Suite 103, Jupiter, FL 33458.

### R E C I T A L S :

A.    Each of PVPC and PVPK was originally formed as a limited partnership under the provisions of Delaware law and pursuant to a certificate filed in the office of the Delaware Secretary of State on August 11, 1998. Each of PVPC and PVPK was converted to a limited liability company governed by the laws of Delaware relating to the formation and operation of limited liability companies (collectively, the "DE LLC Law") pursuant to a certificate of conversion filed in the office of the Delaware Secretary of State on November 7, 2002 (each, a "Certificate of Conversion").

B.    Pursuant to the Certificates of Conversion and the DE LLC Law, each of PVPK and PVPC adopted a certificate of formation (each, a "PVP Certificate") and filed the same in the office of the Delaware Secretary of State on November 7, 2002.

C.    Each party named in the preamble to this agreement other than PVPC and PVPK (each, an "AUBSP Party") was formed as a limited liability company under the provisions of Texas law relating to the formation and operation of limited liability companies (collectively, the "TX LLC Law") pursuant to a Certificate of Formation (each, an "AUBSP Certificate") filed in the office of the Texas Secretary of State in April or July, 2021.

D.    The business and affairs of each of PVPC and PVPK are governed by a written operating agreement, which operating agreement, as amended, remains in effect as of the date hereof (each, as amended to date, a "PVP OA").

E.    The business and affairs of each AUBSP Party are governed by a written operating agreement, which operating agreement, as amended, remains in effect as of the date hereof (each, as amended to date, an "AUBSP OA").

F.    Each Party to this agreement is a single asset, single purpose company that owns certain improved real property (each, a "Property") operated or formerly operated as a Rite Aid drugstore. Each Property was leased to Rite Aid Corporation or a subsidiary thereof (either, "RAD") pursuant to a certain lease agreement (the "RAD Lease"), dated as of on or about August 24, 1998.

G.    Each Property formerly was encumbered by a first mortgage loan facility (each, a "Mortgage") that was originally funded on or about August 24, 1998. Each Mortgage matured on September 1, 2020, and was satisfied in full not later than November 15, 2020.

H.    Each Mortgage was structured such that, throughout the term thereof, 100% of all RAD payments under the RAD Lease and any other income that might be generated by the

applicable Property, such as insurance proceeds or condemnation awards, must be paid directly to the holder of the applicable Mortgage. Each Mortgage also contained prohibitions (the "Bankruptcy Remoteness Covenants") against (i) the ownership by the borrower thereunder of any material assets other than the applicable Property; (ii) the borrower thereunder engaging in any business or activity other than the leasing of the applicable Property to RAD; (iii) the incurrence by the borrower thereunder of any second mortgage loan or other junior financing of any kind; and (iv) the borrower thereunder engaging in certain other investments or activities that could generate income for the borrower thereunder in addition to the rents payable under the RAD Lease.

I.      As a result of the satisfaction of the Mortgages and other circumstances, the Bankruptcy Remoteness Covenants no longer bind the parties named in the preamble to this agreement.

J.      All the parties to named in the preamble to this agreement are owned 100% by Allerand UBSP Holdingco, LLC ("AUBSPH"), a Delaware limited liability company. AUBSPH has determined that it is in the best interest of the parties named in the preamble to this agreement to enter into the merger transaction contemplated in this agreement (the "Merger"). The current Manager of each party named in the preamble to this agreement and of AUBSPH is Richard J. Sabella (together with each person or entity that shall from time to time hold such offices but only for so long as such office shall be so held, "Manager"), who, in such capacities only, has determined that it is in the best interest of the parties named in the preamble to this agreement to enter into the Merger.

## A G R E E M E N T :

NOW, THEREFORE, in consideration of the premises and mutual representations, warranties and covenants contained herein, the parties hereto agree as follows:

1.      The Merger.  On the Effective Date (as defined below), each AUBSP Party and PVPC shall be merged with and into PVPK upon the terms and subject to the conditions hereinafter set forth, all as permitted by and in accordance with the provisions of the Texas Business Organizations Code, the TX LLC Law and the DE LLC Law.  PVPK shall be the surviving entity upon consummation of the Merger (PVPK, following such consummation, the "Surviving Company").

2.      Conversion of Interests. (a) On the Effective Date, the 100% voting membership interest of each AUBSP Party and of PVPC shall be converted into new equity interests to be deemed issued by the Surviving Company to AUBSPH, as the sole member and 100% equity owner of each such party.

(b)     The manner and basis of the foregoing conversions are as follows: (A) AUBSPH is the sole beneficial owner of each of the parties named in the preamble to this agreement and of the respective Properties by virtue of its sole ownership of 100% of the equity interests in each such party; and (B) after giving effect to the Merger and the conversions referenced above, AUBSPH will remain the sole beneficial owner of the Properties by virtue of its 100% equity ownership of all the interests in the Surviving Company.

3.  Effective Date. The Merger shall be consummated and the transactions contemplated by this agreement shall take place on the day (the "Effective Date") that there shall have been filed with each of the Secretary of State of Texas and the Secretary of State of Delaware of a certificate of merger relating to the Merger and this agreement.

4.  Name of Surviving Entity. The name of the Surviving Company upon consummation of the Merger shall be "PVP Krewstown, LLC" until changed in accordance with applicable law.

5.  Effect of Merger. On the Effective Date, (i) the separate existence of PVPK, PVPC and each AUBSP Party shall cease; (ii) the AUBSP Articles of each AUBSP Party and the AUBSP OA of each AUBSP Party shall cease to be of any force or effect; (iii) the PVP Certificate of PVPC and the PVP OA of PVPC shall cease to be of any force or effect; (iv) the business and affairs of the Surviving Company shall be governed by the PVP OA of PVPK; and (v) the PVP Certificate of PVPK shall be the organizational document of the Surviving Company. The Surviving Company shall have all the rights, liabilities and obligations to third parties of PVPC and PVPK and each AUBSP Party and shall continue in existence as it had existed previously and as the successor by merger to PVPC and each AUBSP Party. From and after the Effective Date, the membership interest set forth in the PVPK OA shall constitute the entirety of the equity interest in the Surviving Company, AUBSPH shall continue as the sole member of the Surviving Company and the Manager shall continue as the Manager of the Surviving Company.

6.  Consent and Approval of Parties.  (a) By their signatures below, each of PVPK, PVPC and each AUBSP Party consents to and approves the Merger on behalf of itself. Such consent and approval shall in all events be construed as effective as if the same were set forth in a separate resolution of such party granting such consent that was executed and passed by all necessary controlling persons in respect of such party in accordance with all formalities applicable to such passage under law or any applicable agreement or instrument.

(b)  By their signatures below, each of the manager and AUBSPH consents to and approves the Merger on behalf of itself and on behalf of each party thereto. Such consent and approval shall in all events be construed as effective as if the same were set forth in a separate resolution of such party granting such consent that was executed and passed by all necessary controlling persons in respect of such party in accordance with all formalities applicable to such passage under law or any applicable agreement or instrument.

7.  Entire Agreement.  This agreement constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof and no party shall be liable or bound to the other in any manner by any warranties, representations, covenants or agreements except as specifically set forth herein or expressly required to be made or delivered pursuant hereto.

8.  Modifications, Binding Effect and Benefits. Any amendment, change or modification of this agreement shall be void unless in writing and signed by all parties hereto. This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, assigns, transferees and legal representatives.

9.    Headings; Counterparts. The headings in this agreement are for purposes of reference only and shall not limit or otherwise affect the meanings hereof. This agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10.    Governing Law. This agreement shall be governed by, and construed in accordance with, the laws and decisions of the State of Delaware without regard to conflicts of law rules applied in such State.

11.    Consent to Jurisdiction. All actions and proceedings arising out of, or relating to, this agreement shall be heard and determined in any state or federal court sitting in Delaware. The undersigned, by execution and delivery of this agreement, expressly and irrevocably (i) consent and submit to the personal jurisdiction of any of such courts in any such action or proceeding; (ii) consent to the service of any complaint, summons, notice or other process relating to any such action or proceeding by delivery thereof to such party by hand or by certified mail; and (iii) waive any claim or defense in any such action or proceeding based on any alleged lack of personal jurisdiction, improper venue, *forum non conveniens* or any similar basis. **EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT.**

12.    Notices.    All notices, demands, consents, approvals, requests or other communications that a party desires or may be required to give hereunder (collectively, "Notices") shall be in writing and shall be given by personal delivery or a nationally recognized overnight courier service, fees prepaid, addressed to the other party at the address or addresses set forth in the preamble to this agreement. Either party may designate another addressee (or change its address) for Notices hereunder by a sending the other party, at its then effective address hereunder, Notice given pursuant to this Section. A Notice sent in compliance with the provisions of this Section shall be deemed given on the date of receipt, except if delivery is refused, in which event such Notice shall be deemed given on the date delivery is first attempted.

13.    Waiver. Any breach of any term or provision of this agreement shall be waived only by means of a writing signed by the non-breaching party or parties which sets forth with particularity the breach being waived and the scope of the waiver. Any waiver of any term or condition of this agreement shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or provision, of this agreement. No waiver shall be implied from any conduct or action of the non-breaching party or parties.

14.    Binding Effect. This agreement shall be binding upon and shall inure to the benefit of the respective successors and assigns of the parties hereto.

IN WITNESS WHEREOF, each of the parties hereto has duly executed this agreement as of the date above first written.

PVP KREWSTOWN, LLC

By:
Richard J. Sabella, Manager

PVP CASTOR, LLC

By: _____
Richard J. Sabella, Manager

AUBSP OWNERCO 10, LLC

By: _____
Richard J. Sabella, Manager

AUBSP OWNERCO 11, LLC

By: _____
Richard J. Sabella, Manager

AUBSP OWNERCO 12, LLC

By: _____
Richard J. Sabella, Manager

AUBSP OWNERCO 13, LLC

By: _____
Richard J. Sabella, Manager

AUBSP OWNERCO 14, LLC

By: _____
Richard J. Sabella, Manager

Consented to:

ALLERAND UBSP HOLDINGCO, LLC

By: _____
Richard J. Sabella, Manager

_____
Richard J. Sabella as Manager only